IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALANA M. O'REILLY, Ph.D., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CIVIL ACTION NO. |
| | : |
| | : |
| | : |
| THE INSTITUTE FOR CANCER | : |
| RESEARCH, TEMPLE UNIVERSITY | : JURY TRIAL DEMANDED |
| HEALTH SYSTEM, TEMPLE | : |
| UNIVERSITY, and JONATHAN | : |
| CHERNOFF, MD, Ph.D., | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff, Alana M. O'Reilly, Ph.D. ("Plaintiff"), by and through her counsel, files this Complaint and asserts claims of gender discrimination, including sexual harassment, and retaliation against The Institute For Cancer Research d/b/a Fox Chase Cancer Center ("Fox Chase"), Temple University Health System ("TUHS"), Temple University ("Temple"), and Jonathan Chernoff, MD, Ph.D.

## INTRODUCTION

Fox Chase, TUHS, and Temple are recognized as institutions of excellence with respect to cancer research, medical care, and higher education, respectively. In their own policies, and in communications to thousands of their employees in Philadelphia, Fox Chase, TUHS, and Temple represent that they will comply with all applicable federal, state, and local laws prohibiting sexual harassment and retaliation in the workplace. However, when presented with hard evidence that Jonathan Chernoff, the Fox Chase Cancer Center Director, repeatedly subjected Alana

O'Reilly, a subordinate female scientist, to sexual harassment and retaliation, they failed to take responsibility for the civil rights violations, denied the conduct ever took place, and refused to do anything to prevent it from happening in the future.

Dr. O'Reilly is a scientist whose career has been devoted to the eradication of cancer and the education of future scientists. Dr. O'Reilly's attention should be focused on her research, her students, and her family. Instead, since the institutions which employ her knowingly and willfully failed to prevent and correct sexual harassment and retaliation in her workplace, Dr. O'Reilly has been forced file this lawsuit so that a jury of her peers can hold these Defendants accountable for their blatant violations of the law. In addition to holding Defendants accountable for their knowing violations of the law, Dr. O'Reilly has filed this Complaint to seek compensation for the harms Defendants have caused her, and to ensure that sexual harassment and retaliation does not happen to her or to any other women at Fox Chase, TUHS, or Temple in the future.

<u>JURISDICTION AND VENUE</u>

1.      This action for discrimination and retaliation is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, <u>et seq.</u>, as amended.

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction with respect to Plaintiff's claims for gender discrimination and retaliation under the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code § 9-1101, <u>et seq.</u>

4.      This case is not subject to compulsory arbitration because Plaintiff seeks injunctive relief and the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000), exclusive of interest and costs.

5.      Plaintiff has exhausted her administrative remedies with respect to her discrimination and retaliation claims pursuant to Title VII and PFPO since more than one (1) year has passed since she filed an administrative complaint on August 31, 2023. Such administrative complaint was filed with the Philadelphia Commission on Human Relations ("PCHR"), and dual filed with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto, incorporated herein, and marked as "Exhibit 1" is a true and correct copy of the PCHR administrative complaint.

6.      The PCHR issued its Dismissal and Notice of Rights on September 24, 2024. Attached hereto, incorporated herein, and marked as "Exhibit 2" is a true and correct copy of that Notice. As a result, Plaintiff has adequately exhausted her administrative remedies.

7.      Venue is properly invoked pursuant to 29 U.S.C. § 1391(b) because the actions complained of herein occurred within the jurisdictional limit of this Court.

<u>PARTIES</u>

8.      Plaintiff, Alana M. O'Reilly, Ph.D., is an adult female individual who resides in Pennsylvania.

9.      Fox Chase is a private non-profit cancer research and education institution located in Philadelphia, Pennsylvania.

10.     At all times relevant to this Complaint, Fox Chase is and was Dr. O'Reilly's employer within the meaning of Title VII and the PFPO.

11.     At all times relevant to this Complaint, Fox Chase has been a subsidiary of TUHS.

12.     At all times relevant to this Complaint, TUHS is and was Dr. O'Reilly's employer within the meaning of Title VII and the PFPO.

3

13.     At all times relevant to this Complaint, TUHS has been affiliated with Temple.

14.     At all times relevant to this Complaint, Temple is and was Dr. O'Reilly's employer within the meaning of Title VII and the PFPO.

15.     In the alternative, to the extent they are not Dr. O'Reilly's employers as defined by Title VII and/or the PFPO, TUHS and/or Temple have aided and abetted the other Defendants' discrimination and retaliation against Dr. O'Reilly in violation of the PFPO as set forth herein.

16.     Defendant, Jonathan Chernoff, MD, Ph.D., is an employee of Fox Chase, and currently serves as Fox Chase's Senior Vice President and Cancer Center Director.

17.     Upon information and belief, since his promotion to Cancer Center Director in 2021, Defendant Chernoff has reported to and has been supervised by representatives of TUHS and/or Temple.

18.     At all times relevant to this Complaint, Defendant Chernoff was and is a "person" who is legally prohibited from retaliating against Dr. O'Reilly pursuant to the PFPO.

19.     Defendants' discriminatory and retaliatory actions as described herein took place within Philadelphia, Pennsylvania.

20.     At all times relevant to this Complaint, Defendants Fox Chase, TUHS, and Temple acted by and through their authorized agents and/or employees within the course and scope of their employment.

FACTUAL ALLEGATIONS

Dr. O'Reilly's Educational and Employment History

21.    Dr. O'Reilly holds a B.A. in Chemistry from the University of Pennsylvania, and a Ph.D. in Cell and Developmental Biology from Harvard University. She completed her postdoctoral work at Harvard University and Stanford University.

22.    In 2007, Dr. O'Reilly joined Fox Chase as an Assistant Professor.

23.    Dr. O'Reilly's research has been primarily focused on understanding how diet impacts the genes and signals that cause cancer and related illnesses.

24.    Since 2012, Dr. O'Reilly has also served as a Director for the Immersion Science Program ("ISP") at Fox Chase, which is dedicated to identifying and training future scientists who share a commitment to prevail over cancer. The ISP runs programs for high school students to conduct research at Fox Chase alongside professional scientists and educators, as well as programs for middle and high school teachers who are interested in creating an ISP Teaching Lab in their own classrooms.

25.    In 2014, in recognition of the quality of her research, her recognition in the field, and her contributions to the Intellectual life at Fox Chase, Fox Chase promoted Dr. O'Reilly to Associate Professor, Laboratory Investigator, with tenure.

26.    In late July 2023, Dr. O'Reilly and Dara Ruiz-Whalen, her partner in the ISP, received the Viktor Hamburger Outstanding Educator Prize awarded by the Society for Developmental Biology.

Defendant Chernoff Subjected Dr. O'Reilly to Sexual Harassment Starting in 2014

27.    In May 2014, Dr. O'Reilly reported a scary and threatening sexual harassment incident involving a housekeeping employee. In the wake of that experience, Defendant

Chernoff, who was Dr. O'Reilly's direct supervisor at the time, took advantage of the situation and began subjecting her to sexual harassment as well.

28.    In the summer and into the autumn of 2014, Defendant Chernoff's sexual harassment of Dr. O'Reilly included sending her numerous personal messages about his feelings for her and other women, including sending her a poem that he decided not to send to a former mistress, but was sending to her instead; writing to her because the thunder and lightning made him reflective; telling her of behavior towards him from a pretty young woman what he perceived to be flirtatious; and referencing that he was seeking donations from all his former girlfriends.

29.    By mid-October 2014, Dr. O'Reilly had made it clear in writing to Defendant Chernoff that his communications to her were inappropriate and were interfering with her work environment.

30.    Thereafter, Defendant Chernoff's messages continued and became more demanding, including telling Dr. O'Reilly that he was upset that she was not responding to his messages; that her refusal to respond to him reminded him of being rejected by his former mistress; and that he thought she was special, something he realized after she had been assaulted earlier in the year.

