**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **ALANA M. O'REILLY, Ph.D.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 24-5315-KSM** |
| **THE INSTITUTE FOR CANCER RESEARCH, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                                                        **May 29, 2025**

Plaintiff Alana M. O'Reilly, Ph.D. ("Dr. O'Reilly") brings this employment discrimination action against Defendants The Research Institute of Fox Chase Cancer Center (incorrectly named "The Institute For Cancer Research d/b/a Fox Chase Cancer Center") ("Fox Chase"), Temple University Health System, Temple University ("Temple"), and Jonathan Chernoff, MD, Ph.D. ("Dr. Chernoff"). (Doc. No. 1.) Dr. O'Reilly claims that Defendants discriminated against her on the basis of sex by subjecting her to both hostile work environment and quid pro quo sexual harassment at the hands of Dr. Chernoff and retaliated against her for reporting Dr. Chernoff's conduct, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Philadelphia Fair Practices Ordinance ("PFPO"). (*Id.*)

Defendants have filed a partial motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing for the dismissal of all of Dr. O'Reilly's sex discrimination claims as well as her retaliation claim against Dr. Chernoff. (Doc. No. 11; *see* Doc. No. 17.) Dr. O'Reilly opposes the motion. (Doc. No. 15.)

For the reasons below, the Court grants in part and denies in part Defendants' motion.[1]

## I.    Factual Background

Accepting the allegations in the Complaint as true, the relevant facts are as follows.[2]

### A.    Dr. O'Reilly's Employment at Fox Chase

Dr. O'Reilly has worked at Fox Chase since 2007.  (Doc. No. 1 ¶ 22.)  She began as an Assistant Professor, and in 2014, she was promoted to her current position of Associate Professor, Laboratory Investigator, with tenure.  (*Id.* ¶¶ 22, 25.)  Since 2012, Dr. O'Reilly has also served as a Director for the Immersion Science Program ("ISP") at Fox Chase, which runs research programs for high school students and programs for middle and high school teachers who are interested in creating ISP teaching labs in their classrooms.  (*Id.* ¶ 24.)

### B.    Dr. O'Reilly's Interactions with Dr. Chernoff in 2014–2015

During the summer and fall of 2014, Dr. Chernoff, who was Dr. O'Reilly's direct supervisor at the time, sent Dr. O'Reilly "numerous personal messages about his feelings for her and other women."  (*Id.* ¶ 28.)  These messages included:  "sending her a poem that he decided not to send to a former mistress, but was sending to her instead; writing to her because the thunder and lightning made him reflective; telling her of behavior towards him from a pretty young woman [t]hat he perceived to be flirtatious; and referencing that he was seeking donations from all of his former girlfriends."  (*Id.*)

---

[1] The Court resolves this motion on the papers.  *See* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."); L. Civ. R. 7.1(f) ("Any interested party may request oral argument on a motion.  The court may dispose of a motion without oral argument.").

[2] "The District Court, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [i]s required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."  *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

Dr. O'Reilly told Dr. Chernoff that his communications to her were inappropriate and interfering with her work environment. (*Id.* ¶ 29.) But Dr. Chernoff continued to send Dr. O'Reilly personal messages and became "more demanding." (*Id.* ¶ 30.) He told Dr. O'Reilly that "he was upset that she was not responding to his messages; that her refusal to respond to him reminded him of being rejected by his former mistress; and that he thought she was special, something he realized after she had been assaulted earlier in the year."[3] (*Id.*) He also demanded that Dr. O'Reilly meet with him in person, and when she refused, he insisted he would come to her laboratory because "he wanted to better understand her work, and . . . her refusals to communicate with him were making his job 'difficult.'" (*Id.* ¶ 31.) Dr. O'Reilly continued to communicate to Dr. Chernoff, including in writing, that his behavior was unwelcome and must stop because it was interfering with her ability to work. (*Id.* ¶ 32.)

The continuation of Dr. Chernoff's conduct prompted Dr. O'Reilly to report him to another supervisor, Dr. Anne Skalka. (*Id.* ¶ 33.) As a result of this complaint, Dr. Skalka told Dr. O'Reilly to notify Dr. Chernoff that she would only communicate with him about work-related issues and that he was not to contact her outside of work, which Dr. O'Reilly did. (*Id.* ¶ 34.) But Dr. Chernoff ignored this directive and continued to send personal messages to Dr. O'Reilly, including on Christmas morning. (*Id.* ¶ 35.)

In late 2014, Dr. O'Reilly contacted Temple's Title IX officer to report Dr. Chernoff's conduct. (*Id.* ¶ 37.) Temple's Title IX officer told Dr. O'Reilly to take her complaints directly to Fay Trachtenberg, Esquire, in Temple's Office of University Counsel. (*Id.*) After Dr. O'Reilly detailed Dr. Chernoff's continued unwanted contact, Ms. Trachtenberg informed her that this conduct "constituted 'quid pro quo' sexual harassment, and that Dr. Chernoff would be

---

[3] Dr. Chernoff knew that Dr. O'Reilly had reported a sexual harassment incident involving a housekeeping employee in May 2014. (*Id.* ¶ 27.)

'fired by 8am' the next day." (*Id.* ¶ 38.) But Dr. Chernoff was not terminated. (*Id.* ¶ 39.) Instead, Dr. O'Reilly was forced to hire an attorney, who then facilitated a meeting with Dr. O'Reilly, Ms. Trachtenberg, and Robert Beck, a Fox Chase Deputy Director, on January 7, 2015. (*Id.* ¶¶ 39–40.) During that meeting, Ms. Trachtenberg advised that Temple would not terminate Dr. Chernoff, but Temple would agree to reassign Dr. O'Reilly so that she no longer reported to Dr. Chernoff and instead reported to Dr. Beck. (*Id.* ¶ 41.) Ms. Trachtenberg also threatened that "if [Dr. O'Reilly] tried to pursue her legal right to work in an environment free from discriminatory harassment, Temple had 'deep pockets,' and it could withstand any legal challenge." (*Id.* ¶ 42.)

Following this January 2015 meeting, Ms. Trachtenberg confirmed in writing that Temple and its affiliated entities had taken the following steps in response to Dr. O'Reilly's complaint against Dr. Chernoff: "(1) reassigned Dr. O'Reilly to Dr. Beck as her new supervisor so that she would no longer report to [Dr.] Chernoff; (2) committed that Dr. Chernoff would no longer have any control or influence over any decisions having to do with Dr. O'Reilly's job at Fox Chase; and (3) counseled Dr. Chernoff to 'avoid all communications, both professional and personal,' with Dr. O'Reilly." (*Id.* ¶ 43.)

### C.    Dr. O'Reilly's Interactions with Dr. Chernoff in 2015–2021

Dr. O'Reilly concedes that "for many years" after this, Dr. Chernoff "did not engage in overt sexual harassment of Dr. O'Reilly." (*Id.* ¶ 51.) She believes this was "because a fellow professor and colleague at Fox Chase, Dr. Jeffrey Peterson, was willing to stand up to [Dr.] Chernoff about his behavior." (*Id.*) Nevertheless, Dr. O'Reilly claims that Dr. Chernoff "continued to have a detrimental impact on her career" during this time. (*Id.* ¶ 44.) For example, in late 2015, Dr. Chernoff warned Dr. O'Reilly that "he would not be able to provide support for her postdoctoral student unless she communicated with him directly about [the student]." (*Id.* ¶

4

45.)  And Dr. Chernoff "made or influenced numerous decisions about the trajectory of Dr. O'Reilly's career at Fox Chase that were motivated by discrimination and/or retaliation, including but not limited to decisions about her compensation and funding opportunities."  (*Id.* ¶ 50.)

