IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALANA M. O'REILLY, Ph.D., | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 2:24-CV-05315 |
| | : (JUDGE MARSTON) |
| | : [ELECTRONICALLY FILED] |
| THE INSTITUTE FOR CANCER RESEARCH, TEMPLE UNIVERSITY HEALTH SYSTEM, TEMPLE UNIVERSITY, and JONATHAN CHERNOFF, MD, Ph.D., | : |
| Defendants. | : |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF DEFENDANTS' MOTION
<u>FOR SUMMARY JUDGMENT AS TO ALL REMAINING CLAIMS</u>**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Policies and Procedures of this Court and the Amended Scheduling Order of January 22, 2025 (ECF No. 22), Defendants, The Institute for Cancer Research d/b/a The Research Institute of Fox Chase Cancer Center ("Fox Chase" or "FCCC"), Temple University Health System ("TUHS"), Temple University and Dr. Jonathan Chernoff, M.D., Ph.D. ("Dr. Chernoff") ("Defendants"), by and through their attorneys, hereby submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment as to All Remaining Claims filed herewith.[1]

A. **<u>Introduction to FCCC and the NIH Grant Process.</u>**

1. FCCC is a non-profit cancer research and education institution located in

---

[1] Defendants reserve the right to contest any of the facts set forth herein, which are accepted as true only for purposes of the instant Motion for Summary Judgment.

Philadelphia. ECF No. 14, Answer and Affirmative Defenses of Defendants the Research Institute of Fox Chase Cancer Center and Temple University Health System to Plaintiff's Complaint ¶ 9.

2. FCCC is one of approximately 55 National Cancer Institute ("NCI")-designated Comprehensive Cancer Centers in the United States, which signifies that FCCC does high-quality research, patient care and cancer prevention. **Exhibit 1**, Deposition of Jonathan Chernoff, M.D., Ph.D. ("Chernoff Dep.") at 23:6-21.[2]

3. In or about 2012, TUHS acquired FCCC, but FCCC has its own faculty and makes its own personnel appointments. **Exhibit 2**, Deposition of Alana M. O'Reilly ("Pl. Dep.") at 34:6-8; Ex. 1, Chernoff Dep. at 22:15-21.

4. FCCC maintains an Academic Appointments and Promotions Policy containing an expectation that each tenured professor "support half of his or her salary or fringe benefits, and the expenses of the laboratory staff salary and fringe benefits." **Exhibit 3** (P-Dep 98) at 23 (O'Reilly 1699); **Exhibit 4**, Deposition of Camille Ragin, Ph.D., MPH ("Ragin Dep.") at 13:6-14:7.

5. FCCC research professors may meet this expectation with internal grant funding, or with grant funding from external mechanisms such as those funded by the National Institutes of Health ("NIH"). Ex. 4, Ragin Dep. at 19:19-23, **Exhibit 5**, Deposition of Erica Golemis, Ph.D. ("Golemis Dep.") at 24:12-16.

6. NIH maintains a publicly available listing of opportunities facilitating faculty applications for research project grant funding. **Exhibit 6**, Expert Report of David T. Curiel,

---

[2] Pursuant to the Policies and Procedures of this Court and the Amended Scheduling Order of January 22, 2025 (ECF No. 22), each exhibit cited herein is filed as a separate attachment to this Statement of Undisputed Material Facts along with a Table of Contents.

M.D., Ph.D. ("Curiel Report"), at 2.[3]

7. "Study sections" comprised of peer scientists review NIH grant applications, provide written critiques and give the applications scores that determine whether the grant applications are approved and funded. Ex. 6, Curiel Report at 2, 4.

8. The vast majority of NIH grant applications are not successful, especially on the first submission. Ex. 6, Curiel Report at 5 ("perhaps as many as 95%"); **Exhibit 7**, Deposition of David Wiest, Ph.D. ("Wiest Dep.") at 98:22-99:2 ("Most of us, we just keep submitting, keep submitting, keep submitting."); Ex. 2, Pl. Dep. at 94:6-13 ("It's – actually, when I got my first grant on the first submission, I was told by another faculty member it was a 1 in 10 million chance.").