31.    Defendant Chernoff also demanded that Dr. O'Reilly meet with him in person. When she refused, Defendant Chernoff insisted that he would stop by her lab because he wanted to better understand her work, and that her refusals to communicate with him were making his job "difficult."

32.    During that time, Dr. O'Reilly told Defendant Chernoff multiple times, including in writing, that his behavior was unwelcome and had to stop because it was interfering with her ability to work.

33.    When Defendant Chernoff's personal messages continued even after she notified him of their impact on her work environment, Dr. O'Reilly reported his conduct to another supervisor, Anne Skalka.

34.    As a result of the complaint, and as approved by Dr. Skalka, Dr. O'Reilly notified Defendant Chernoff that she would only communicate with him about work-related issues, and he was not to contact her outside of work.

35.    Despite Dr. O'Reilly's notice to Defendant Chernoff that she would not communicate with him other than with respect to work-related matters, Defendant Chernoff continued to send her messages to her non-work email about personal matters, including on Christmas morning.

36.    Defendant Chernoff's conduct towards Dr. O'Reilly in 2014 constituted illegal sexual harassment.

<u>Fox Chase, TUHS, and Temple Refused to Correct Chernoff's Misconduct</u>

37.    To address Defendant Chernoff's threatening conduct, Dr. O'Reilly contacted the Title IX officer at Temple in late 2014 to report her concerns. Dr. O'Reilly was redirected to speak to Fay Trachtenberg, Esquire, who worked in Temple's Office of University Counsel.

38.    After Dr. O'Reilly provided details of Defendant Chernoff's behaviors, Ms. Trachtenberg advised her that Defendant Chernoff's conduct constituted "quid pro quo" sexual harassment, and that he would be "fired by 8am" the next day.

39.    However, Defendants Fox Chase, TUHS and/or Temple did not terminate Defendant Chernoff for his unlawful sexual harassment of Dr. O'Reilly.

40.    Thereafter, Dr. O'Reilly hired an attorney, who facilitated a meeting with Ms. Trachtenberg and Robert Beck, a Fox Chase Deputy Director, on January 7, 2015.

41.    At the meeting, Ms. Trachtenberg advised Dr. O'Reilly that Temple would not terminate Defendant Chernoff for his illegal misconduct towards her because he was instrumental in writing the institution's "core grant," a partnership with the National Cancer Institute that was funded by the National Institutes of Health ("NIH"). Instead, according to Ms. Trachtenberg, Temple would reassign Dr. O'Reilly to report to Dr. Beck, and hope that Defendant Chernoff would realize his error and correct his behavior.

42.    During the meeting on January 7, 2015, Ms. Trachtenberg also taunted Dr. O'Reilly, letting her know that if she tried to pursue her legal right to work in an environment free from discriminatory harassment, Temple had "deep pockets," and it could withstand any legal challenge.

43.    However, Ms. Trachtenberg later confirmed in writing that Temple and its affiliated entities had taken the following steps in response to Dr. O'Reilly's sexual harassment complaint against Dr. Chernoff: (1) reassigned Dr. O'Reilly to Dr. Beck as her new supervisor so that she would no longer report to Defendant Chernoff; (2) committed that Dr. Chernoff would no longer have any control or influence over any decisions having to do with Dr. O'Reilly's job at Fox Chase; and (3) counseled Dr. Chernoff to "avoid all communications, both professional and personal," with Dr. O'Reilly.

44.     Despite these commitments to protect Dr. O'Reilly from Defendant Chernoff's continued harassment and retaliation for her complaints about him, Defendant Chernoff continued to have a detrimental impact on her career.

45.     By way of example only, later the same year, Defendant Chernoff warned Dr. O'Reilly that he would not be able to provide support for her postdoctoral student unless she communicated with him directly about her.

46.     At the time, Dr. O'Reilly elected not to pursue formal legal action against Defendants for many reasons, including the cost of such litigation, the concern that public accusations would further harm her career, and her fear that such a step could expose her young children to the risk of harm.

47.     In November 2021, Fox Chase, TUHS and/or Temple promoted Defendant Chernoff to Cancer Center Director, the highest research position within Fox Chase. By that time, Dr. Beck had already retired and stepped back from his duties at Fox Chase.

48.     At the time of Defendant Chernoff's promotion to Cancer Center Director, the leadership of Fox Chase, TUHS, and/or Temple knew that Defendant Chernoff had subjected Dr. O'Reilly to sexual harassment and that they had committed that Defendant Chernoff would have no influence over her job at Fox Chase. Nevertheless, these institutional leaders placed Defendant Chernoff back in Dr. O'Reilly's chain of command and did nothing to prevent Defendant Chernoff from discriminating or retaliating against her in this new role.

49.     The leaders at Fox Chase, TUHS, and/or Temple who decided to promote Defendant Chernoff without taking any steps to protect Dr. O'Reilly from further sexual harassment or retaliation did so with the knowledge that they were violating Dr. O'Reilly's legal right to work in an environment free from sexual harassment and retaliation.

50.     Upon information and belief, in the years that followed Dr. O'Reilly's initial complaint about him, Defendant Chernoff made or influenced numerous decisions about the trajectory of Dr. O'Reilly's career at Fox Chase that were motivated by discrimination and/or retaliation, including but not limited to decisions about her compensation and funding opportunities.

51.     Upon information and belief, Defendant Chernoff did not engage in overt sexual harassment of Dr. O'Reilly for many years because a fellow professor and colleague at Fox Chase, Jeffrey Peterson, was willing to stand up to Defendant Chernoff about his behavior.

Defendant Chernoff's Discriminatory Harassment of Dr. O'Reilly in 2023

52.     Tragically, in early January 2023, Dr. Peterson died at age 53 from cancer.

53.     Within weeks of Dr. Peterson's passing, Defendant Chernoff made the decision to again subject Dr. O'Reilly to quid pro quo sexual harassment knowing it violated the law, his employer's policies, and the explicit instructions he had been given in 2015.

54.     As the head of the Cancer Center, Defendant Chernoff decided to test the waters to see if he could get away with sexually harassing Dr. O'Reilly again now that he was in charge and Dr. Peterson was no longer present to object to his conduct.

55.     On January 18, 2023, Dr. O'Reilly made her annual presentation about her research at a faculty seminar during which she paid tribute to Dr. Peterson.

56.     Defendant Chernoff decided to attend Dr. O'Reilly's annual presentation for the first time since he had been instructed not to communicate with her in 2015.

57.     In attending Dr. O'Reilly's presentation to faculty, Defendant Chernoff knowingly and willfully disregarded his employers' prior instructions to "avoid all communications, both professional and personal," with Dr. O'Reilly.

10

58.    Soon thereafter, Dr. O'Reilly learned from other colleagues that Dr. Chernoff had been taking pictures of her with his phone camera during her presentation. In fact, Defendant Chernoff was observed zooming in on and scrolling through the photos he had taken of Dr. O'Reilly while sitting in the audience.

59.    The colleagues who reported Defendant Chernoff's behavior during the presentation to Dr. O'Reilly considered his conduct to be shocking and unsettling.

60.    On Monday, January 23, 2023, Defendant Chernoff sent an email to Dr. O'Reilly in which he referenced being in the audience during her presentation the week prior, praised her work, and asked that she work directly with him on a grant application even though he had more than sufficient support from other staff members to complete the application.

61.    As with his attendance at her presentation, Defendant Chernoff's decision to email Dr. O'Reilly and ask that she work with him was a knowing and willful abuse of his power as Cancer Center Director, a violation of both the law and his employer's policies, and a blatant breach of his employers' prior instructions not to communicate with Dr. O'Reilly.

Dr. O'Reilly's Internal Complaint About Chernoff's Discriminatory Harassment in 2023

62.    On January 25, 2023, Dr. O'Reilly met in person with her direct supervisors, David Wiest, Ph.D., Scientific Director of the Research Institute, and Erica Golemis, Ph.D, Deputy Chief Science Officer, to report Defendant Chernoff's behavior.