Dr. Chernoff was subsequently promoted to Director of Fox Chase in November 2021, at which point Dr. Chernoff was "placed . . . back in Dr. O'Reilly's chain of command."  (*Id.* ¶ 47.) At that point, her former supervisor, Dr. Beck, had retired from Fox Chase.  (*Id.*)

### D.    Dr. O'Reilly's Interactions with Dr. Chernoff in 2023

Tragically, in early January 2023, Dr. Peterson passed away.  (*Id.* ¶ 52.)  Shortly after his death, Dr. O'Reilly paid tribute to him during her annual research presentation at a faculty seminar on January 18.  (*Id.* ¶ 55.)  Dr. Chernoff attended the seminar and was observed using his cell phone to take pictures of Dr. O'Reilly during her presentation.[4]  (*Id.* ¶¶ 56, 58.) Although Dr. Chernoff did not have any communication with Dr. O'Reilly at the seminar, he sent her an email five days later, explaining that he had been in the audience during her presentation.  (*Id.* ¶ 60; Doc. No. 11-5.)  Dr. Chernoff went on to praise her work and request her help with a grant application.  (*Id.*)

After receiving this email, Dr. O'Reilly arranged a meeting on January 25 with her direct supervisors, Dr. David Wiest, Scientific Director of Fox Chase, and Dr. Erica Golemis, Deputy Chief Science Officer of Fox Chase, to report Dr. Chernoff's recent conduct.[5]  (Doc. No. 1 ¶¶ 62,

---

[4] Not only was Dr. Chernoff observed taking pictures of Dr. O'Reilly, but Dr. O'Reilly's colleagues reported that he was scrolling through and zooming in on the photographs as he sat in the audience.  (*Id.* ¶ 58.)  After the presentation, these colleagues told Dr. O'Reilly about Dr. Chernoff's conduct and stated that they found his behavior "shocking and unsettling."  (*Id.* ¶ 59.)

[5] Although Dr. Golemis "knew" that Dr. Chernoff was restricted from having contact with Dr. O'Reilly, Dr. Wiest was not aware of any such restrictions.  (*Id.* ¶ 63.)  So, at the meeting, Dr. O'Reilly explained to them what happened in 2014 and 2015, including the position taken by Temple's Office of

63.)  At the conclusion of this meeting, and despite referring to Dr. Chernoff as Dr. O'Reilly's "daddy" who controlled which Fox Chase faculty members received funding, Dr. Wiest gave Dr. O'Reilly "'his word' that [Dr.] Chernoff would not bother her again."  (*Id.* ¶¶ 63–64.)

### E.     *Dr. O'Reilly's Grant Application Process in 2023*

As a tenured Associate Professor at Fox Chase, Dr. O'Reilly must secure funding to support fifty percent of her salary, benefits, and laboratory expenses to retain her employment. (*Id.* ¶ 69.)  On March 20, 2023, Dr. Wiest emailed Dr. O'Reilly about certain federal funding opportunities.  (*Id.* ¶ 67.)  Dr. O'Reilly immediately responded and requested a requisite institutional letter of support for her application for the National Institutes of Health ("NIH") Research with Activities Related to Diversity ("ReWARD") grant.  (*Id.* ¶¶ 67–68.)  A few days later, on March 23, Dr. Wiest replied that while the ReWARD grant "would be a 'great opportunity' for her . . . he was unable to convince the 'institution' to provide support 'as they felt there were other initiatives that were of a higher priority.'"  (*Id.* ¶ 71.)  Dr. Wiest later confirmed to Dr. O'Reilly that Dr. Chernoff "made or participated in the decision" to deny her request for an institutional letter of support.  (*Id.* ¶ 74.)  Dr. O'Reilly alleges that she was denied a letter of support "because she refused [Dr.] Chernoff's requests that she work with and/or interact with him."  (*Id.* ¶ 75.)

When Dr. O'Reilly submitted this request, her then-current grant was scheduled to end on April 23, 2024.  (*Id.* ¶ 70.)  Without the institutional letter of support, Dr. O'Reilly could not apply for the ReWARD grant by the initial application deadline of June 5, 2023.  (*Id.* ¶ 72.)  Dr. O'Reilly claims that the refusal to provide her the institutional letter of support in March 2023 "jeopardized her external grant funding, her continued employment, her career, and her

---

University Counsel at the time.  (*Id.*)  In response, Dr. Wiest questioned why Dr. Chernoff was still employed at Fox Chase.  (*Id.*)

livelihood." (*Id.* ¶ 78.)

On August 2 and 11, 2023, Dr. O'Reilly emailed Dr. Wiest and again informed him that she wanted to apply for the ReWARD grant by the next application deadline, which was October 5, 2023, and requested an institutional letter of support. (*Id.* ¶ 80.) Dr. Wiest acknowledged Dr. O'Reilly's request and indicated "his plans to consult a colleague about it," but did not confirm that the letter of support would be provided. (*Id.* ¶ 81.)

On August 31, 2023, Dr. O'Reilly dually filed an administrative complaint against Defendants with the Philadelphia Commission on Human Relations ("PCHR") and the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶¶ 5, 83; *id.* at 28–44.) Shortly after receiving notice of her complaint, Fox Chase notified Dr. O'Reilly that it would provide her a letter of support for her ReWARD grant application. (*Id.* ¶ 85.) Dr. O'Reilly submitted her grant application by the October 5, 2023 deadline, and it was still pending as of the filing date of the Complaint in this action. (*Id.* ¶ 86.)

## II.    Procedural History

The PCHR issued its Dismissal of Dr. O'Reilly's administrative complaint and Notice of Rights on September 24, 2024. (*Id.* ¶ 6; *id.* at 46 (indicating "Notice received that a right to sue was requested from the EEOC in this dual-filed matter" as the reason for dismissal).) On October 3, 2024, Dr. O'Reilly filed this action, alleging unlawful sex discrimination and retaliation in violation of Title VII and the PFPO. (*See generally id.*) Defendants filed their instant partial motion to dismiss all of the sex discrimination claims and the retaliation claim against Dr. Chernoff on December 2, 2024. (Doc. No. 11; *see* Doc. No. 17.) Dr. O'Reilly opposes the motion. (Doc. No. 15.)

## III.     Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  And a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). Although the court must accept as true the allegations in the complaint and all reasonable inferences therefrom, *Phillips*, 515 F.3d at 228, the court is not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation," *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (internal quotation omitted).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up and internal quotations omitted).

Similarly, the court "may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Accordingly, the Court may consider the copy of the email that Dr. Chernoff sent to Dr. O'Reilly in January 2023, which is attached to Defendants' partial motion to dismiss (Doc. No. 11-5), because this email is one of the predicate acts upon which Dr. O'Reilly's discrimination and retaliation claims are based. *See id.*

## IV.   Discussion

Defendants move to dismiss all of Dr. O'Reilly's sex discrimination claims, which are alleged as both hostile work environment and quid pro quo sexual harassment claims, as well as Dr. O'Reilly's retaliation claim under the PFPO against Dr. Chernoff.  (Doc. No. 11; *see* Doc. No. 17.)  The Court assesses Defendants' arguments as to each category of claims in turn below. But first, the Court addresses whether it is appropriate to consider the allegations in the Complaint that predate the lookback period for Dr. O'Reilly's sex discrimination and retaliation claims.