9. NIH grant applications commonly require institutional letters of support, which demonstrate sufficient institutional resources to allow the investigator to be able to carry out the themes of the grant. Ex. 4, Ragin Dep. at 20:20-21:9.

10. Some institutional letters of support require that FCCC commit additional resources beyond what a faculty member has access to on a day-to-day basis. Ex. 7, Wiest Dep. at 16:13-17:1; Ex. 1, Chernoff Dep. at 17:3-19.

C. **Plaintiff's FCCC Employment.**

11. FCCC hired Plaintiff effective approximately December 1, 2007 as an Assistant Professor. Ex. 2, Pl. Dep. at 22:1-2.

---

[3] David T. Curiel, M.D., Ph.D., Defendants' expert witness, is a Professor of Radiation Oncology at Washington University School of Medicine in St. Louis, Missouri. In addition to his significant experience in obtaining NIH funding (including over $40 million for 135 projects over more than 30 years), Dr. Curiel has served as an NIH grant reviewer, completed his post-doctoral traineeship at NIH and developed a professional Grant Writing Course. Ex. 6, Curiel Report at 1.

12. Dr. Chernoff has worked at FCCC since approximately 1991 and FCCC is his W-2 employer. Ex. 1, Chernoff Dep. at 9:11-15.

13. In or around 2011, Dr. Chernoff became the Chief Scientific Officer of FCCC and held that position until his promotion to Cancer Center Director in or about November 2021. Ex. 1, Chernoff Dep. at 9:11-21, 11:3-8.

14. Prior to his promotion in November 2021, Dr. Chernoff reported to FCCC's former Cancer Center Director, Richard Fisher ("Dr. Fisher"); since that time, Dr. Chernoff has reported to Michael Young, the CEO of TUHS. Ex. 1, Chernoff Dep. at 10:3-8, 11:12-19.

15. Prior to approximately 2021, J. Robert Beck ("Dr. Beck") was the Deputy Director, Chief Administrative Officer and Chief Academic Officer of FCCC. Ex. 1, Chernoff Dep. at 58:9-15.

16. Since approximately November 2021, David Wiest, Ph.D. ("Dr. Wiest") has been the Chief Scientific Officer of FCCC; prior to that time, Dr. Wiest was the Deputy Chief Scientific Officer of FCCC. Ex. 7, Deposition of David Wiest, Ph.D. ("Wiest Dep.") at 9:16-10:3.

17. Dr. Wiest has reported to Dr. Chernoff since at least November 2021. Ex. 7, Wiest Dep. at 10:4-9.

18. Camille Ragin, Ph.D. is a full professor at FCCC and prior to 2025 was Associate Director for DEIA. Ex. 4, Ragin Dep. at 7:18-19, 8:23-24.

19. In or about August 2014, FCCC promoted Plaintiff to Associate Professor with Tenure. Ex. 2, Pl. Dep. at 28:14-29:11.

20. FCCC is Plaintiff's W-2 employer. **Exhibit 8** (O'Reilly 1213).

### D. FCCC's Response to Plaintiff's 2014 Complaint About Dr. Chernoff.

21. In or about late 2014, Plaintiff made an internal complaint about Dr. Chernoff that was investigated by Fay Trachtenberg, Esq., an employment lawyer who worked in the Legal Department of Temple University from approximately January 2006 until her voluntary separation in February 2023 and provided services to FCCC following TUHS' acquisition of FCCC. Ex. 2, Pl. Dep. at 82:20-83:7; **Exhibit 9**, Deposition of Fay Trachtenberg, Esq. ("Trachtenberg Dep.") at 5:21-8:5, 16:1-15.

22. Following Ms. Trachtenberg's investigation, Dr. Beck issued Dr. Chernoff a letter dated January 9, 2015 that was drafted with the involvement of Ms. Trachtenberg and copied Dr. Fisher and Ms. Trachtenberg. Ex. 9, Trachtenberg Dep. at 35:7-17.