63.    The meeting with her supervisors in Dr. Wiest's office included the following communications, among others, after Dr. O'Reilly informed them of Defendant Chernoff's recent conduct:

    a.    Dr. Golemis initially disputed that Defendant Chernoff was in the audience on January 18, 2023, because she thought he was participating via Zoom.

11

    b.   Dr. Wiest confirmed that Defendant Chernoff was sitting a few seats away from him during Dr. O'Reilly's presentation.

    c.   Dr. Wiest was not aware of any restrictions on Defendant Chernoff's contact with Dr. O'Reilly.

    d.   Dr. Golemis acknowledged that she knew that Defendant Chernoff was restricted from having contact with Dr. O'Reilly, although that was not something they had ever discussed.

    e.   When Dr. Wiest asked to be filled in on the history of the situation, Dr. O'Reilly explained the circumstances from 2014-2015 (as described above), after which Dr. Wiest asked: "Why is [Defendant Chernoff] still here?"

    f.   Dr. O'Reilly described the position taken by the Temple Office of University Counsel at the time, and confirmed that she did not think it would be useful to contact the legal department this time, despite Dr. Golemis' suggestion that they do so.

    g.   Dr. O'Reilly confirmed that she just wanted to be treated like her male faculty colleagues and to have access to funding, which was difficult without adequate institutional support.

    h.   At the conclusion of the meeting, Dr. Wiest assured Dr. O'Reilly that she had "his word" that Defendant Chernoff would not bother her again.

64.     During the meeting on January 25, 2023, Dr. O'Reilly questioned how Dr. Wiest could protect her since he also reported to Dr. Chernoff. In that context, Dr. Wiest compared the situation to one in which his children want to take a friend out to do something, and they are independent enough to make the plan and decide what to do, but they have to come to him for the money to pay for it. Dr. Wiest said that was how it was at Fox Chase, and referring to Defendant Chernoff said: "He's your daddy."

65.     Dr. O'Reilly's report to Dr. Wiest and Dr. Golemis on January 25, 2023, constituted protected conduct for purposes of her retaliation claim pursuant to Title VII and the PFPO.

66.    Pursuant to the Fox Chase and TUHS Policy against Workplace Harassment, Dr. Wiest and Dr. Golemis were obligated to notify Human Resources of Dr. O'Reilly's harassment complaint.

<u>Defendants' Continued Discrimination and Retaliation Against O'Reilly</u>

67.    On March 20, 2023, Dr. Wiest forwarded an email to all faculty identifying federal funding opportunities.

68.    Dr. O'Reilly wrote back to Dr. Wiest immediately to confirm that the Research with Activities Related to Diversity ("ReWARD") grant opportunity with the NIH might be ideal for her, and that it would require an institutional Letter of Support. Dr. O'Reilly asked Dr. Wiest to confirm that it was feasible for her to obtain the Letter of Support required for the grant before she applied.

69.    As is true for all Associate Professors with tenure at Fox Chase, Dr. O'Reilly must secure funding, primarily from outside sources, to support fifty percent (50%) of her salary and benefits, and the expenses of her laboratory to retain her employment.

70.    At the time of her inquiry about the ReWARD grant opportunity, Dr. O'Reilly's then current grant (an R21 from the NIH) was scheduled to be in place until April 23, 2024.

71.    A few days later, on March 23, 2023, Dr. Wiest confirmed in an email back to Dr. O'Reilly that the ReWARD grant would be a "great opportunity" for her, but that he was unable to convince the "institution" to provide support "as they felt there were other initiatives that were of a higher priority." Dr. Wiest also said he was "sorry."

72.    Without an institutional Letter of Support for her application for the ReWARD grant, Dr. O'Reilly was unable to meet the initial deadline on June 5, 2023.

73.    Dr. Wiest's assertion that there were other initiatives at Fox Chase that were of a higher priority than the ReWARD grant opportunity and that such assessment motivated the decision to deny her request for the Letter of Support were false.

74.    Dr. Wiest later confirmed to Dr. O'Reilly that Defendant Chernoff made or participated in the decision to deny her request for the institutional Letter of Support.

75.    Defendants denied Dr. O'Reilly's request for a Letter of Support for her ReWARD grant application because she refused Defendant Chernoff's requests that she work with and/or interact with him.

76.    Defendants denied Dr. O'Reilly's request for a Letter of Support for her ReWARD grant application in retaliation for the complaint she made to her supervisors about Defendant Chernoff's sexual harassment of her on January 25, 2023.

77.    Defendants' denial of Dr. O'Reilly's request for a Letter of Support on March 23, 2023, was a knowing and willful violation of Dr. O'Reilly's right to be free from sexual harassment and retaliation, a violation of Defendants' own policies, and a blatant breach of her employers' prior commitment that Defendant Chernoff would not have any influence on her job at Fox Chase.

78.    Defendants' decision to deny Dr. O'Reilly's request for a routine Letter of Support for a grant application, which was confirmed in writing on March 23, 2023, illegally jeopardized her external grant funding, her continued employment, her career, and her livelihood.

79.    In early August 2023, when Fox Chase included a notice in its daily news communication to all staff that Dr. O'Reilly and Ms. Ruiz-Whalen, her partner in the ISP, had been awarded the Viktor Hamburger Outstanding Educator Prize by the Society for

Developmental Biology, Dr. Wiest sent Dr. O'Reilly a congratulatory message to her about the award.

80.     In email responses on August 2 and 11, 2023, Dr. O'Reilly reconfirmed to Dr. Wiest that she intended to apply for the ReWARD grant by the next submission deadline, which was October 5, 2023, and asked that he confirm that an institutional Letter of Support for the grant would be forthcoming.

81.     The same day, Dr. Wiest acknowledged Dr. O'Reilly's intent, his awareness of the requirements for the Letter of Support, and his plans to consult with a colleague about it, but did <u>not</u> confirm that the requested letter would be provided.

Defendants' Knowing and Willful Violations of Dr. O'Reilly's Civil Rights, Their Own Policies, and Prior Commitments Forced Dr. O'Reilly to Initiate Legal Proceedings

82.     In light of Defendant Chernoff's illegal conduct towards her, and the other Defendants' knowing and willful decisions to facilitate and enable such illegal conduct, Dr. O'Reilly understood that she had no choice but to pursue formal legal action to protect her career and livelihood, to hold Defendants accountable for their illegal actions, and to protect other women at Fox Chase, TUHS, and Temple from similar treatment.

83.     On August 31, 2023, Dr. O'Reilly filed an administrative complaint with the Philadelphia Commission on Human Relations against Defendants alleging, among other things, that Defendant Chernoff's conduct towards her, and Defendants' denial of the institutional Letter of Support for the ReWARD grant, constituted illegal sexual harassment and retaliation.

84.     Fox Chase, TUHS, and Temple became aware of Dr. O'Reilly's administrative complaint within a few days of its filing.

85.    On September 14, 2023, <u>after</u> receiving notice of Dr. O'Reilly's administrative complaint of discrimination and retaliation, Fox Chase notified Dr. O'Reilly that it would provide a Letter of Support for the ReWARD grant application.

86.    Dr. O'Reilly submitted her application for the ReWARD grant by the October 5, 2023, deadline, and it is still pending.

87.    The fact that Defendants provided an institutional Letter of Support for Dr. O'Reilly's ReWARD grant application in October 2023, <u>after</u> Dr. O'Reilly was forced to file formal legal proceedings against them, demonstrates that their prior rationale for denying the request (that is, there were other funding priorities) was just the product of quid pro quo sexual harassment, and a pretext for retaliation.

<u>The Impact of Defendants' Discriminatory and Retaliatory Conduct</u>

88.    The sex-based harassment to which Defendant Chernoff subjected Dr. O'Reilly as described herein was unwelcome.

89.    Dr. O'Reilly believed her work environment was hostile and abusive as a result of Defendant Chernoff's sex-based harassment of her, and the harassment unreasonably interfered with her ability to perform her job duties.