Title VII and the PFPO require an individual seeking to challenge an employment practice to file a complaint with the EEOC and the PCHR within 300 days after the alleged unlawful practice occurred.  42 U.S.C. § 2000e–5(e)(1); Phila. Code. §§ 9-1112(1), (3).  Dr. O'Reilly dually filed a complaint with the EEOC and the PCHR on August 31, 2023 (Doc. No. 1 ¶¶ 5, 83; *id.* at 28–44), so the 300-day lookback period dates back to November 4, 2022.  It is undisputed that only the allegations within this 300-day window are actionable bases for Dr. O'Reilly's sex discrimination and retaliation claims. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013).  But, as Dr. O'Reilly contends, it is well established that her

allegations outside the 300-day lookback period may be considered as "background evidence" in support of her claims.[6]  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (holding that Title VII does not bar an employee from using prior acts that predate the limitations period "as background evidence in support of a timely claim"); *Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213, 217 (3d Cir. 2013) ("[B]ecause each of the alleged discriminatory acts occurred outside of the limitations period, they cannot in the aggregate form the basis for a hostile work environment claim.  However, Titus–Morris may cite those discrete occurrences as background evidence in support of her timely claim that her eventual termination constituted unlawful discrimination under Title VII."); *Mudie v. Phila. Coll. of Osteopathic Med.*, No. 21-2156-KSM, 2022 WL 1607544, at *15 n.23 (E.D. Pa. May 20, 2022) (holding that employer's alleged retaliatory transfer of plaintiff, which fell outside of the applicable limitations period, may be considered as "background evidence" in support of plaintiff's discrimination claims); *Bhatti v. Republican Caucus of Pa. House of Reps.*, No. 18-cv-2178, 2020 WL 3412661, at *4 (M.D. Pa. June 22, 2020) ("[A]ssessing Bhatti's alleged unfair treatment around the time of his termination against the backdrop of his untimely allegations of religious intolerance and discrimination[,] Bhatti sufficiently alleges that his termination occurred under circumstances giving rise to an inference of discrimination" and "thus adequately pleads a Title VII discrimination claim."); *Mavrinac v. Emergency Med. Ass'n of Pittsburgh (EMAP)*, No. 04-cv-1880, 2007 WL 2908007, at *12 (W.D. Pa. Oct. 2, 2007) (denying motion in limine to exclude all evidence pertaining to plaintiff's untimely discrimination claims because such evidence "can be introduced as background evidence for establishing the discriminatory nature of the timely

---

[6] These allegations pertain to Dr. Chernoff's prior behavior toward Dr. O'Reilly in 2014 and 2015, Dr. O'Reilly's complaint to Defendants about his behavior, and Defendants' actions taken in response to her complaint.

claims, such as Plaintiff's termination" and "may show motive, intent, and a pattern and practice of discrimination").

Treating the untimely allegations in Dr. O'Reilly's Complaint as background evidence, the Court now addresses Defendants' arguments for the dismissal of all of Dr. O'Reilly's sex discrimination claims and her retaliation claim against Dr. Chernoff.

### A.      Dr. O'Reilly Has Failed to Plead Plausible Hostile Work Environment Sexual Harassment Claims.

Sexual harassment is a form of sex discrimination prohibited by Title VII,[7] for which there are two types of actionable claims:  hostile work environment and quid pro quo.  *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998).  Here, Dr. O'Reilly brings both types of claims against all Defendants.  (Doc. No. 1.)  The Court begins with Dr. O'Reilly's hostile work environment claims.

Hostile work environment sexual harassment arises "when unwelcome sexual misconduct has the purpose or effect of unreasonably interfering with a person['s] work performance or creating an intimidating, hostile, or offensive working environment."  *Ogilvie v. N. Valley EMS, Inc.*, No. 07-cv-485, 2008 WL 4761717, at *6 (E.D. Pa. Oct. 29, 2008).  To state a plausible hostile work environment claim of sexual harassment under Title VII, a plaintiff must allege that: "1) [she] suffered intentional discrimination because of [her] sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) there

---

[7] Because "[t]he standards for pleading Title VII claims and the corresponding . . . PFPO claims are the same[,]" the Court will analyze Dr. O'Reilly's Title VII and PFPO claims according to Title VII's pleading requirements.  *See Purnell v. City of Philadelphia*, No. 20-cv-3718, 2021 WL 3617161, at *2 n.2 (E.D. Pa. Aug. 16, 2021).

was *respondeat superior* liability."  *See Nitkin v. Main Line Health*, 67 F. 4th 565, 570 (3d Cir. 2023) (quoting *Mandel*, 706 F.3d at 167).

Defendants argue for the dismissal of Dr. O'Reilly's hostile work environment claims based on Dr. O'Reilly's failure to plausibly allege that she experienced (1) intentional sex discrimination that (2) was severe or pervasive.  (Doc. No. 11-1 at 12–21; Doc. No. 17 at 2–5.)  The Court finds that Dr. O'Reilly has sufficiently alleged that she experienced intentional sex discrimination but has failed to allege that this discrimination rises to the level of severity or pervasiveness necessary to sustain a plausible hostile work environment claim.

### 1.    Dr. O'Reilly Has Sufficiently Alleged that She Experienced Intentional Sex Discrimination.

Defendants contend that none of the alleged acts of mistreatment experienced by Dr. O'Reilly during the actionable time period—i.e., Dr. Chernoff's attendance at and photographs taken during Dr. O'Reilly's presentation on January 18, 2023; Dr. Chernoff's email to Dr. O'Reilly on January 23, 2023; and Defendants' denial of Dr. O'Reilly's institutional letter of support on March 23, 2023—constitute "intentional sex discrimination" because they are not "explicitly sexual or sexist in nature."  (Doc. No. 11-1 at 13–17.)  They further argue that Dr. O'Reilly's allegations of Dr. Chernoff's 2014–2015 conduct—even if considered as "background evidence"—do not convert Defendants' alleged "facially nondiscriminatory" conduct in 2023 into plausible allegations of intentional sex discrimination.[8]  (Doc. No. 17 at 4–5.)  The Court disagrees.

---

[8] Dr. O'Reilly does not—and cannot—argue that she has alleged a continuing unlawful employment practice such that she may premise her hostile work environment claims on allegations that fall outside of the 300-day lookback period.  "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'"  *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).  "To allege a continuing violation, the plaintiff must show that all acts which

First, Defendants overstate the requirement of intentional sex discrimination because "the intent to discriminate on the basis of sex [*can*] be demonstrated through actions which 'are not sexual by their very nature.'" *Spain v. Gallegos*, 26 F.3d 439, 447 (3d Cir. 1994) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990)) (emphasis added); *see, e.g.*, *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 148 (3d Cir. 1999) (holding that the district court did not err by aggregating events "apparently triggered by sexual desire," "sexually hostile" events, "non-sexual but gender-based" events, and "facially neutral" events to support its finding of a hostile work environment, since "Title VII may be applied to all of these types of conduct"); *Andrews*, 895 F.2d at 1485 (finding that the district court "too narrowly construed what type of conduct can constitute sexual harassment" by putting "[g]reat emphasis" on the lack of overt sexual harassment, i.e., "sexual advances, innuendo, or contact"); *McClain v. Connellsville Sch. Dist.*, 20-cv-1485, 2021 WL 1737465, at *6 (W.D. Pa. May 3, 2021) ("[S]exual harassment can take on different forms, both overtly sexual and facially neutral." (internal quotation omitted)).  At this stage, the pertinent inquiry as to the intentional sex discrimination prong of a hostile work environment claim is whether the Complaint plausibly alleges "that gender is a substantial factor in the discrimination, and that if the plaintiff had been

---

constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165–66.  But "if an act [that predates the limitations period] had no relation to the acts [within the limitations period], or for some other reason, such as intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts." *Morgan*, 536 U.S. at 118; *see Fields v. Am. Airlines, Inc.*, No. 23-2962, 2024 WL 3534478, at *3 n.7 (3d Cir. July 25, 2024).  Dr. O'Reilly alleges that Defendants took several steps in early 2015 in response to her complaint about Dr. Chernoff's conduct (Doc. No. 1 ¶¶ 37–43), which the Court concludes constitute intervening remedial actions that foreclose application of the continuing violation doctrine.  *See Morgan*, 536 U.S. at 118; *Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 111–12 (E.D. Pa. 2023) (concluding that plaintiffs' allegations that they received faulty work equipment between 2012 and 2014 and were the subject of racially offensive comments from their managers between 2010 and 2015 fell outside of the scope of the continuing violation doctrine because this alleged conduct was remediated by intervening actions from defendant, including changes to defendant's policies and practices following OSHA complaints and a lawsuit concerning the conduct), *aff'd*, 2024 WL 3534478.

a man she would not have been treated in the same manner." *See Andrews*, 895 F.2d at 1485

(internal quotation omitted); *Gallegos*, 26 F.3d at 448.

Second, Defendants' alleged mistreatment of Dr. O'Reilly in 2023, though—according to

Defendants—"facially neutral with respect to sex, cannot be viewed in a vacuum." *McClain*,

2021 WL 1737465, at *6.  As explained above, the Court analyzes Defendants' alleged conduct

toward Dr. O'Reilly in 2023 against the backdrop of the allegations in the Complaint that predate

2023, which "may be utilized to establish the discriminatory nature of the timely claims."