### E. Dr. Chernoff's 2021 Promotion.

23. Dr. Chernoff was promoted to Cancer Center Director in or about November 2021, following the unexpected and sudden termination of Dr. Fisher. Ex. 1, Chernoff Dep. at 155:5-14.

24. TUHS CEO Michael Young relieved Dr. Fisher of his duties because, under his leadership, the National Cancer Institute ("NCI") issued FCCC a "No-Cost Extension" of its Cancer Center Support Grant ("CCSG" or "Core Grant") and required FCCC to reapply for the Core Grant, creating significant uncertainty about FCCC's prospects of retaining the NCI Comprehensive Cancer Center Designation. Ex. 1, Chernoff Dep. at 24:14-23, 26:5-10, 30:11-32:3 ("You only get one shot."); **Exhibit 10**, Deposition of Towanda Record ("Record Dep.") at 71:8-72:20.

25. The Core Grant is "an essential focus" of FCCC and is "absolutely critical to not only getting patients to get the best care, but also get the best faculty. People are attracted to that

designation. It's like a gold star, if you will. The brand value of an cancer center like that, it's estimated to be a hundred million dollars by at least one consultant." Ex. 2, Pl. Dep. at 36:2-4; Ex. 1, Chernoff Dep. at 23:13-21.

26. Mr. Young promoted Dr. Chernoff to Cancer Center Director because there was a need for an internal candidate in order to quickly begin working on a Core Grant resubmission. Ex. 10, Record Dep. at 71:13-72:9; Ex. 1, Chernoff Dep. at 156:12-14.

**F.     Dr. Chernoff's 2023 Request for Plaintiff's Assistance with the Core Grant Application.**

27. On or about January 3, 2022, Dr. Chernoff sent an email to Fay Trachtenberg, Esq., in which he wrote:

> Dear Fay,
>
> I would like to communicate the message below to Alana O'Reilly. It has now been a little over seven years since our last contact and things have gone about as well as can be expected, in that she and I have practiced a policy of total avoidance, both at work and in our neighborhood (as you may recall, she is my next door neighbor)[.] However, things have changed for me lately (see below) and it is becoming awkward to maintain complete isolation. I had considered using a surrogate for communication, but the only logical person who could do that (Glenn Rall) is also persona non grata with Alana. All that said, I don't know how the intended message might be received, and I don't want to send anything without consulting you.
>
> Thanks, and Happy New Year
>
> Jonathan
>
> _____
>
> Dear Alana,
>
> Having been named Cancer Center Director, I now have responsibilities for our CCSG. One of these involves our various education programs, of which yours is an important component. For that reason, I would like to meet remotely with you sometime this month to review your plans for the coming year.

6

>   Best Wishes,
>   Jon

**Exhibit 11** (P-Dep 105); Ex. 1, Chernoff Dep. at 158:9-15; Ex. 9, Trachtenberg Dep. at 46:10-13.

28.     Between January 2015 and when she received Dr. Chernoff's January 3, 2022, email, Ms. Trachtenberg periodically checked in with Dr. Beck to see how things were going with Plaintiff and Dr. Chernoff; was told "things were going along" and the "reporting line was working"; and was not aware of any complaint made by Plaintiff about Dr. Chernoff. Ex. 9, Trachtenberg Dep. at 44:2-16, 50:6-18.

29.     Dr. Chernoff consulted with Ms. Trachtenberg in 2022 because his circumstances had materially changed and he wanted clarification on what he could or could not do in his new role. Ex. 1, Chernoff Dep. at 158:12-15.

30.     Ms. Trachtenberg sent the following email response to Dr. Chernoff's email on January 3, 2022:

>   Jonathan –
>
>   So nice to hear from you and happy New Year to you too. Thank you for thinking to include me before you reached out to Dr. O'Reilly. Given your new position and the oversight of her program, it makes perfect sense to reach out and get the information you need to do your job thoroughly. I didn't realize that Dr. O'Reilly also had an issue with Glenn Rall. For a number of reasons, academically and administratively, I think he should be included in any correspondence you have with her. This gives us another set of eyes and ears on the situation in case something comes up on her end. If there is someone other than Glenn who makes sense to be copied on your correspondence with her (perhaps Dr. Uzzo?), they should be copied as well. You may want to give Glenn a "heads up" to remind him of our past issues with Dr. O'Reilly.
>
>   Let me know if you'd like to discuss – I am working from home

> until the University opens up again in two weeks.
>
> Best,
> Fay

Ex. 11 (P-Dep 105); Ex. 9, Trachtenberg Dep. at 50:23-51:4.