90.    The sex-based harassment to which Dr. O'Reilly was subjected was severe and/or pervasive such that a reasonable person in her position would find her work environment to be hostile and abusive.

91.    Defendants conditioned Dr. O'Reilly's receipt of institutional support for her application for the ReWARD grant on having a personal or professional relationship with Defendant Chernoff.

92.     Defendants' denial of Dr. O'Reilly's request to provide an institutional Letter of Support for the ReWARD grant application to the NIH in March 2023 constituted a tangible employment action, which was motivated by Dr. O'Reilly's rejection of Defendant Chernoff's sexually harassing conduct towards her.

93.     Upon information and belief, Defendant Chernoff is the alter ego of Fox Chase.

94.     Fox Chase, TUHS, and Temple failed to take reasonable steps to prevent or promptly correct the sex-based harassment to which Dr. O'Reilly was subjected.

95.     Defendants' denial of Dr. O'Reilly's request to provide an institutional Letter of Support for the ReWARD grant application to the NIH in March 2023 constitutes a materially adverse action that would discourage a reasonable worker from complaining about sex-based harassment.

96.     As a result of the sex-based harassment (both quid pro quo and hostile environment) and retaliation to which Defendants subjected her, Dr. O'Reilly has suffered, and will continue to suffer, significant emotional distress, mental anguish, and harm to her professional and academic reputation.

97.     As a result of Defendants' discriminatory and retaliatory conduct, Dr. O'Reilly has suffered, and will continue to suffer, harm to her employment at Fox Chase, including her tenure status and compensation, her research funding, her ability to collaborate with her colleagues, her career, and her livelihood.

Defendants' Intentional, Malicious, and Continuing Violation of Dr. O'Reilly's Civil Rights

98.     Defendants' discriminatory and retaliatory actions as described herein were willful and taken with malice and/or reckless disregard for Dr. O'Reilly's civil rights and warrant the imposition of punitive damages.

99. Even after Dr. O'Reilly filed her administrative complaint of discrimination and retaliation with the PCHR, Fox Chase, TUHS, and Temple refused to take her allegations seriously, and have taken no steps to correct the past violations of her civil rights or protect her from continued harassment and retaliation.

100. In their administrative answers to Dr. O'Reilly's complaint filed with the PCHR, Defendants swore under oath that neither Defendant Chernoff's attendance at Dr. O'Reilly's presentation on January 18, 2023, nor his email to her on January 23, 2023, asking that she work with him, were inconsistent with the prior instructions to him to "avoid all communications, both professional and personal," with her.

101. In their administrative answers to Dr. O'Reilly's complaint filed with the PCHR, Defendants swore under oath that Defendant Chernoff never took pictures of Dr. O'Reilly during her presentation on January 18, 2023, suggesting that perhaps he had been looking at his phone at that time.

102. Upon information and belief, despite the receipt of two sworn Declarations from witnesses who observed Defendant Chernoff taking pictures of Dr. O'Reilly during her presentation and zooming in on the pictures, Fox Chase, TUHS, and Temple have not conducted any investigation into the situation and/or disciplined Defendant Chernoff for lying about his behavior.

103. Despite their awareness of Defendant Chernoff's illegal conduct towards Dr. O'Reilly in January 2023, Fox Chase, TUHS, and/or Temple permitted, facilitated, and enabled Defendant Chernoff's illegal decision to deny Dr. O'Reilly's request for a Letter of Support less than two months later in March 2023.

104.    Rather than accept responsibility for their illegal conduct, Defendants want to pretend that the sexual harassment and retaliation never happened since they provided a Letter of Support for Dr. O'Reilly's grant in October 2023, after she was forced to initiate formal legal proceedings. In fact, in their sworn answers to Dr. O'Reilly's administrative complaint, Defendants asserted that they "did not deny Dr. O'Reilly a letter of support for the ReWARD grant."

105.    Upon information and belief, Fox Chase, TUHS, and/or Temple have refused to enforce the law and their own policies with respect to Defendant Chernoff's violation of Dr. O'Reilly's civil rights because, among other reasons, to do so would trigger an obligation to notify the NIH that one of their scientific investigators has been disciplined for discrimination and retaliation.

106.    Defendants' knowing and willful refusal to take responsibility for their prior illegal actions, their knowing and willful refusal to address or correct such prior illegal conduct, and their knowing and willful refusal to take steps to prevent illegal discrimination and retaliation in the future ensures that such conduct will be repeated, not only with respect to Dr. O'Reilly, but with respect to other women employed by Fox Chase, TUHS, and Temple.

107.    In fact, despite their awareness of Defendant Chernoff's illegal conduct towards Dr. O'Reilly as set forth herein, Fox Chase, TUHS, and Temple refuse to facilitate Dr. O'Reilly's full participation as an Associate Professor, including but not limited to, opportunities to collaborate with her colleagues at scientific meetings and faculty retreats, and continue to allow Defendant Chernoff to be the ultimate decision maker with respect to all the terms and conditions of her employment.

108.    Defendants' continued refusal to take corrective action in response to Defendant Chernoff's illegal conduct towards Dr. O'Reilly and/or to facilitate her full participation as an Associate Professor constitute materially adverse actions that would discourage a reasonable worker from complaining about sex-based harassment and/or retaliation.

109.    Upon information and belief, to the extent TUHS and/or Temple are not Dr. O'Reilly's "employers" for purposes of Title VII and/or the PFPO, TUHS and/or Temple aided and abetted the other Defendants' sexual harassment and retaliation and/or are directly responsible for the other Defendants' retaliation of her through its and/or their actions, including but not limited to:

a.    Making, participating in and/or influencing decisions about: what, if any, actions would be taken to prevent Defendant Chernoff from subjecting Dr. O'Reilly to sexual harassment and/or retaliation following her initial complaints, particularly in connection with his promotion to Cancer Center Director in 2021; whether and how to investigate Dr. O'Reilly's complaints against Defendant Chernoff in 2023; whether, and to what extent, Defendant Chernoff would be disciplined for his conduct; and what, if any, remedial actions would be taken to correct the harassment and prevent further harassment or retaliation; and/or

b.    Providing legal advice about the decisions identified above, since, for example, and upon information and belief, the General Counsel for Fox Chase reports to the Chief Counsel Officer for TUHS, who reports to and/or is considered part of the Temple's Office of University Counsel.

<u>COUNT I</u>

Sex-Based Discrimination in violation of
<u>Title VII of the Civil Rights Act of 1964 Against Fox Chase</u>

110.    Plaintiff hereby incorporates by reference paragraphs 1 through 109 as though fully set forth herein.

111.    Fox Chase violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiff to sexual harassment.

<u>COUNT II</u>

Sex-Based Discrimination in violation of
<u>Title VII of the Civil Rights Act of 1964 Against TUHS</u>

112.     Plaintiff hereby incorporates by reference paragraphs 1 through 111 as though fully set forth herein.

113.    TUHS violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiff to sexual harassment.

<u>COUNT III</u>

Sex-Based Discrimination in violation of
<u>Title VII of the Civil Rights Act of 1964 Against Temple</u>

114.     Plaintiff hereby incorporates by reference paragraphs 1 through 113 as though fully set forth herein.

115.    Temple violated Title VII of the Civil Rights Act of 1964, as amended, by subjecting Plaintiff to sexual harassment.

<u>COUNT IV</u>

Sex-Based Discrimination in violation of the
<u>Philadelphia Fair Practices Ordinance Against Fox Chase</u>

116.    Plaintiff hereby incorporates by reference paragraphs 1 through 115 as though

fully set forth herein.

117.    Fox Chase violated the Philadelphia Fair Practices Ordinance by subjecting

Plaintiff to sexual harassment.

<u>COUNT V</u>

Sex-Based Discrimination in violation of the
<u>Philadelphia Fair Practices Ordinance Against TUHS</u>

118.    Plaintiff hereby incorporates by reference paragraphs 1 through 117 as though

fully set forth herein.