*Bearer v. Teva Pharms. USA, Inc.*, No. 19-cv-5415, 2021 WL 4145053, at *7 (E.D. Pa. Sept. 8,

2021); s*ee Morgan*, 536 U.S. at 113; *Titus-Morris*, 512 F. App'x at 217; *Lloyd-Bragg v. Axis Ins.

Co.*, No. 20-cv-8559, 2021 WL 2010580 (D.N.J. May 20, 2021) ("[A]fter nearly two decades of

employment with Defendants, Plaintiff's allegations that fall outside of the purported limitations

period are properly included in the Amended Complaint as background evidence in support of

her timely [employment discrimination] claims.").

Dr. O'Reilly alleges that on January 18, 2023, Dr. Chernoff attended her research

presentation, during which he was observed taking photos of her and looking at and zooming in

on those photos while sitting in the audience.  (Doc. No. 1 ¶¶ 55–56, 58–59.)  The timing of Dr.

Chernoff's attendance is noteworthy—this was the first time that he attended Dr. O'Reilly's

annual research presentation since being ordered not to communicate with her in early 2015, and

the presentation took place shortly after the death of Dr. Peterson, Dr. O'Reilly's colleague who

allegedly prevented Dr. Chernoff from engaging in overt sexual harassment of Dr. O'Reilly for

many years because he was "willing to stand up to [Dr.] Chernoff about his behavior."  (*Id.*

¶¶ 51–55.)

14

Then, five days after watching her presentation, Dr. Chernoff emailed Dr. O'Reilly to ask her to work with him on a grant application.  (*Id.* ¶ 60; Doc. No. 11-5.)  In his email, Dr. Chernoff referenced Dr. O'Reilly's tribute to Dr. Peterson, which had "reminded [him] that [they] had a lot in common."  (Doc. No. 11-5; *see* Doc. No. 1 ¶ 55.)  After noting that "[i]t's been eight years, more or less, since [he and Dr. O'Reilly had] spoken," he asked "whether [they] might begin to work together again."  (Doc. No. 11-5.)

Dr. O'Reilly alleges that she promptly reported Dr. Chernoff's behavior to Drs. Wiest and Golemis on January 25, and in response, Dr. Wiest assured Dr. O'Reilly that "she had 'his word' that [Dr.] Chernoff would not bother her again."  (Doc. No. 1 ¶¶ 62–63.)  Yet, just two months later, Dr. O'Reilly was denied an institutional letter of support for her ReWARD grant application, a decision in which Dr. Chernoff—now "back in Dr. O'Reilly's chain of command" as Director of Fox Chase—allegedly participated.  (*Id.* ¶¶ 47–48, 67–69, 71, 74.)

Dr. Chernoff's actions in 2023 occurred after he had previously subjected Dr. O'Reilly to a series of knowingly unwelcome personal messages containing sexual innuendos about "his feelings for her and other women" in 2014.  (*Id.* ¶¶ 28–35.)  Defendants allegedly deemed Dr. Chernoff's conduct serious enough in 2014 to warrant not only Dr. O'Reilly's reassignment to a new supervisor but also a prohibition on any further contact between Drs. Chernoff and O'Reilly.  (*Id.* ¶¶ 28–35, 37–43.)  With this context in mind, the Court can quite reasonably infer that Dr. Chernoff's alleged conduct toward Dr. O'Reilly in 2023 was sexually motivated and thus that Dr. O'Reilly's sex was a substantial factor that influenced Dr. Chernoff's conduct.  *See Gallegos*, 26 F.3d at 449 ("[W]here an employee claims sex discrimination predicated on sexually neutral conduct it may be necessary for the employee to establish that the employer's motives for its actions were sexual."); *Bearer*, 2021 WL 4145053, at *7 (holding that untimely allegations may

be "considered as background evidence . . . to establish the discriminatory nature of the timely claims by showing motive or intent" (internal quotations omitted)); *Bhatti*, 2020 WL 3412661, at *4 ("While [the alleged] explicit acts ["of overt discrimination and religious intolerance"] occurred outside the statute of limitations and are not themselves actionable, they may nevertheless be considered as background evidence in support of Bhatti's timely claim that his eventual termination constituted unlawful discrimination under Title VII.  Doing just that . . . Bhatti sufficiently alleges that his termination occurred under circumstances giving rise to an inference of discrimination." (internal quotations omitted)).

The Court thus finds that Dr. O'Reilly has plausibly alleged that she suffered intentional discrimination because of her sex based on Dr. Chernoff's behavior toward her in 2023.

### 2.  Dr. O'Reilly Has Not Sufficiently Alleged that She Experienced "Severe or Pervasive" Intentional Sex Discrimination.

Defendants also move for the dismissal of Dr. O'Reilly's hostile work environment claims based on Dr. O'Reilly's failure to plausibly allege that she experienced "severe or pervasive" harassment.  They argue that Dr. O'Reilly's allegations of "three non-sexual, non-threatening and non-physical incidents in a span of ten months fall[ ] short of the legal standard for severe or pervasive harassment."  (Doc. No. 11-1 at 18–21; *see* Doc. No. 17 at 2–3.)

For intentional sex discrimination to constitute "severe or pervasive" behavior for purposes of establishing a hostile work environment sexual harassment claim, it must "alter the conditions of the victim's employment and create an abusive working environment."  *Nitkin*, 67 F.4th at 570 (quoting *Meritor*, 477 U.S. at 67) (cleaned up).  "The environment must be objectively hostile, not just hostile in the plaintiff's view."  *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[I]n order to be actionable under [Title VII], a sexually objectionable environment must be

16

both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."). "The 'severe or pervasive' standard is disjunctive and so a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n. 12 (3d Cir. 2017).

"[T]he determination of what constitutes 'severe or pervasive' does not lend itself to a mathematically precise test." *D.F. v. CMBK Resort Operations, LLC*, No. 23-cv-517, 2024 WL 3605940, at *4 (M.D. Pa. July 31, 2024). Rather, the Court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether [the conduct] unreasonably interferes with an employee's work performance." *Nitkin*, 67 F.4th at 570 (quoting *Mandel*, 706 F.3d at 167).

Dr. O'Reilly alleges that Dr. Chernoff's conduct toward her in 2023 was "severe and/or pervasive" such that it created a work environment that was both objectively and subjectively hostile and abusive. (Doc. No. 1 ¶¶ 89–90; *see* Doc. No. 15 at 11–14.) This alleged conduct consisted of: taking and then examining photos of Dr. O'Reilly while attending Dr. O'Reilly's annual research presentation on January 18, which he attended for the first time since he was ordered to stop communicating with Dr. O'Reilly in 2015 and shortly after Dr. Peterson's death (Doc. No. 1 ¶¶ 52–56, 58–59); sending Dr. O'Reilly an email on January 23 asking her to work with him on a grant application (*id.* ¶ 60; Doc. No. 11-5); denying Dr. O'Reilly's request for an institutional letter of support for her ReWARD grant application in March (Doc. No. 1 ¶¶ 67–69, 71, 74–75); and withholding a decision on Dr. O'Reilly's second request made in early August

17

for an institutional letter of support for her ReWARD grant application until September, when it was granted only after Defendants received notice that Dr. O'Reilly filed her administrative complaint against them[9] (*id.* ¶¶ 80–81, 83–85).[10]

The Court concludes that this conduct—even considered within the context of the allegations that predate 2023, particularly Dr. Chernoff's alleged past behavior toward Dr. O'Reilly in 2014 and the responsive actions taken by Defendants in 2015—does not rise to the requisite level of severity or pervasiveness to plausibly allege a hostile work environment claim.