31.     Dr. Chernoff responded to Ms. Trachtenberg's email with the following email to Ms. Trachtenberg later that day:

> Thanks, Fay.  Those are good suggestions.  I will confer with Glenn and also inform Rob Uzzo.  It's not by any means an emergency situation, so I will get all my ducks in a row before proceeding.

Ex. 11 (P-Dep 105).

32.     In Ms. Trachtenberg's opinion, Dr. Chernoff sending Plaintiff work-related emails was not prohibited.  Ex. 9, Trachtenberg Dep. at 39:1-40:14 ("That was the practical expectation all along.").

33.     Approximately one year later, on or about January 23, 2023, Dr. Chernoff sent Plaintiff the following email with the subject heading "Core grant":

> Dear Alana,
>
> Losing our friend Jeff, and then later hearing your words about him at your seminar last week, reminded me that we had a lot in common.  It's been eight years, more or less, since we've spoken. I wonder, after all that time, whether we might begin to work together again.
>
> As you may know, the education sections of the core grant write-up have become more prominent with each cycle, and your work in this area has been exemplary.  I'm not sure if we ever spoke of this, but my grandfather and mother both devoted their lives to teaching and though I myself did not take that path, my interests in this area are authentic and deep-rooted.  The sections on education are a potential strength for us in the write-up, as we have some real accomplishments to describe.  In the narrative, my intent is to weave in three elements - education, outreach, and diversity - that we have not emphasized enough previously.  I've asked everyone

> involved with the composition of the core grant to keep these three crucial ideas in mind as we pivot from the Fox Chase of the past into something better. If you are willing, I'd like you to serve as a reviewer and editor for various sections as they are drafted, with the particular task of harmonizing the descriptions of our research efforts with our educational imperative.
>
> Best Wishes,
>
> Jon

**Exhibit 12** (P-Dep 18); Ex. 1, Chernoff Dep. at 164:23-165:3.

34. Based on Ms. Trachtenberg's January 3, 2022 email response to him, Dr. Chernoff believed that what he wrote in his January 23, 2023 email to Plaintiff was permitted. Ex. 1, Chernoff Dep. at 166:24-167:2.

35. Plaintiff, who did not respond to the email, does not believe that Dr. Chernoff's January 23, 2023 email was romantic. Ex. 2, Pl. Dep. at 122:4-8.

36. When asked during his deposition whether he was asking Plaintiff for "direct contact," Dr. Chernoff testified:

> I wasn't seeking direct contact . . . Remotely, if that's what it had to be. I was okay with whatever [Plaintiff] wanted, but I needed some work things from her. For me, it would have been easier not do it directly. And it could have been done by correspondence, frankly. She needed to edit some things. And that would have been helpful, and that's what I wanted from her.

Ex. 1, Chernoff Dep. at 168:6-21.

37. Plaintiff believes the following aspects of Dr. Chernoff's January 23, 2023 email are true or accurate: (1) "the education sections of the core grant write-up have become more prominent with each cycle, and your work in this area has been exemplary"; and (2) "The sections on education are a potential strength for us in the write-up, as we have some real accomplishments to describe." Ex. 2, Pl. Dep. at 122:11-18, 122:20-123:7.

38. Plaintiff does not believe that Dr. Chernoff, in his January 23, 2023 email, was offering her a more prominent role in the Core Grant application. Ex. 2, Pl. Dep. at 126:20-23.