119.    TUHS violated the Philadelphia Fair Practices Ordinance by subjecting Plaintiff

to sexual harassment.

120.    In the alternative, TUHS violated the Philadelphia Fair Practices Ordinance by

aiding and abetting the other Defendants' sexual harassment of Plaintiff.

<u>COUNT VI</u>

Sex-Based Discrimination in violation of the
<u>Philadelphia Fair Practices Ordinance Against Temple</u>

121.    Plaintiff hereby incorporates by reference paragraphs 1 through 120 as though

fully set forth herein.

122.    Temple violated the Philadelphia Fair Practices Ordinance by subjecting Plaintiff

to sexual harassment.

123.    In the alternative, Temple violated the Philadelphia Fair Practices Ordinance by

aiding and abetting the other Defendants' sexual harassment of Plaintiff.

COUNT VII

Sex-Based Discrimination in violation of the
Philadelphia Fair Practices Ordinance Against Chernoff

124.    Plaintiff hereby incorporates by reference paragraphs 1 through 123 as though
fully set forth herein.

125.    Chernoff violated the Philadelphia Fair Practices Ordinance by aiding and
abetting the other Defendants' sexual harassment of Plaintiff.

COUNT VIII

Retaliation in violation of
Title VII of the Civil Rights Act of 1964 Against Fox Chase

126.    Plaintiff hereby incorporates by reference paragraphs 1 through 125 as though
fully set forth herein.

127.    Fox Chase violated and continues to violate Title VII of the Civil Rights Act of
1964, as amended, by subjecting Plaintiff to retaliation and/or retaliatory harassment for making
good faith complaints about Defendant Chernoff's sexual harassment of her, including with
respect to Plaintiff's career trajectory, her compensation, decisions about her access to funding
opportunities, and other terms and conditions of her employment.

COUNT IX

Retaliation in violation of
Title VII of the Civil Rights Act of 1964 Against TUHS

128.     Plaintiff hereby incorporates by reference paragraphs 1 through 127 as though
fully set forth herein.

129.    TUHS violated and continues to violate Title VII of the Civil Rights Act of 1964,
as amended, by subjecting Plaintiff to retaliation and/or retaliatory harassment for making good
faith complaints about Defendant Chernoff's sexual harassment of her, including with respect to

Plaintiff's career trajectory, her compensation, decisions about her access to funding

opportunities, and other terms and conditions of her employment.

COUNT X

Retaliation in violation of
Title VII of the Civil Rights Act of 1964 Against Temple

130.    Plaintiff hereby incorporates by reference paragraphs 1 through 129 as though

fully set forth herein.

131.    Temple violated and continues to violate Title VII of the Civil Rights Act of

1964, as amended, by subjecting Plaintiff to retaliation and/or retaliatory harassment for making

good faith complaints about Defendant Chernoff's sexual harassment of her, including with

respect to Plaintiff's career trajectory, her compensation, decisions about her access to funding

opportunities, and other terms and conditions of her employment.

COUNT XI

Retaliation in violation of
Philadelphia Fair Practices Ordinance Against Fox Chase

132.    Plaintiff hereby incorporates by reference paragraphs 1 through 131 as though

fully set forth herein.

133.    Fox Chase violated and continues to violate the Philadelphia Fair Practices

Ordinance by subjecting Plaintiff to retaliation and/or retaliatory harassment for making good

faith complaints about Defendant Chernoff's sexual harassment of her, including with respect to

Plaintiff's career trajectory, her compensation, decisions about her access to funding

opportunities, and other terms and conditions of her employment.

COUNT XII

Retaliation in violation of
Philadelphia Fair Practices Ordinance Against TUHS

134.    Plaintiff hereby incorporates by reference paragraphs 1 through 133 as though fully set forth herein.

135.    TUHS violated and continues to violate the Philadelphia Fair Practices Ordinance by subjecting Plaintiff to retaliation and/or retaliatory harassment for making good faith complaints about Defendant Chernoff's sexual harassment of her, including with respect to Plaintiff's career trajectory, her compensation, decisions about her access to funding opportunities, and other terms and conditions of her employment.

COUNT XIII

Retaliation in violation of
Philadelphia Fair Practices Ordinance Against Temple

136.    Plaintiff hereby incorporates by reference paragraphs 1 through 135 as though fully set forth herein.

137.    Temple violated and continues to violate the Philadelphia Fair Practices Ordinance by subjecting Plaintiff to retaliation and/or retaliatory harassment for making good faith complaints about Defendant Chernoff's sexual harassment of her, including with respect to Plaintiff's career trajectory, her compensation, decisions about her access to funding opportunities, and/or other terms and conditions of her employment.

COUNT XIV

Retaliation in violation of
Philadelphia Fair Practices Ordinance Against Chernoff

138.    Plaintiff hereby incorporates by reference paragraphs 1 through 137 as though fully set forth herein.

139.    Chernoff violated and continues to violate the Philadelphia Fair Practices Ordinance by subjecting Plaintiff to retaliation and/or retaliatory harassment for making good faith complaints about his sexual harassment of her, including with respect to Plaintiff's career trajectory, her compensation, decisions about her access to funding opportunities, and other terms and conditions of her employment.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Alana M. O'Reilly, Ph.D., respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.    Declare the acts and practices complained of herein to be a violation of the Title VII of the Civil Rights Act of 1964;

B.    Declare the acts and practices complained of herein to be a violation of the Philadelphia Fair Practices Ordinance;

C.    Enter an order requiring Defendants to cease and desist their discriminatory and retaliatory actions;

D.    Award to Plaintiff compensatory damages for all past and future non-economic harms she has suffered and will continue to suffer as a result of Defendants' discrimination and retaliation, including, but not limited to, emotional distress, mental anguish, and harm to her professional and academic reputation;

E.    Award to Plaintiff compensatory damages for all past and future economic harms she has suffered and will continue to suffer as a result of Defendants' discrimination and retaliation;

F.    Award to Plaintiff punitive damages for Defendants' willful and/or reckless disregard for her legal rights;

26

G.    Award to Plaintiff all costs, disbursements, and reasonable attorneys' fees relating to the enforcement of her rights;

H.    Award to Plaintiff pre-and post-judgment interest as well as the sum necessary to make up for any adverse tax consequences incurred by her as result of any judgment entered in this matter; and

I.    Grant to Plaintiff such additional relief as the Court deems just and proper under the circumstances.


<u>JURY TRIAL DEMANDED</u>

Plaintiff hereby requests a jury trial on each of the Counts in this Complaint.



UEBLER LAW LLC


Julie A. Uebler, Esquire (ID No. 71297)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
(484) 875-3186 (Voice)
(484) 875-9273 (Fax)
uebler@ueblerlaw.com

Attorney for Plaintiff
Alana M. O'Reilly, Ph.D.

EXHIBIT 1

CITY OF PHILADELPHIA COMMISSION ON HUMAN RELATIONS

ALANA M. O'REILLY, Ph.D., :
                                                    :
                              Complainant, :        PCHR Charge No.:
                                                    :        EEOC Charge No.:
                                                    :
v.                                                  :
                                                    :
THE INSTITUTE FOR CANCER       :
RESEARCH, TEMPLE UNIVERSITY    :
HEALTH SYSTEM, TEMPLE          :
UNIVERSITY, AND JONATHAN       :
CHERNOFF, MD, Ph.D.,           :
                                                    :
                              Respondents. :
                                                    :

## COMPLAINT

### INTRODUCTION

In 2014, the year in which she was promoted to Associate Professor with tenure at Fox Chase Cancer Center ("FCCC"), Alana M. O'Reilly suffered discriminatory harassment and retaliation at the hands of her supervisor, Jonathan Chernoff. At the time, Dr. Chernoff made implicit threats to Dr. O'Reilly that if she did not satisfy his requests to have continued contact with her, she would suffer adverse employment actions. In response, Dr. Chernoff's employers made a calculated decision to prioritize Dr. Chernoff's status ahead of Dr. O'Reilly's civil rights because Dr. Chernoff was "too important" to the institution's grant funding. Rather than take appropriate steps to remedy the illegal conduct and prevent it from happening in the future, FCCC and its affiliates apparently advised Dr. Chernoff to stay away from Dr. O'Reilly and hoped he would keep his conduct under control.