The Third Circuit has cautioned that "[t]he threshold for pervasiveness and regularity of discriminatory conduct is high," *Greer*, 590 F. App'x at 173, requiring "pervasive prejudice, disparagement, and interference with one's job functions," *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016). The (at most) four alleged instances of Dr. Chernoff's conduct toward Dr. O'Reilly over a period of approximately nine months do not meet this threshold. *See, e.g.*, *Nitkin*, 67 F.4th at 571 (affirming this Court's conclusion that the "relative infrequency" of the seven sexual comments made to plaintiff over the span of three-and-a-half years "– reflecting one or two statements in a given six-month period – indicates that his actions

---

[9] The Court can reasonably infer—although the Complaint does not specifically allege—that Dr. Chernoff participated in the decision regarding Dr. O'Reilly's August 2023 request for an institutional letter of support, based on the allegations that Dr. Chernoff was the Director of Fox Chase at that time, that Dr. Wiest referred to Dr. Chernoff as Dr. O'Reilly's "daddy" who had to approve her requests for funding, and that Dr. Chernoff participated in the decision to deny Dr. O'Reilly's March 2023 request for an institutional letter of support. (*See* Doc. No. 1 ¶¶ 47, 64, 74.)

[10] Although Dr. O'Reilly also alleges that "[u]pon information or belief, in the years that followed Dr. O'Reilly's initial complaint about him, [Dr.] Chernoff made or influenced numerous decisions about the trajectory of Dr. O'Reilly's career at Fox Chase that were motivated by discrimination and/or retaliation, including but not limited to decisions about her compensation," this allegation is too vague and conclusory for the Court to consider as support for Dr. O'Reilly's hostile work environment claims. *See Castleberry*, 863 F.3d at 263; *Treviso v. Del Toro*, No. 23-cv-508, 2024 WL 1195522, at *7 (M.D. Pa. Mar. 20, 2024) (finding plaintiff's allegations, which were "vague and unsupported by facts suggesting how, [when,] or even if, they impacted her work environment," insufficient to plausibly allege pervasive discrimination).

were not severe or pervasive harassment"); *Burgess*, 642 F. App'x at 155 (finding that none of the approximately seven alleged incidents of sexual harassment and religious discrimination that occurred during a one-month period "demonstrate any meaningful frequency of the conduct towards [plaintiff], and only two instances . . . could rightly be considered physically threatening or abusive," which "do not represent the kind of pervasive prejudice, disparagement, and interference with one's job functions necessary to make out a plausible hostile work environment claim"); *Mitchell v. Continental Real Estate Mgmt. Inc.*, No. 23-cv-2141, 2024 WL 3868228, at *4 (M.D. Pa. Aug. 19, 2024) (holding that allegations of "two isolated incidents" of physical sexual conduct toward plaintiff occurring within a two-day period are not "numerous . . . enough" to support hostile work environment claims); *Tavares v. Builders FirstSource Northeast Grp., Inc.*, No. 21-cv-2964, 2023 WL 4248770, at *6 (D.N.J. June 29, 2023) (finding three "crude" comments overheard by or made toward plaintiff were not frequent "since [p]laintiff alleges only three incidents occurring over the course of . . . six months"); *Whetstine v. Woods Servs.*, No. 21-cv-2289, 2022 WL 221526, at *7 (E.D. Pa. Jan. 24, 2022) (dismissing hostile work environment claim premised on five alleged incidents that occurred over a ten-month period, which "len[t] themselves to be categorized as isolated incidents rather than frequent harassment").

Similarly, "[t]he bar for severity is high," *Whetstine*, 2022 WL 221526, at *7, necessitating allegations of "extreme" conduct that exhibit "permeating intimidation, ridicule, and insult," *Burgess*, 642 F. App'x 152 at 155 (quoting *Faragher*, 524 U.S. at 788). Dr. Chernoff's alleged photo taking of Dr. O'Reilly and inspection of those photos while in attendance at her annual research presentation, his subsequent email request to Dr. O'Reilly to work with her on a grant application, and his later participation in the decisions concerning Dr.

O'Reilly's requests for an institutional letter of support were inappropriate, unprofessional, and disturbing—particularly in light of Dr. O'Reilly's longstanding "restraining order" against Dr. Chernoff, which prohibited Dr. Chernoff from communicating with Dr. O'Reilly or participating in "any decisions having to do with [her] job" because of his alleged inappropriate behavior throughout 2014. (*See* Doc. No. 1 ¶¶ 43, 61, 77; Doc. No. 15 at 12.) And Dr. O'Reilly does allege that Dr. Chernoff's conduct altered the conditions of her employment to some extent by precluding her from the opportunity to apply for the ReWARD grant in March, when she is required to secure funding, including from external sources like this grant, to support fifty percent of her salary, benefits, and laboratory expenses to maintain her job. (Doc. No. 1 ¶¶ 69, 71–72, 78.)

Nevertheless, Dr. Chernoff's alleged conduct does not rise to the level of "permeating intimidation, ridicule, and insult" necessary to withstand a motion to dismiss. *Compare, e.g.*, *Burgess*, 642 F. App'x at 155 (affirming dismissal of hostile work environment claims based on allegations that plaintiff's female supervisor threatened to rip off plaintiff's religious necklace if she ever wore it to work again and touched plaintiff's hair, told her it was soft, and asked if she would ever "go to the other side," which—though they "could rightly be considered physically threatening or abusive"—"do[] not reach the level of permeating intimidation, ridicule, and insult necessary to be considered severe or pervasive for purposes of Title VII"), *Sousa v. Amazon.com, Inc.*, No. 22-3043, 2023 WL 7486751, at *3 (3d Cir. Nov. 13, 2023) (affirming dismissal of hostile work environment claim premised on a series of alleged sexual overtures from plaintiff's supervisor because there were no allegations (1) that supervisor's "intrusive" after-hours calls to plaintiff, which "ventured into topics a supervisor should avoid," were "physically threatening, humiliating, or even highly offensive" or (2) how supervisor's avoidance of plaintiff's work

calls, which occurred in response to plaintiff rebuffing supervisor's advances, "impacted

[plaintiff's] ability to do her job" or "otherwise altered her conditions of employment"), *Mitchell*,

2024 WL 3868228, at *4 (dismissing hostile work environment claims based on allegations of

two incidents "during which Defendant's employees rubbed their keys against their genital area

and then unsuccessfully attempted to hand them to Plaintiff," which were not "humiliating

enough to rise to the level of severe . . . as required to sustain" the claims), *and Whetstine*, 2022

WL 221526, at *7 (dismissing hostile work environment claim premised on five incidents,

including "merely offhand comments," that "do not involve physical contact or conduct that is

physically threatening or humiliating" and thus are not "sufficiently severe" to support a hostile

work environment claim), *with, e.g.*, *D.F.*, 2024 WL 3605940, at *4 (finding plaintiff sufficiently

alleged "severe or pervasive" sexual harassment based on allegations that "on a routine and

pervasive basis," a male coworker would "touch [plaintiff] inappropriately against her will,"

"make sexual comments and advances towards [plaintiff], saying things like 'shut the fuck up

and suck my dick'" and "'dirty fucking ho'"), *Linhart v. County of Erie*, No. 23-cv-114, 2024

WL 1142699, at *5 (W.D. Pa. Mar. 15, 2024) (denying motion to dismiss hostile work

environment claim premised on allegations that for the year that plaintiff was employed with

defendant, the work environment was "pervaded by comments and actions of an openly sexual

nature," examples of which included a male coworker asking plaintiff "to 'see if you can make it

move,' referring to his penis," that same coworker spanking plaintiff's rear end, and another male

coworker "block[ing] [p]laintiff from walking around him and plac[ing] his chest against hers

stating, 'I just want to feel them up close'"), *and Fedder v. Bloomsburg Univ. of Pa.*, No. 23-cv-

1678, 2024 WL 580552, at *2–3 (M.D. Pa. Feb. 13, 2024) (denying motion to dismiss hostile

work environment claim based on allegations of continued "sexist commentary and sexually

21

intimidating behavior" by plaintiff's supervisor that escalated after plaintiff made two formal complaints, including closely following plaintiff on defendants' campus, "[coming] within an inch from [plaintiff's] face and stat[ing] in a sexual manner, 'You're about the size of my wife,'" and asking plaintiff "'How would you like to do all the mail by yourself?' and then 'proceed[ing] to shuffle all the mail' to make her job more difficult").