**G.    Plaintiff's January 25, 2023 Complaint to Drs. Wiest and Golemis.**

39. On or about January 25, 2023, Plaintiff asked to meet with Dr. Wiest and Dr. Erica Golemis, whose Molecular Therapeutics Program Plaintiff joined in 2017 (around which time Dr. Golemis began to complete Plaintiff's annual performance evaluations. Ex. 2, Pl. Dep. at 130:22-24; Ex. 7, Wiest Dep. at 33:6-9, 34:19-21; Ex. 5, Golemis Dep. at 37:14-17, 90:19-23.

40. During their January 25, 2023 meeting, Plaintiff told Drs. Wiest and Golemis about Dr. Chernoff's January 23, 2023 email and that Dr. Chernoff "was taking the photographs"; additionally, Plaintiff explained "the history" with Dr. Chernoff to Dr. Wiest who had said he knew "nothing about this." Ex. 2, Pl. Dep. at 131:13-132:22.

41. Dr. Wiest told Plaintiff during their January 25, 2023 meeting that he would speak with Dr. Chernoff immediately. Ex. 2, Pl. Dep. at 134:2-5.

42. After the January 25, 2023 meeting, Dr. Wiest met with Dr. Chernoff and discussed Dr. Chernoff's January 23, 2023 email and that Dr. Chernoff would be "dropping the matter." Ex. 1, Chernoff Dep. at 172:9-11, 173:15-17; Ex. 7, Wiest Dep. at 59:1-12 ("And [Dr. Chernoff] said, "Okay. Fine.")

**H.    Dr. Chernoff's March and August 2023 Approvals of Plaintiff's Letter of Support.**

43. On or about March 25, 2023, Dr. Chernoff approved Plaintiff's request for an institutional Letter of Support in connection with an NIH grant called a Research With Activities Related to Diversity ("ReWARD") Grant. **Exhibit 13** (P-Dep 46); Ex. 1, Chernoff Dep. at 199:6-11, 203:19-204:3 ("I said the letter could be authorized. So as far as I'm concerned, she had permission to go ahead and we would sign the letter. So I didn't consider it denied."); Ex. 7,

Wiest Dep. at 93:4-94:12.

44. Five days earlier, on March 20, 2023, in response to an email circulated by Dr. Wiest to all Science Faculty and Clinical Faculty containing "a number of relevant funding opportunities," Plaintiff wrote in an email to Dr. Wiest, in relevant part:

> Hi Dave,
>
> One of the announcements on the list you just sent might be ideal for me . . . It's for investigators who don't have current funding at the time of the award . . . **I'm sending to you because it requires significant institutional commitment** . . . . Given my current lack of funding and high interest in community and DEI projects, this might really be ideal.
>
> Thoughts?

**Exhibit 14** (P-Dep 43) (emphasis added); Ex. 7, Wiest Dep. at 80:10-17.

45. Later in the day on March 20, 2023, Dr. Wiest forwarded Plaintiff's email earlier that day to Dr. Chernoff, writing, "Hi – I sent out an email for grant opportunities this morning. Alana replied….looks like her community would could [*sic*] be a very good fit and would loop Camille and Charnita in…should I ask what kind of support would be needed?"  Ex. 14 (P-Dep 43); Ex. 7, Wiest Dep. at 83:12-15.

46. Dr. Wiest sent his March 20, 2023 email to Dr. Chernoff because, based the information in Plaintiff's email to him, he believed that FCCC's support of Plaintiff's ReWARD Grant application would have required FCCC to commit additional financial resources, which required Dr. Chernoff's approval.  Ex. 7, Wiest Dep. at 83:16-84:7.

47. Dr. Chernoff responded to Dr. Wiest's March 20, 2023 email that same day, writing, "I'll need a day or two to consider."  Ex. 14 (P-Dep 43); Ex. 1, Chernoff Dep. at 193:19-23.  By this, Dr. Chernoff meant to consider "what support [Plaintiff] was actually seeking here."  Ex. 1, Chernoff Dep. at 193:24-194:2.

48. After responding to Dr. Chernoff on March 21, 2023 by email, "ok – thanks…let me know," on March 22, 2023, Dr. Wiest again emailed Dr. Chernoff, writing, "Hi – been a couple days…thoughts?" Dr. Chernoff responded to Dr. Wiest's March 22, 2023 email that same day, writing, "We can discuss in person later this week." **Exhibit 15** (P-Dep 44); Ex. 14 (P-Dep 43); Ex. 1, Chernoff Dep. at 194:19-24; Ex. 7, Wiest Dep. at 85:7-16.