In January 2023, despite the prior admonitions from his employers to stay away from Dr. O'Reilly, Dr. Chernoff again subjected Dr. O'Reilly to discriminatory harassment. Dr. Chernoff

also asked her to personally assist him on a significant grant application. As a result of Dr. O'Reilly's failure to respond to Dr. Chernoff's overtures, and her complaints about his conduct, Dr. O'Reilly was – and continues to be - denied institutional support for an important grant application for which she is eminently qualified. Dr. O'Reilly brings this Complaint against FCCC, its affiliates, and Dr. Chernoff to hold them accountable for their discriminatory harassment and retaliation, and to prevent the continued violation of her civil rights.

PARTIES AND JURISDICTION

1.    Complainant, Alana M. O'Reilly, Ph.D., is an adult female individual who resides in Pennsylvania.

2.    At all times relevant to this Complaint, Dr. O'Reilly is and was an "employee" of The Institute For Cancer Research d/b/a Fox Chase Cancer Center ("FCCC") and FCCC is and was her "employer" pursuant to the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100, et seq. ("PFPO").

3.    At all times relevant to this Complaint, FCCC has been affiliated with and is under the control of the Temple University Health System ("TUHS") and Temple University (collectively "Temple").

4.    Respondents FCCC and Temple employ well over 500 individuals in Philadelphia.

5.    Respondent Temple University, through its Office of University Counsel, provides legal advice to FCCC and TUHS about employment-related matters.

6.    Respondent, Jonathan Chernoff, MD, Ph.D., is an employee of FCCC and/or Temple, and FCCC and/or Temple are Dr. Chernoff's employers for purposes of the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1100, et seq. ("PFPO").

2

7.      At all times relevant to this Complaint, Dr. Chernoff was and is Dr. O'Reilly's supervisor.

8.      At all times relevant to this Complaint, Dr. Chernoff was and is a "person" who is legally prohibited from retaliating against Dr. O'Reilly pursuant to the PFPO.

9.      Respondents' discriminatory and retaliatory actions as described herein took place within the City of Philadelphia.

10.     At all times relevant to this Complaint, Respondents FCCC and Temple acted by and through their authorized agents and/or employees within the course and scope of their employment.

11.     The discriminatory and retaliatory conduct challenged in this Complaint occurred less than 300 days ago and is on-going.

<u>STATEMENT OF FACTS</u>

<u>Dr. O'Reilly's Educational and Employment History</u>

12.     Dr. O'Reilly holds a B.A. in Chemistry from the University of Pennsylvania, and a Ph.D. in Cell and Developmental Biology from Harvard University. She completed her postdoctoral work at Harvard University and Stanford University.

13.     In 2007, Dr. O'Reilly joined FCCC as an Assistant Professor, and she was promoted to Associate Professor with tenure in 2014.

14.      Since 2012, Dr. O'Reilly has served as a Director for the Immersion Science Program ("ISP") at FCCC, which is dedicated to identifying and training future scientists who share a commitment to prevail over cancer. The ISP runs programs for students to conduct research at FCCC alongside professional scientists and educators, as well as programs for middle

3

and high school teachers who are interested in creating an ISP Teaching Lab in their own classrooms.

15.     In late July 2023, Dr. O'Reilly and Dara Ruiz-Whalen, her partner in the ISP, received the Viktor Hamburger Outstanding Educator Prize awarded by the Society for Developmental Biology.

Chernoff's Discriminatory Harassment Of O'Reilly In 2014

16.     In the summer and into the autumn of 2014, Dr. Chernoff subjected Dr. O'Reilly to sexual harassment, including but not limited to sending her numerous messages about personal matters such as his romantic and sexual relationships and his personal feelings about her.

17.     During that time, Dr. O'Reilly told Dr. Chernoff multiple times that his behavior was unwelcome and had to stop.

18.     In October 2014, Dr. O'Reilly expressly notified Dr. Chernoff in writing that his communications to her were not only unwelcome and had to stop, but that they were interfering with her ability to work.

19.      When Dr. Chernoff's personal messages continued even after she notified him of the impact they were having on her work environment, Dr. O'Reilly reported his conduct to a supervisor, Anne Skalka.

20.     As a result of the complaint and as approved by her supervisor, Dr. O'Reilly notified Dr. Chernoff that she would only communicate with him about work-related issues and he was not to contact her outside of work.

21.     Despite Dr. O'Reilly's notice to Dr. Chernoff that she would not communicate with him other than with respect to work-related matters, Dr. Chernoff continued to send her messages to her non-work email about personal matters.

22.     As a result of Dr. O'Reilly's refusal to communicate with him and her complaints to and about him, Dr. Chernoff insisted on meeting with her in person purportedly to discuss the status of her research lab. Dr. Chernoff claimed that Dr. O'Reilly's refusal to respond to his demands was making his job difficult.

23.     Dr. Chernoff also threatened to withhold his support for Dr. O'Reilly's work, and the work of one of her post-doctoral students, if she did not comply with his demands to have contact with her.

24.     Dr. Chernoff's communications to Dr. O'Reilly in 2014 constituted illegal threats that her failure to have an interpersonal relationship with him would result in adverse employment actions against her and/or her students.

FCCC/Temple's Failure To Correct Chernoff's Misconduct

25.     Following Dr. Chernoff's threatening communications, Dr. O'Reilly contacted the Title IX officer at Temple to report her concerns about Dr. Chernoff in late 2014. Dr. O'Reilly was redirected to speak to Fay Trachtenberg, Esquire, who worked in Temple's Office of University Counsel.

26.     After Dr. O'Reilly provided details of Dr. Chernoff's harassment of her, Ms. Trachtenberg advised her that Dr. Chernoff's conduct constituted "quid pro quo" harassment and that he would be "fired by 8am" the next day.

27.     However, Respondents FCCC and Temple did not terminate Dr. Chernoff for his unlawful harassment of Dr. O'Reilly.

28.     Thereafter, Dr. O'Reilly hired an attorney, who facilitated a meeting with Ms. Trachtenberg and Robert Beck, an FCCC Deputy Director, on January 7, 2015.

29.     At the meeting, Ms. Trachtenberg advised Dr. O'Reilly that Temple would not terminate Dr. Chernoff for his illegal misconduct towards her because he was instrumental in writing the institution's "core grant," a partnership with the National Cancer Institute. Instead, FCCC and Temple would assign Dr. O'Reilly to report to Dr. Beck, and hope that Dr. Chernoff would realize his error and correct his behavior.

30.     During the meeting on January 7, 2015, Ms. Trachtenberg also taunted Dr. O'Reilly, letting her know that if she tried to pursue her legal rights to work in an environment free from discriminatory harassment, Temple had "deep pockets" and it could withstand any legal challenge.

31.     In subsequent communications, Ms. Trachtenberg confirmed that Dr. O'Reilly would no longer report to Dr. Chernoff, who would have "no say" in her grant proposals and "no influence" over any funding projects involving Dr. O'Reilly. In addition, according to Ms. Trachtenberg, Dr. Chernoff had been counseled to "avoid all communications, both professional and personal," with Dr. O'Reilly.

32.     Despite these commitments to protect Dr. O'Reilly from Dr. Chernoff's continued harassment and retaliation for her complaints about him, Dr. Chernoff continued to have a detrimental impact on her career.

33.     For example, later the same year, Dr. Chernoff again warned Dr. O'Reilly that he would not be able to provide support for her postdoctoral student unless she communicated with him directly about her.