Thus, even accepting the allegations in the Complaint as true and drawing all reasonable inferences therefrom, the Court finds Dr. Chernoff's conduct toward Dr. O'Reilly in 2023 "do[es] not rise to a level that could fairly be called severe or pervasive" to sustain a plausible hostile work environment claim. *See Nitkin*, 67 F.4th at 573.

***

For the reasons stated above, while Dr. O'Reilly has adequately alleged that she suffered intentional sex discrimination based on Dr. Chernoff's conduct in 2023, her hostile work environment claims nevertheless fail because she has not alleged that this discriminatory conduct was sufficiently severe or pervasive. Accordingly, the Court finds that Dr. O'Reilly has not stated plausible claims of hostile work environment sexual harassment and, therefore, grants Defendants' motion to dismiss as to those claims.

### B. *Dr. O'Reilly Has Pleaded Plausible Quid Pro Quo Sexual Harassment Claims.*

Dr. O'Reilly also brings quid pro quo sexual harassment claims against all Defendants. (Doc. No. 1.) Quid pro quo sexual harassment occurs when an employee experiences a "tangible employment action result[ing] from a refusal to submit to a supervisor's sexual demands." *Ellerth*, 524 U.S. at 753. To state a plausible quid pro quo claim of sexual harassment under Title VII, a plaintiff must allege that she experienced "[u]nwelcome sexual advances, requests for sexual favors, [or] other verbal or physical conduct of a sexual nature," and "submission to such conduct is made either explicitly or implicitly a term or condition of [the plaintiff's]

22

employment" or "submission to or rejection of such conduct by [the plaintiff] is used as the basis

for employment decisions affecting [the plaintiff]." *Starnes v. Butler Cnty. Ct. of Common

Pleas*, 971 F.3d 416, 427 (3d Cir. 2020); *see Moody*, 870 F.3d at 213 n. 10.

Defendants argue for the dismissal of Dr. O'Reilly's quid pro quo claims based on Dr.

O'Reilly's failure to plausibly allege that she experienced (1) any conduct of a sexual nature or

(2) a tangible employment action.  (Doc. No. 11-1 at 21–28.)  The Court finds that Dr. O'Reilly

has adequately alleged that she experienced both sexually motivated behavior from Dr. Chernoff

and a tangible employment action based on her response to Dr. Chernoff's behavior and,

therefore, has stated plausible quid pro quo sexual harassment claims.

1. **Dr. O'Reilly Has Sufficiently Alleged that She Experienced "Conduct of a Sexual Nature."**

Defendants claim that Dr. O'Reilly has not alleged that she experienced any "conduct of

a sexual nature" during the actionable time period.  (Doc. No. 11-1 at 22–24.)  They also contend

that Dr. O'Reilly's quid pro quo claims "require a 'sexual advance' or demand, a higher standard

than [the] 'intentional discrimination based on sex' [required] for . . . her hostile work

environment claims."  (*Id.* at 11-1.)  The Court disagrees on both fronts.

While quid pro quo claims typically involve allegations of overt sexual harassment, the

key inquiry for quid pro quo claims is whether the plaintiff has plausibly alleged "that she would

not have been sexually harassed but for her sex."  *Starnes*, 971 F.3d at 427; *see Toth v. Cal.

Univ. of Pa.*, 844 F. Supp. 2d 611, 628 (W.D. Pa. 2012) ("In order to establish a violation of Title

VII pursuant to a *quid pro quo* theory, [plaintiff] must establish that the 'unwanted advances'

were made by Armenti and Madden because of her 'sex.'" (citing *Oncale v. Sundowner Offshore

Servs., Inc.*, 523 U.S. 75, 80–81 (1998))); *Iyer v. Everson*, 382 F. Supp. 2d 749, 758–59 (E.D. Pa.

2005) ("[O]ther than [plaintiff's] own speculation, there is no indication that [his supervisor's]

conduct was in any way linked to [plaintiff's] sex.  Therefore, [plaintiff's] claim of *quid pro quo*

sexual harassment is dismissed.").  Courts in this Circuit, including in the decisions cited by

Defendants, often quote the EEOC's guidelines on Title VII sex discrimination to explain the

requisite basis for quid pro quo sexual harassment claims—i.e., "[u]nwelcome sexual advances,

requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute

sexual harassment."  *See, e.g.*, *Whetstine*, 2022 WL 221526, at *7; *Purnell*, 2021 WL 3617161,

at *2.  But the Third Circuit has clarified how this language is to be interpreted:

> [T]he EEOC Guideline concerning sexual harassment . . . states:  Harassment on
> the basis of sex is a violation of Sec. 703 of Title VII.  Unwelcome sexual advances,
> requests for sexual favors, and other verbal or physical conduct of a sexual nature
> constitute harassment when [(1) submission to such conduct is made either
> explicitly or implicitly a term or condition of an individual's employment,
> (2) submission to or rejection of such conduct by an individual is used as the basis
> for employment decisions affecting such individual, or (3)] such conduct has the
> purpose or effect of unreasonably interfering with an individual's work
> performance or creating an intimidating, hostile, or offensive working environment.
>
> We read the first sentence, that harassment based on sex is a violation of Title VII,
> to be the general concept, and the second sentence as merely an illustration of how
> explicit sexual conduct could rise to this level.  But, if the second sentence were
> read to modify the first, it would seem to imply that only explicit sexual harassment
> would be actionable.  This reading does not appear to be consistent with either the
> wording of the EEOC guideline or the prevailing case law.

*Andrews*, 895 F.2d at 1485 n.6.  The Third Circuit's interpretation is consistent with the Supreme

Court's direction that "Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms'

or 'conditions' of employment.  Our holding that this includes sexual harassment must extend to

sexual harassment of any kind that meets the statutory requirements."  *Oncale*, 532 U.S. at 79–

80.  The Court, therefore, rejects Defendants' argument that Dr. O'Reilly must allege overtly

sexual conduct to state a plausible quid pro quo sexual harassment claim.

Dr. O'Reilly predicates her quid pro quo claim on Dr. Chernoff's January 23, 2023 email

request that they "begin to work together again" on a grant application.  (Doc. No. 1 ¶¶ 60, 74–

75; *see* Doc. No. 11-5.)  The Court considers this request in light of Dr. Chernoff's alleged conduct less than one week earlier—taking photos of Dr. O'Reilly and zooming in to examine Dr. O'Reilly more closely while attending her research presentation (Doc. No. 1 ¶¶ 55–56, 58– 59)—and Dr. Chernoff's repeated, unwelcome, "personal messages" to Dr. O'Reilly in 2014 that resulted in Defendants' removal of Dr. Chernoff as Dr. O'Reilly's supervisor and demand that Dr. Chernoff have no further contact or communication with Dr. O'Reilly (Doc. No. 1 ¶¶ 28–35, 37–43).  *See, e.g.*, *Morgan*, 536 U.S. at 113; *Titus-Morris*, 512 F. App'x at 217; *Bearer*, 2021 WL 4145053, at *7.  Against the backdrop of Dr. Chernoff's alleged prior conduct toward Dr. O'Reilly, the Court can reasonably infer that Dr. Chernoff's January 23 email request to work with Dr. O'Reilly on a grant application was both sexually motivated and based on her sex for purposes of stating a quid pro quo sexual harassment claim.  *See Gallegos*, 26 F.3d at 449; *Bearer*, 2021 WL 4145053, at *7; *Bhatti*, 2020 WL 3412661, at *4.

The Court thus finds that Dr. O'Reilly has plausibly alleged that Dr. Chernoff engaged in "conduct of a sexual nature" toward her when he requested that they work together on a grant application in January 2023.

## 2. Dr. O'Reilly Has Sufficiently Alleged that She Experienced a Tangible Employment Action.

Defendants argue that Dr. O'Reilly's quid pro quo claims are also deficient because the Complaint fails to allege that Dr. O'Reilly experienced a "tangible employment action" resulting from her reporting of Dr. Chernoff's January 2023 email request to work together following his attendance at her presentation.  (Doc. No. 11-1 at 24–28.)  A "tangible employment action" for purposes of a quid pro quo sexual harassment claim is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Ellerth*, 524 U.S. at 761.