49. At some point that week, Dr. Wiest recalls having a conversation with Dr. Chernoff about Plaintiff's ReWARD Grant Letter of Support in which Dr. Chernoff stated that there were competing interests or competing needs and that it was not something that FCCC could support at this time. Ex. 7, Wiest Dep. at 85:17-86:2.

50. On March 23, 2023, Dr. Wiest sent an email to Plaintiff, in which he wrote:

> Hi Alana - sorry for the delay. I think it's a great
> opportunity….but as you know, I don't have resources of my own
> to invest so I had to see if the institution would be willing to invest
> and i was unable to convince them to provide support as they felt
> there were other initiatives that were of a higher priority.
>
> Sorry.
> Dave

**Exhibit 16** (P-Dep 45); Ex. 7, Wiest Dep. at 87:20-22.

51. Aside from their emails, Dr. Chernoff does not recall speaking with Dr. Wiest that week about Plaintiff's ReWARD Grant Letter of Support and did not tell Dr. Wiest that there were other initiatives that were of a higher priority. Ex. 1, Chernoff Dep. at 195:1-2, 196:6-13.

52. On Saturday, March 25, 2023, at or around 6:36 P.M., Dr. Chernoff wrote the following email to Dr. Wiest approving Plaintiff's request for a Letter of Support:

> Having reviewed this funding mechanism in detail, I see that the
> required institutional [Letter of Support] doesn't commit FCCC to
> much beyond a DEI focus, a guarantee of lab space, and access to
> an administrator such as is already in place. **Given that no extra
> institutional funds or activities are required, I will supply [a
> Letter of Support] and wish her good luck.**

Ex. 13 (P-Dep 46) (emphasis added); Ex. 1, Chernoff Dep. at 198:11-199:11 ("Q. And at the top when you're responding . . . you say you will supply the letter of support? A. Yes.").

53. Although Dr. Wiest did not see Dr. Chernoff's March 25, 2023 email approving Plaintiff's request for a Letter of Support, had Dr. Wiest seen this email, he would have moved forward with the Letter of Support. Ex. 7, Wiest Dep. at 93:12-18, 98:6-15.

54. According to Dr. Chernoff, Dr. Wiest "must have misinterpreted" his "delay" in providing his approval to mean that he was not willing to give Plaintiff a Letter of Support, because Dr. Chernoff "hadn't made any decision yet about this grant [as of March 23, 2023]." Ex. 1, Chernoff Dep. at 200:14-201:6.

55. Following his March 25, 2023 approval, Dr. Chernoff believed that a Letter of Support had been provided and that Plaintiff had submitted her ReWARD Grant application. Ex. 1, Chernoff Dep. at 204:1-3.

56. Plaintiff did not need her ReWARD Grant to be funded in order to remain employed. Ex. 2, Pl. Dep. at 160:1-7.

57. When asked during her deposition what harm Plaintiff experienced as a result of not receiving a Letter of Support prior to the June 2023 submission date, Plaintiff testified that, had she been able to apply by that date, "the grant could have potentially been funded" but that "[a]ll of this is, obviously, speculation." Ex. 2, Pl. Dep. at 166:13-23.

58. On or about May 8, 2023, Plaintiff wrote in an email to an NIH representative, "I think we will submit when our application is stronger." **Exhibit 17** (P-Dep 93) at FCCC 2260; Ex. 2, Pl. Dep. at 170:8-23.

59. Plaintiff further testified, "The denial of the letter of support harmed me so dramatically because it was a decision on the part of the leadership team that they were not going

to support my science." Ex. 2, Pl. Dep. at 167:5-8.