34.     In or around 2017, Erica Golemis, Ph.D., Deputy Chief Science Officer, took over responsibility to prepare Dr. O'Reilly's performance reviews. At that time, no one from FCCC or Temple communicated to Dr. O'Reilly about whether Dr. Golemis was advised of Dr. Chernoff's

6

prior conduct and/or whether she should still consider Dr. Beck a "supervisor" for purposes of avoiding Dr. Chernoff's influence.

35.     In July 2021, Dr. Beck retired and stepped back from his duties at FCCC. At that time, no one from FCCC or Temple communicated to her about the steps, if any, they were taking to prevent Dr. Chernoff's discrimination or retaliation against her.

36.     Despite knowledge of Dr. Chernoff's discriminatory and retaliatory conduct, FCCC and Temple promoted Dr. Chernoff to Cancer Center Director, the highest research position within FCCC, in November 2021.

37.     At the time FCCC and Temple promoted Dr. Chernoff, no one communicated to Dr. O'Reilly about the steps, if any, they would take to prevent Dr. Chernoff from discriminating or retaliating against her in this new role.

38.     Upon information and belief, in the years that followed Dr. O'Reilly's complaint about him, Dr. Chernoff made or influenced numerous decisions about the trajectory of Dr. O'Reilly's employment that were motivated by discrimination and retaliation.

39.     Upon information and belief, Dr. Chernoff did not engage in overt harassment of Dr. O'Reilly for many years because a fellow professor and colleague at FCCC, Jeffrey Peterson, was willing to stand up to Dr. Chernoff about his behavior.

40.     From 2014 through the present, no one from FCCC or Temple has checked in with Dr. O'Reilly to confirm that Dr. Chernoff was no longer subjecting her to discriminatory harassment or retaliation.

Chernoff's Discriminatory Harassment of O'Reilly in 2023

41.     In early January 2023, Dr. Peterson died at age 53 from cancer.

42.     On January 18, 2023, Dr. O'Reilly made her annual presentation about her work at a faculty seminar during which she paid tribute to Dr. Peterson.

43.     From 2015 through 2022, Dr. Chernoff did not attend Dr. O'Reilly's annual presentation of her work. However, Dr. Chernoff was in the audience on January 18, 2023.

44.     In attending Dr. O'Reilly's presentation to faculty, Dr. Chernoff knowingly disregarded his employers' prior instructions not to have contact with her.

45.     After the presentation, Dr. O'Reilly learned from other colleagues that Dr. Chernoff had been in the audience during her presentation and had been taking pictures of her with his phone camera. In fact, Dr. Chernoff was observed zooming in on and scrolling through the photos he had taken of Dr. O'Reilly while sitting in the audience.

46.     On Monday, January 23, 2023, Dr. Chernoff sent an email to Dr. O'Reilly on her FCCC email in which he referenced being in the audience on January 18, 2023, and hearing her speak about Dr. Peterson.

47.     In his email on January 23, 2023, Dr. Chernoff referenced the fact that it had been eight years since they had spoken, and asked for the opportunity to work together again. Dr. Chernoff also specifically asked Dr. O'Reilly to serve as a reviewer and editor for the "core grant" that he would be submitting on behalf of FCCC.

48.     The specific areas of the grant that Dr. Chernoff wanted Dr. O'Reilly to work on for him were "education, outreach, and diversity," which were a central focus of her work. Dr. Chernoff also acknowledged in the email that the education sections of the core grant application "have become more prominent with each cycle, and [her] work in this area has been exemplary."

8

49.    As with his attendance at the meeting to observe Dr. O'Reilly's presentation, Dr. Chernoff knowingly disregarded his employers' prior instructions by writing to Dr. O'Reilly and asking that they resume a working relationship.

O'Reilly's Internal Complaint About Chernoff's Discriminatory Harassment in 2023

50.    On January 25, 2023, Dr. O'Reilly met in person with Dr. Golemis and David Wiest, Ph.D., Scientific Director of the Research Institute, to notify them of her concerns about Dr. Chernoff's behavior.

51.    The meeting with her supervisors in Dr. Wiest's office included the following communications, among others, after Dr. O'Reilly informed them of Dr. Chernoff's recent conduct:

    a.    Dr. Golemis initially disputed that Dr. Chernoff was in the audience on January 18, 2023, because she thought he was participating via Zoom.

    b.    Dr. Wiest confirmed that Dr. Chernoff was sitting a few seats away from him during Dr. O'Reilly's presentation.

    c.    Dr. Wiest was not aware of any restrictions on Dr. Chernoff's contact with Dr. O'Reilly.

    d.    Dr. Golemis acknowledged that she knew that Dr. Chernoff was restricted from having contact with Dr. O'Reilly, although that was not something they had ever discussed.

    e.    When Dr. Wiest asked to be filled in on the history of the situation, Dr. O'Reilly explained the circumstances from 2014-2015 (as described above), after which Dr. Wiest asked: "Why is [Dr. Chernoff] still here?"

    f.    Dr. O'Reilly described the position taken by the Temple Office of University Counsel at the time, and confirmed that she did not think it would be useful to contact the legal department this time, despite Dr. Golemis' suggestion that they do so.

    g.    Dr. O'Reilly confirmed that she just wanted to be treated like her male faculty colleagues and to have access to funding, which was difficult without adequate institutional support.

9

        h.      At the conclusion of the meeting, Dr. Wiest assured Dr. O'Reilly that she had "his word" that Dr. Chernoff would not bother her again.

52.     Dr. O'Reilly's report to Dr. Golemis and Dr. Wiest on January 25, 2023, constituted protected conduct.

<u>Respondents' On-Going Discrimination and Retaliation Against O'Reilly</u>

53.     On March 20, 2023, Dr. Wiest forwarded an email to all faculty identifying federal funding opportunities.

54.     Dr. O'Reilly wrote back to Dr. Wiest immediately to confirm that the Research with Activities Related to Diversity ("ReWARD") grant opportunity with the National Institutes of Health ("NIH") might be ideal for her and that it would require a letter of institutional support. Dr. O'Reilly asked Dr. Wiest to confirm that it was feasible for her to obtain the letter of support required for the grant before she applied.

55.     A few days later, on March 23, 2023, Dr. Wiest confirmed in an email back to Dr. O'Reilly that the ReWARD grant would be a "great opportunity" for her, but that he was unable to convince the "institution" to provide support "as they felt there were other initiatives that were of a higher priority." Dr. Wiest also said he was "sorry."

56.     Dr. Wiest did not explain who made the decision not to provide a letter of support for her anticipated application for the ReWARD grant and/or how her work, which was focused on all the areas that Dr. Chernoff had just recently identified as highly important to the core grant application, were not a high priority for FCCC.

57.     Upon information and belief, Respondents' decision not to provide a letter of support to Dr. O'Reilly for her application for the ReWARD grant was made in retaliation for the complaint she made to her supervisors about Dr. Chernoff on January 25, 2023.

58.    Upon information and belief, Dr. Chernoff refused to provide the letter of support to Dr. O'Reilly because she did not respond to his email seeking to work with her again.

59.    Without a letter of support from FCCC and Temple, Dr. O'Reilly was unable to meet the deadline for the ReWARD grant on June 5, 2023.

60.    However, Dr. O'Reilly has communicated to Dr. Wiest that she plans to submit an application for the ReWARD grant by the next deadline on October 5, 2023, and has questioned how there could be any higher priorities for the institution since diversity, community engagement, and education outreach are among the institution's highest priorities in 2023.

61.    On August 1, 2023, FCCC included notice in its daily news communication to all staff that Dr. O'Reilly and Ms. Ruiz-Whalen, her partner in the ISP, had been awarded the Viktor Hamburger Outstanding Educator Prize by the Society for Developmental Biology.

62.    Following Dr. Wiest's congratulatory message to her about the award, Dr. O'Reilly reconfirmed in an email dated August 11, 2023, that she intended to apply for the ReWARD grant by the October 5, 2023 deadline, and that she was hoping to get confirmation from him that the institutional letter of support would be forthcoming.