Defendants argue that Dr. O'Reilly does not allege "any significant change in her employment"—rather, she merely puts forth the speculative, conclusory allegation that Defendants delayed providing her a letter of support for her ReWARD grant application, which "jeopardized her external grant funding, her continued employment, her career, and her livelihood." (Doc. No. 11-1 at 27.)

As Dr. O'Reilly points out, tangible employment actions include "the loss of significant job benefits or characteristics, such as the resources necessary for an employee to do [her] job" and actions that "substantially decrease[ ] an employee's earning potential and cause[ ] significant disruption in [her] working conditions." *Durham Life Ins. Co.*, 166 F.3d at 144, 153; *see Swain v. City of Vineland*, 457 F. App'x 107, 110 (3d Cir. 2012) ("While direct economic harm is probative, so, too, is conduct that substantially decreases one's earning potential or disrupts his working conditions."). (Doc. No. 15 at 17–18.)

Dr. O'Reilly alleges that Defendants' denial of her request for an institutional letter of support for her ReWARD grant application in March 2023 constitutes a tangible employment action resulting from her "rejection" of Dr. Chernoff in January 2023, including her report of his renewed contact with her to Drs. Wiest and Golemis. (Doc. No. 1 ¶¶ 75, 92.) Dr. O'Reilly is required to secure funding to support fifty percent of her salary, benefits, and the expenses of her laboratory to retain her employment as a tenured Associate Professor at Fox Chase. (*Id.* ¶ 69.) Because Dr. O'Reilly only had grant funding in place until April 23, 2024, Dr. O'Reilly planned to apply for the ReWARD grant, which required an institutional letter of support from Defendants. (*Id.* ¶¶ 68, 70.) Defendants, including Dr. Chernoff, denied Dr. O'Reilly's initial request for an institutional letter of support, and as a result, Dr. O'Reilly could not meet the initial ReWARD grant application deadline of June 5, 2023. (*Id.* ¶¶ 71–72.) This denial

"jeopardized [Dr. O'Reilly's] external grant funding, her continued employment, her career, and her livelihood." (*Id.* ¶ 78.)

Based on these allegations, the Court finds that Dr. O'Reilly has plausibly alleged that she experienced the "loss of [a] significant job benefit[ ] or characteristic," i.e., the opportunity to seek grant funding. *See Durham Life Ins. Co.*, 166 F.3d at 144. Because Dr. O'Reilly is required to secure such funding for fifty percent of her salary, benefits, and laboratory expenses as a condition of her employment, the opportunity to seek grant funding is a "resource necessary for [Dr. O'Reilly] to do [her] job." *See id.* at 144, 153 (holding that plaintiff's loss of an office and the dismissal of her secretary, both of which were "specific, negotiated conditions" of plaintiff's employment, constituted tangible adverse employment actions for purposes of plaintiff's Title VII claims); *cf. Rogers v. Alt. Res. Corp.*, 440 F. Supp. 2d 366, 374–75 (D.N.J. 2006) (concluding that plaintiff "cannot establish that the disparity in his training rises to the level of an adverse employment action" for purposes of his New Jersey Law Against Discrimination claim, which term is defined based on Title VII and federal civil rights case law, because of the lack of evidence "that a certain level of training was required for promotion, retention or other benefits").

The Court is unpersuaded by Defendants' argument that their denial of the letter of support for Dr. O'Reilly in March 2023—characterized by Defendants as a "delay"—was not a tangible employment action because Defendants eventually provided the letter to Dr. O'Reilly in October 2023, and she was then able to apply for the ReWARD grant that same month. (*See* Doc. No. 11-1 at 27.) As alleged, Dr. O'Reilly renewed her request for this letter in early August 2023, but Defendants still refused to provide it to her until September 14, 2023, *after* Defendants received notice of Dr. O'Reilly's administrative complaint filed against them on August 31,

2023, which was partially premised on Defendants' March 2023 denial of the letter of support. (Doc. No. 1 ¶¶ 79–81, 83–87.)

Defendants analogize the denial of Dr. O'Reilly's requested letter of institutional support to the unfulfilled threat of a performance improvement plan or the "hints" and suggestions of a "chance" at a promotion that courts in this Circuit have found do not rise to the level of tangible employment actions. (Doc. No. 11-1 at 25–27.) As support for this analogy, they cite *Polenik v. Yellen*, wherein the court rejected plaintiff's argument that her supervisor's alleged threat to put her on a performance improvement plan because she slept at her boyfriend's house constituted a change in her employment sufficient to sustain a quid pro quo sexual harassment claim. No. 22-cv-1691, 2024 WL 1466783, at *6 (M.D. Pa. Apr. 4, 2024). (*See* Doc. No. 11-1 at 26–27.) The court held that an unfulfilled threat of a tangible employment action does not amount to a tangible employment action and found that it was not clear from the allegations "whether, even if fulfilled, [this threat] would have resulted in a change in [plaintiff's] overall employment." *Id.*

Defendants also cite to *Sousa v. Amazon.Com, Inc.*, in which the court dismissed a quid pro quo claim premised on, among other actions, plaintiff's failure to receive the promotion that her supervisor "hin[ted] that he could help her get" when he made sexual advances toward plaintiff, and her supervisor's "ignor[ing] some of her requests for assistance" after his sexual advances were rejected by plaintiff. No. 21-cv-717, 2022 WL 4548910, at *6 (D. Del. Sept. 29, 2022), *aff'd*, No. 22-3043, 2023 WL 7486751 (3d Cir. Nov. 13, 2023). (*See* Doc. No. 11-1 at 25, 27.) The court found that neither action amounted to a "significant change" to her employment situation since they did not alter "the 'compensation, terms, conditions, or privileges' of her employment." *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281–82 (3d Cir. 2000)). A quid pro quo claim involving similar allegations that plaintiff was not promoted after

she rejected her supervisor's sexual advances that were accompanied by an offer of "the chance" at a promotion was similarly dismissed in *Wang v. SLM Corp.*, which Defendants cite as further support for the dismissal of Dr. O'Reilly's quid pro quo claims.  No. 23-cv-1240, 2024 WL 3444650, at *2–3 (D. Del. July 15, 2024).  (*See* Doc. No. 11-1 at 26–27.)  In *Wang*, the court determined that "[p]laintiff's allegation that [her supervisor] implied that she would have a 'chance' at a promotion to a vague 'Director position'"—without "any further information specifying what position was offered or whether [p]laintiff was even qualified for the promotion to such a position"—was insufficient to sustain plaintiff's quid pro quo claim.  *Id.* at *3.

Unlike these employment actions that were rejected as insufficiently tangible to support quid pro quo sexual harassment claims, Defendants' denial of Dr. O'Reilly's requested letter was a concrete action carried out by Defendants.  *See Ellerth*, 524 U.S. at 751 (distinguishing quid pro quo sexual harassment cases as "[c]ases based on threats which are carried out" from hostile work environment sexual harassment cases, "where [threats] are not [carried out] or are absent altogether").  Further, this denial caused Dr. O'Reilly to lose the opportunity to seek grant funding, which the Court can reasonably infer was one of the "terms, conditions, or privileges of her employment" based on her allegation that she is obligated to secure a certain amount of outside funding, include from grants, to maintain her employment.  *See Farrell*, 206 F.3d at 281–82.  And to accept Defendants' characterization of their March 2023 denial of a letter of institutional support as a mere "delay" would require the Court to not only draw an inference in favor of Defendants, which the Court cannot do at this stage, but also to go so far as to draw an unreasonable inference, given the allegations that Defendants eventually provided the letter only after they learned that Dr. O'Reilly had instituted legal action against them based, in part, on their initial denial of the letter.

In sum, the Court finds that Dr. O'Reilly has plausibly alleged that she experienced a tangible employment action when Defendants denied her request for an institutional letter of support for her ReWARD grant application in March 2023.

***

For the reasons stated above, Dr. O'Reilly has sufficiently alleged that she experienced both conduct of a sexual nature by Dr. Chernoff and a tangible employment action resulting from her rejection of Dr. Chernoff's conduct. Accordingly, the Court finds that Dr. O'Reilly has stated plausible claims of quid pro quo sexual harassment and, therefore, denies Defendants' motion to dismiss as to those claims.