60. On August 11, 2023, Plaintiff again emailed Dr. Wiest about the ReWARD Grant Letter of Support, writing, in relevant part, "Just following up on the ReWARD grant, due October 5 . . . I hope to hear positive news soon that the LOS will be provided for the October 5 submission." Ex. 17 (P-Dep 93); Ex. 2, Pl. Dep. at 169:22-23; Ex. 7, Wiest Dep. at 110:5-21.

61. Dr. Wiest forwarded Plaintiff's August 11, 2023 email to Dr. Chernoff, writing, in relevant part, "Hi – got this from Alana . . . If you have no objections I'll give Camille a heads up." **Exhibit 18** (P-Dep 47); Ex. 7, Wiest Dep. at 111:6-14.

62. Dr. Chernoff responded to Dr. Wiest's August 11, 2023 email within a few minutes, writing to Dr. Wiest via email, "**Fine with me**." Ex. 18 (P-Dep 47) (emphasis added); Ex. 7, Wiest Dep. at 111:6-14, 113:18-22; Ex. 1, Chernoff Dep. at 202:11.

63. On August 11, 2023, Dr. Wiest both responded to Dr. Chernoff's "Fine with me" email by writing to Dr. Chernoff "OK – sounds good… I'll let Camille know.." and by emailing Camille Ragin, Ph.D., MPH as follows:

> Hi [Camille] – I hope you are well. I got a request for a support letter for a grant Alana would like to submit in Oct. [I]t requires an institutional support letter attesting to the things listed below…
>
> The issue is that many of the things I'd need to put in the letter fall [within] your domain… would you be willing to help get that letter together when the time comes?

Ex. 18 (P-Dep 47); **Exhibit 19** (P-Dep 99); Ex. 4, Ragin Dep. at 32:14-33:6. Dr. Ragin responded to Dr. Wiest via email in which she wrote, in relevant part, "Happy to help." Ex. 19 (P-Dep 99); Ex. 4, Ragin Dep. at 32:14-33:6.

64. Also on August 11, 2023, Dr. Wiest sent an email response to Plaintiff, which stated as follows:

14

> Hi Alana - thanks for circling back. I looked through what needs to be in the letter and I think I'll need help from Camille on [specifics] here since some of this is in her wheelhouse ..but I'll reachout [*sic*] to her for help.
>
> Dave

Ex. 17 (P-Dep 93); Ex. 7, Wiest Dep. at 110:18-21.

65. Dr. Wiest testified that he communicated to Plaintiff in his August 11, 2023 email response to Plaintiff that Plaintiff would receive the Letter of Support, and that, "When I got permission [from Dr. Chernoff], I immediately responded [to Plaintiff] and sought to move forward." Ex. 7, Wiest Dep. at 110:18-21, 114:3-4.

66. Based on Dr. Wiest's email to Dr. Ragin, Dr. Ragin understood that she would be involved in assisting with the Letter of Support and that she would need to be a coauthor in writing the Letter of Support. Ex. 4, Ragin Dep. at 33:7-13.

67. The ReWARD Grant had multiple potential submission dates over a period of several years. Ex. 6, Curiel Report at 3; Ex. 2, Pl. Dep. at 163:10-164:22.

68. Plaintiff received the Letter of Support in September 2023 and submitted her ReWARD Grant application by the next submission date of October 5, 2023. Ex. 2, Pl. Dep. at 163:10-16; Ex. 6, Curiel Report at 3.

69. Plaintiff's October 2023 ReWARD Grant submission was not funded, and Plaintiff re-submitted for the ReWARD Grant in June 2024 which also was not funded. Ex. 2, Pl. Dep. at 163:17-24.

70. As to the reasons why NIH did not fund Plaintiff's ReWARD Grant submissions, Plaintiff was told, in summary, "they didn't think low-income Philadelphia high school students could contribute productively to research." Ex. 2, Pl. Dep. at 164:1-5.

71. Plaintiff's second (June 2024) ReWARD Grant submission received a lower score

15

than her first submission in October 2023. Ex. 6, Curiel Report at 7.

72. The ReWARD Grant program announcement presumed a "set aside" budget for each funding cycle, meaning that adequate NIH funds existed to fund meritorious grant submissions submitted during each cycle. Ex. 6, Curiel Report at 6.