63.    As of the date of this filing, Dr. O'Reilly has not received an institutional letter of support for the ReWARD grant.

64.    Upon information and belief, Respondents' failure to provide the letter of support is motivated by retaliation against her for complaining about Dr. Chernoff's conduct towards her.

65.    Upon information and belief, Dr. Chernoff blocked any institutional letter of support for Dr. O'Reilly because she has refused to engage in any personal or professional relationship with him.

<u>The Impact of Respondents' Discriminatory and Retaliatory Conduct</u>

66.     The sex-based harassment to which Dr. Chernoff subjected Dr. O'Reilly as described herein was unwelcome.

67.     Dr. O'Reilly believed her work environment was hostile and abusive as a result of Dr. Chernoff's sex-based harassment of her, and the harassment unreasonably interfered with her ability to perform her job duties.

68.      The sex-based harassment to which Dr. O'Reilly was subjected was severe and/or pervasive such that a reasonable person in her position would find her work environment to be hostile and abusive.

69.     Respondents conditioned Dr. O'Reilly's receipt of institutional support for her application for the ReWARD grant on having a personal or professional relationship with Dr. Chernoff.

70.     FCCC and Temple failed to take reasonable steps to prevent or remedy the sex-based discrimination to which Dr. O'Reilly was subjected.

71.     Respondents' refusal in March 2023 and continuing through the present to provide an institutional letter of support for Dr. O'Reilly's application for the ReWARD grant to the NIH constitutes a materially adverse action that would discourage a reasonable worker from complaining about sex-based harassment.

72.     As a result of the sex-based harassment (both hostile work environment and quid pro quo) and retaliation to which Respondents subjected her, Dr. O'Reilly has suffered, and will continue to suffer, significant emotional distress, mental anguish, and harm to her professional and academic reputation.

73.     As a result of Respondents' discriminatory and retaliatory conduct, Dr. O'Reilly

has suffered, and will continue to suffer, a loss of financial support for her research programs.

74.     Respondents' discriminatory and retaliatory actions as described herein were

willful and taken with malice and/or reckless disregard for Dr. O'Reilly's civil rights and warrant

the imposition of punitive damages.

## STATEMENT OF CLAIMS

### Count I
### Sex-Based Discrimination Against Respondents FCCC and Temple

75.     Complainant incorporates the foregoing paragraphs as if set fully herein.

76.     The actions of Respondents FCCC and Temple as set forth herein subjected

Complainant to a sex-based harassment in violation of the Philadelphia Fair Practices Ordinance.

### Count II
### Sex-Based Discrimination Against Respondent Chernoff

77.     Complainant incorporates the foregoing paragraphs as if set fully herein.

78.     Respondent Chernoff aided and abetted the discriminatory harassment of

Complainant by Respondents FCCC and Temple in violation of the Philadelphia Fair Practices

Ordinance.

### Count III
### Retaliation Against Respondents FCCC and Temple

79.     Complainant incorporates the foregoing paragraphs as if set fully herein.

80.     The actions of Respondents FCCC and Temple as set forth herein, including their

refusal to provide an institutional letter of support for Complainant's grant application, constitute

retaliation in violation of the Philadelphia Fair Practices Ordinance.

Count IV
Retaliation Against Respondent Chernoff

81.    Complainant incorporates the foregoing paragraphs as if set fully herein.

82.    Respondent Chernoff's actions as set forth herein, including his refusal to provide
an institutional letter of support for Complainant's grant application, constitute retaliation in
violation of the Philadelphia Fair Practices Ordinance.

PRAYER FOR RELIEF

WHEREFORE, Complainant, Alana M. O'Reilly, Ph.D., respectfully requests that the
Philadelphia Commission on Human Relations:

A.    Declare the acts by Respondents complained of herein to be a violation of the
Philadelphia Fair Practices Ordinance;

B.    Enter an order requiring Respondents to cease and desist their discriminatory and
retaliatory actions;

C.    Award to Complainant compensatory damages for past and future non-economic
losses she has suffered and will continue to suffer as a result of Respondents' discrimination and
retaliation, including but not limited to emotional distress, mental anguish, and harm to her
professional and academic reputation;

D.    Award to Complainant punitive damages for Respondents' willful and/or reckless
disregard for Complainant's legal rights;

E.    Award Complainant all costs, disbursements and reasonable attorneys' fees
relating to the enforcement of her rights; and

F.    Grant to Complainant such other additional relief as the Commission deems just

and proper.


UEBLER LAW LLC

By:    */s/Julie A. Uebler*
Julie A. Uebler, Esquire
Attorney ID No. 71297
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
(484) 875-3186
uebler@ueblerlaw.com

*Attorney for Complainant*
*Alana M. O'Reilly*

<u>VERIFICATION</u>

I declare under penalty of perjury that all of the information that I have provided in this Complaint is true, correct and complete to the best of my knowledge. I acknowledge that false statements on this form are punishable pursuant to 18 Pa.C.S. § 4904 (unsworn falsification to authorities).

Aug 31, 2023
_____
Date

_____
Alana O'Reilly (Aug 31, 2023 09:16 MDT)

Alana M. O'Reilly

16

# EXHIBIT 2



# PHILADELPHIA COMMISSION ON HUMAN RELATIONS

## DISMISSAL AND NOTICE OF RIGHTS

To:

Julie A. Uebler, Esq.
Uebler Law, LLC
101 Lindenwood Drive, Suite 225
Malvern, PA 19355

From:
Philadelphia Commission on Human Relations
601 Walnut Street, Suite 300 South
Philadelphia, PA 19106
215-686-4670 (p) 215-686-4684 (f)

PCHR Complaint No.: 2023-09-01-15721

EEOC Complaint No.:  17G-2023-00043

Date of Commission Decision: 9/20/2024

Re: Alana M. O'Reilly Ph.D. v. The Institute for Cancer Research d.b.a. Fox Chase Cancer Center, Temple University Health System, Temple University and Johnathan Chernoff MD, Ph.D.

The Philadelphia Commission on Human Relations is closing its file on this complaint for the following reasons

☐ **Charge Not Substantiated** – The PCHR is unable to conclude that the information obtained through our investigation establishes a violation of the Philadelphia Fair Practices Ordinance.  This does not certify that *the Respondent is* in compliance with the Philadelphia Fair Practices Ordinance.  No finding is made as to any other issues that might be construed as having been raised by this complaint.

☐ **Failure to Cooperate** – After 30 days in which to respond, the Complainant failed to provide information, failed to appear or to be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve the complaint.

☐ **Failure to Locate** – Though reasonable efforts were made to locate the Complainant, we were not able to do so.

☐ **Complaint Withdrawn** – The PCHR has complied with the Complainant's request for withdrawal of the complaint referenced above.

☐ **Lack of Jurisdiction** – The facts alleged in the complaint fail to state a claim over which the PCHR has enforcement authority because the Complainant waited too long after the date(s) of the alleged discrimination to file the complaint, the discrimination alleged occurred outside Philadelphia or for some other reason(s).

☐ **Satisfactorily Adjusted** – The parties entered a settlement agreement that provides relief for the harm(s) alleged.

☐ **Waiver to EEOC** – The Complainant has requested that the case be waived to the Equal Employment Opportunity commission for further processing.

☒ **Right to Sue Requested** – Notice received that a right to sue was requested from the EEOC in this dual-filed matter. Complainant has the right to pursue this claim in the appropriate state or federal court.

☐ **Conciliation** – After a finding of probable cause, the parties entered a conciliation agreement that provides full relief for the violations established by our investigation.  The complaint will be closed accordingly, but the Conciliation Agreement will remain on file and subject to review by the Commission during the period it is in effect.

☐ **Other** – Administrative Action.

No further action is required at this time.

On behalf of the Commission

_Pamela Gauthrey_

Name

9-24-24

Date