### C.     Dr. O'Reilly Has Pleaded a Plausible Retaliation Claim against Dr. Chernoff.

Finally, while Dr. O'Reilly brings retaliation claims against all Defendants, Defendants move to dismiss only Dr. O'Reilly's retaliation claim against Dr. Chernoff. (Doc. No. 11-1 at 28–29.) To state a plausible claim of retaliation, Dr. O'Reilly must allege that: "(1) [she] engaged in a protected employee activity; (2) "the employer took an adverse employment action after or contemporaneous with [her] protected activity; and (3) a causal link exists between [her] protected activity and the employer's adverse action." *Farrell*, 206 F.3d at 279.

With respect to the third element of a retaliation claim, "unduly suggestive" temporal proximity between the protected activity and adverse action is sufficient to create an inference of a causal link. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012). But where the temporal proximity is not "unduly suggestive," courts consider "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015). And, as Defendants correctly

30

point out (*see* Doc. No. 11-1 at 28–29), the causation element cannot be satisfied without establishing that "the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted."  *Daniels*, 776 F.3d at 196–97; *see Moore v. City of Philadelphia*, 461 F.3d 331, 351–52 (3d Cir. 2006) ("It is not reasonable for a factfinder to infer that an employer's reaction was motivated by an intent to retaliate for conduct of which the employer's decision maker was not aware.").

Dr. O'Reilly alleges that she engaged in protected activity when she reported Dr. Chernoff's 2023 conduct toward her to Drs. Wiest and Golemis on January 25, 2023, and in retaliation for doing so, Defendants, including Dr. Chernoff, denied Dr. O'Reilly's request for an institutional letter of support for her ReWARD grant application on March 23, 2023.  (Doc. No. 1 ¶¶ 62–65, 67–74, 76–77, 95.)  Defendants only contest the causation element of Dr. O'Reilly's retaliation claim against Dr. Chernoff, arguing that Dr. O'Reilly fails to allege that Dr. Chernoff knew about her alleged protected activity—i.e., that she reported Dr. Chernoff's attendance and behavior during her January 18, 2023 research presentation and his subsequent email to her on January 23.  (Doc. No. 11-1 at 28–29; *see* Doc. No. 17 at 5–6.)  Dr. O'Reilly counters that the Court can reasonably infer Dr. Chernoff's knowledge from her allegations that when she reported Dr. Chernoff's conduct, Dr. Wiest assured her that "she had 'his word' that [Dr.] Chernoff would not bother her again" and that Dr. Chernoff participated in the decision to deny her request for an institutional letter of support in March 2023.  (Doc. No. 15 at 19.)

At the motion to dismiss stage, Dr. O'Reilly "need not conclusively allege that [Dr. Chernoff] had knowledge of [her] protected conduct" to state a plausible claim of retaliation against him; rather, she "need only plead facts that allow the Court to *reasonably infer* that [Dr. Chernoff] was aware of the protected conduct."  *Brown v. Smith*, 23-cv-780-KSM, 2024 WL

4094279, at *7 (E.D. Pa. Sept. 5, 2024); *see Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) (explaining that the plaintiff must allege "supporting facts that make it reasonable to draw an inference of retaliation" to properly "plead causation"); *Kachmar v. SunGuard Data Sys., Inc.*, 109 F.3d 173, 179 (3d Cir. 1997) ("Because the facts viewed in the light most favorable to Kachmar would support an inference of retaliation, her complaint states a colorable claim as to which she is entitled to further factual development.").  Dr. O'Reilly alleges that in response to reporting Dr. Chernoff's condut to Drs. Wiest and Golemis in January 2023, Dr. Wiest gave Dr. O'Reilly "'his word' that [Dr.] Chernoff would not bother her again."  (Doc. No. 1 ¶¶ 62–65.) Pursuant to Defendants' Policy Against Workplace Harassment, Drs. Wiest and Golemis were obligated to notify Human Resources of Dr. O'Reilly's complaint about Dr. Chernoff.  (*Id.* ¶ 66.) Less than two months after Dr. O'Reilly's complaint, Dr. Chernoff—to whom Dr. Wiest referred as Dr. O'Reilly's "daddy" who controlled which Fox Chase faculty members received funding— allegedly participated in the decision to deny Dr. O'Reilly an institutional letter of support for her ReWARD grant application.  (*Id.* ¶¶ 67–74.)

The Court disagrees with Defendants that these allegations are insufficient to create a reasonable inference that Dr. Chernoff knew that Dr. O'Reilly reported his January 2023 behavior when he denied her request for an institutional letter of support two months later.  *See Kachmar*, 109 F.3d at 177–79 (reversing dismissal of Title VII retaliation claim after finding that (1) the district court "concentrate[ed] exclusively on the gap between [plaintiff's] protected activity and her firing, and the sufficiency of [plaintiff's] allegations of a pattern of antagonism" and "failed to make the more generalized inquiry into whether [plaintiff's] protected activity was the likely reason for her termination," and (2) that the complaint adequately alleged retaliatory animus such that it was reasonable to infer that plaintiff "was being taken off the management

track because of her [protected activity], and that her final dismissal was just a matter of time"); *Bell v. Sullivan*, No. 17-cv-912, 2017 WL 5518005, at *3–4 (E.D. Pa. Nov. 16, 2017) (finding that complaint sufficiently alleged defendant's awareness of the protected activity—filing a lawsuit—and connection to the retaliatory conduct—issuance of citations—based on allegations that one week passed between the threat and issuance of citations; that the citations were subsequently withdrawn one week after their issuance; that a third party threatened that "his friends at [the Philadelphia Department for Licenses and Inspections] would 'drown' [plaintiff] in citations;" and that defendant works at that department); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 793 (3d Cir. 2016) ("[T]he fact that [defendant] continued to rehire [plaintiff] for four years despite her complaints about co-workers, but declined to rehire her at the first such opportunity after she complained of harassment by a supervisor, can be construed to support a reasonable inference of a causal connection between the protected act and the adverse employment action.").

Defendants cite cases involving vague, conclusory, or entirely lacking allegations as to knowledge of the protected conduct. *See Michael v. Quaker Valley Sch. Dist.*, No. 16-cv-473, 2017 WL 639374, at *8–9 (W.D. Pa. Feb. 16, 2017) (dismissing First Amendment retaliation claim based on failure to allege defendants' knowledge of plaintiff's protected speech, where plaintiff did not allege that either defendant was present at the school board meeting where plaintiff's protected speech occurred and merely alleged "'some' connection" between one defendant and the "central figure" at the meeting and that both defendants then "acted in concert"); *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470 (M.D. Pa. Mar. 19, 2012) ("The complaint does not allege that Plaintiffs complained to or threatened to sue any of these Defendants, nor does it allege that these Defendants knew that the Plaintiffs had spoken

33

out against the alleged discriminatory actions.").  That is not the case here, where the allegations allow the Court "to infer more than the mere possibility of misconduct" as to Dr. Chernoff's retaliatory intent.  *See Leibert v. Phila. Hous. Auth.*, 474 F. App'x 76, 79 (3d Cir. 2012).  The allegations that Dr. Wiest—after hearing Dr. O'Reilly's report of Dr. Chernoff's both recent and past conduct—assured Dr. O'Reilly that she had "his word" that Dr. Chernoff "would not bother her again" and that Drs. Wiest and Golemis were obligated under Defendants' Policy Against Workplace Harassment to notify Human Resources of Dr. O'Reilly's report "raise[ ] a reasonable inference that discovery will reveal evidence" that Dr. Chernoff was informed of Dr. O'Reilly's January 2023 complaint about him before he participated in the decision to deny her request for an institutional letter of support approximately two months later.  *See Connelly*, 809 F.3d at 793.

The Court therefore concludes that Dr. O'Reilly has adequately alleged a retaliation claim against Dr. Chernoff and denies Defendants' motion to dismiss as to that claim.

## V.    Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss.  An appropriate Order follows.