73. The NIH funded more than twice as many ReWARD Grant submissions made in June 2024 as compared to the submissions made by the October 2023 submission date. Ex. 6, Curiel Report at 7.

74. In Dr. Curiel's opinion:

> In summary, in my opinion, based on my experience and analysis of the materials presented in this case, the timing of Plaintiff's applications for the ReWARD Grant funding mechanism had no impact on the prospects of the same being funded. Had Plaintiff submitted by the June 2023 deadline, her score very likely would have been the same as her October 2023 submission. Her demonstrated inability to improve upon her initial submission when she re-submitted in 2024 provides further support for the conclusion that, regardless of when Plaintiff submitted her application, it would not have been funded.

Ex. 6, Curiel Report at 9.

I. **Plaintiff's Post-PCHR Complaint Allegations**

75. On or about August 31, 2023, Plaintiff filed a Complaint with the Philadelphia Commission on Human Relations ("PCHR Complaint"). ECF No. 1.

76. In its Verified Answer with New Matter to Plaintiff's PCHR Complaint, Temple University denied any knowledge of Plaintiff's operative factual allegations other than that Ms. Trachtenberg involvement in responding to Plaintiff's 2014 complaint. **Exhibit 20**, Verified Answer with New Matter of Temple University to Plaintiff's 2023 Complaint with the Philadelphia Commission on Human Relations.

77. In or about March 2024, Plaintiff, along with all other members of her academic

16

program (then called Cancer Signaling and Microenvironment; "CSM"), was asked to make a brief research presentation at a CSM program retreat FCCC.  Ex. 2, Pl. Dep. at 15:18-16:19.

78.     Plaintiff had a "problem" with participating in the CSM retreat and asked Dr. Wiest "how I handle a program that is in-person only."  Ex. 2, Pl. Dep. at 15:18-16:19; **Exhibit 21** (P-Dep 96).

79.     In response, Dr. Wiest offered that Plaintiff could participate and present via Zoom.  Ex. 2, Pl. Dep. at 15:24-16:1.

80.     Plaintiff found the Zoom option "a very significant issue" because "Dr. Chernoff could be watching, taking pictures, recording video over Zoom."  Ex. 2, Pl. Dep. at 16:4-8.

81.     In or about August 2024, Plaintiff requested "assurances that Dr. Chernoff would not attend breakout sessions" or "try to communicate" with her at an FCCC retreat.  Ex. 2, Pl. Dep. at 196:21-197:13.

82.     In response to her August 2024 request, Towanda Record, AVP of HR Strategy, met with Plaintiff in September 2024 and offered to attend the retreat with Plaintiff so as to observe and address anything that were to occur.  Ex. 10, Record Dep. at 10:17-18, 164:18-20 ("What I said was I would be there.  That I would observe, and that I would address anything, if it were to occur."); Ex. 2, Pl. Dep. at 204:16-19 ("Her solution basically was that she would be there and if he behaved inappropriately, I could tap her on the shoulder and she would correct his behavior in the moment.").

83.     Plaintiff rejected this offer and did not attend the FCCC retreat because:

> There was no way I was going, if he was going to be wandering around basically doing whatever he wants, at any time he wants, and with no guarantee.  They weren't taking his cell phone.  They weren't preventing him from taking photographs.  They weren't preventing him from any other form of harassment, other than if

17

>me did something that she could observe as misconduct, that I
could tap her on the shoulder . . . There was no offer of protection.

Ex. 2, Pl. Dep. at 204:22-205:6.

84. Plaintiff has no factual basis to believe that Dr. Chernoff could have secretly recorded her. Ex. 2, Pl. Dep. at 206:17-19.

Respectfully submitted,

**Cozen O'Connor**

/s/ Benjamin L. Shechtman
Benjamin L. Shechtman
bshechtman@cozen.com
Elizabeth A. Malloy
emalloy@cozen.com
1650 Market St., Suite 2800
Philadelphia, PA  19103
Telephone:  (215) 665-2046
Facsimile:  (215) 372-2344

Dated:   June 27, 2025

Attorneys for Defendants