**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALANA M. O'REILLY, Ph.D.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 24-5315-KSM** |
| **THE INSTITUTE FOR CANCER RESEARCH, et al.,** | |
| Defendants. | |

**MEMORANDUM**

Marston, J.                                                                                         October 2, 2025

This case presents a long, complicated history of troubling conduct from an influential male figure and responses to that conduct that are far from exemplary. But when it comes to employment discrimination and retaliation, the scope of the law is limited, and this is one such case where, unfortunately, those limits are particularly apparent.

Plaintiff Alana O'Reilly, Ph.D., ("Dr. O'Reilly") brings sex discrimination and retaliation claims against Defendants The Research Institute of Fox Chase Cancer Center (incorrectly named "The Institute For Cancer Research d/b/a Fox Chase Cancer Center") ("Fox Chase"), Temple University Health System ("Temple Health"), Temple University ("Temple"), and Jonathan Chernoff, MD, Ph.D. ("Dr. Chernoff"). Dr. O'Reilly alleges that Defendants subjected her to quid pro quo sexual harassment at the hands of Dr. Chernoff and retaliated against her for reporting Dr. Chernoff's conduct first internally and then externally to the Philadelphia Commission on Human Relations ("PCHR"), in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Philadelphia Fair Practices Ordinance ("PFPO").

Defendants have filed a motion for summary judgment on all of Dr. O'Reilly's claims.  (Doc. No. 46; *see* Doc. No. 52.)  Dr. O'Reilly opposes Defendants' motion.  (Doc. No. 48.)

For the reasons below, the Court grants Defendants' motion in its entirety.

## I.    Factual Background

Viewing the evidence in the light most favorable to Dr. O'Reilly, the relevant facts are as follows.[1]

### A.    Dr. O'Reilly's Employment at Fox Chase

Fox Chase is a non-profit cancer research and education institution in Philadelphia owned by Temple Health.  (Doc. No. 48-2 ¶¶ 1, 3.)  It is one of approximately fifty-five National Cancer Institute ("NCI")-designated Comprehensive Cancer Centers in the United States, which designation reflects Fox Chase's high-quality research, patient care, and cancer prevention.  (*Id.* ¶ 2.)  Fox Chase hired Dr. O'Reilly in December 2007 as an Assistant Professor.  (*Id.* ¶ 11.)  Fox Chase promoted Dr. O'Reilly to Associate Professor with Tenure in approximately August 2014. (*Id.* ¶ 19.)

As a tenured Associate Professor, Dr. O'Reilly has a "continuous appointment that extends until resignation, retirement, early retirement, long-term disability, or death, or until terminated by action of the Board of Directors under the provisions for removal for just cause or for reasons of financial exigency."  (Doc. No. 46-6 at 26.)  She is expected to support half of her

---

[1] As the Court addressed in its Memorandum partially granting Defendants' motion to dismiss, Title VII and the PFPO require an individual seeking to challenge an employment action to file a complaint with the EEOC and the PCHR within 300 days after the alleged unlawful action occurred.  (*See* Doc. No. 38 at 9–10 (citing 42 U.S.C. § 2000e–5(e)(1); Phila. Code. §§ 9-1112(1), (3)).)  Thus, the Court only considers evidence from that 300-day lookback period, which begins on November 4, 2022, for purposes of determining the sufficiency of Plaintiff's claims at the summary judgment stage.  However, because the Court may consider evidence that predates the lookback period as "background evidence," the Court recites all of the relevant facts, including those that predate the lookback period.  *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Titus-Morris v. Banc of Am. Card Servicing Corp.*, 512 F. App'x 213, 217 (3d Cir. 2013).

salary and fringe benefits, as well as her laboratory expenses, including staff salaries and fringe benefits, through grant funding.  (*Id.*; Doc. No. 48-2 ¶¶ 4–5.)  Dr. O'Reilly may fulfill this obligation through external (also known as "extramural") funding, which is ordinarily expected, or internal funding mechanisms.  (*Id.*)

If, at any point, "all major extramural grants" of a tenured Associate Professor are not renewed, Fox Chase will pay 100% of the salary and fully cover the laboratory expenses for the first twelve months following the cessation of extramural funding.  (Doc. No. 46-6 at 27.)  If funding is not restored within that initial 12-month period, Fox Chase will continue to provide "50% of the investigator's actual salary or 50% of the [National Institutes of Health] salary cap, whichever is less . . . until new research funding is obtained" and may continue to provide some level of research support.  (*Id.* at 27–28.)  "Absent evidence of other productive activity," a lack of extramural funding for a period of 24 months may be deemed a "failure to sustain scientific productivity," which is a cause for termination.  (*Id.* at 28.)

### B.    *Dr. O'Reilly's Internal Sexual Harassment Complaint against Dr. Chernoff in 2014*

In late 2014, Dr. O'Reilly made an internal complaint of sexual harassment against her supervisor, Dr. Chernoff, then-Chief Scientific Officer of Fox Chase.[2]  (Doc. No. 52-1 ¶¶ 1–2; Doc. No. 48-2 ¶ 21.)  Dr. O'Reilly's complaint was based, at least in part, on Dr. Chernoff's repeated email communications covering a range of topics like Dr. Chernoff's past affair, his marriage, and his progression through therapy.  (*See* Doc. No. 48-5.)

Fox Chase conducted an internal investigation into Dr. O'Reilly's complaint, which involved numerous conversations between Dr. Chernoff; Fay Trachtenberg, Temple's in-house

---

[2] Dr. Chernoff has worked at Fox Chase since approximately 1991, and in approximately 2011, he became Chief Scientific Officer of Fox Chase.  (Doc. No. 48-2 ¶¶ 12–13.)

counsel at the time; Dr. Robert Beck, then-Deputy Director, Chief Administrative Officer and Chief Academic Officer at Fox Chase; and Dr. Richard Fisher, then-Cancer Center Director at Fox Chase.  (*See* Doc. No. 48-8 at 2.)  During those conversations, Dr. Chernoff was instructed to have "<u>no</u> communication" with Dr. O'Reilly.[3]  (*Id.*)  Dr. Chernoff ignored that instruction and sent Dr. O'Reilly an email from his personal email account on Christmas Day 2014.  (*Id.*)

On January 5, 2015, Dr. Beck, Dr. Fisher, and Ms. Trachtenberg again met with Dr. Chernoff and reprimanded him for violating the no-contact order.  (*Id.*)  Following this meeting, Dr. Beck issued a letter[4] to Dr. Chernoff outlining Fox Chase's expectations and implementing specific remedial actions in response to Dr. O'Reilly's complaint:  Dr. Chernoff would no longer have control over any of Dr. O'Reilly's "funding" or "any employment decisions" regarding Dr. O'Reilly, her lab, or her grants; instead, Dr. O'Reilly would report to Dr. Robert Beck; Dr. Chernoff was prohibited from having any "personal communication" with Dr. O'Reilly, including "in person, on the phone, via email, text or handwritten letter or through social media," and was directed "not [to] ask[ ] her direct questions in a meeting or at a chance encounter at work;" and Dr. Chernoff could only send Dr. O'Reilly professional email from his office that went to "consolidated email lists"—any other work communication needed to go through Dr. Beck.  (*Id.* at 2–3; Doc. No. 48-2 ¶¶ 15, 21–22; Doc. No. 52-1 ¶¶ 3–6.)  The letter contained no expiration date for the enumerated remedial actions and did not otherwise indicate that the implementation of these actions was temporary.[5]  (*See id.*)

---

[3] Indeed, this was a "condition of [his] reinstatement on December 29, 201[4]," which suggests that Dr. Chernoff was placed on temporary leave during Fox Chase's internal investigation into Dr. O'Reilly's complaint.  (*See id.*)

[4] Dr. Fisher and Ms. Trachtenberg were copied on this letter.  (*Id.* at 3.)

[5] The letter also stated that if Dr. Chernoff did not abide by the parameters outlined, Fox Chase "would be unable to defend [Dr. Chernoff's] actions should [Fox Chase] have to go to Court."  (Doc. No. 48-8 at 3.)

### C.    Dr. O'Reilly's Interactions with Dr. Chernoff from 2015 through 2022

At least initially, Dr. Chernoff failed to strictly adhere to the terms of Dr. Beck's letter. (*See* Doc. No. 52-1 ¶ 9; Doc. No. 48-13.)  For example, during a meeting at which Dr. O'Reilly was presenting in April 2015, Dr. Chernoff asked her "at least a half a dozen questions." (Doc. No. 48-13 at 11.)  And he repeatedly contacted Dr. Beck to express his frustration with the situation and his perception of Dr. O'Reilly's declining participation in meetings and other work-related activities. (*See, e.g., id.* at 5 ("This is nuts.  I cannot imagine what must be going through her head, but she's definitely dropped off the map in terms of academic participation."); *id.* at 7 ("The real problem is not in trying to obey her rules; it is that the rules themselves are absurd. Her current stance is untenable at an academic center, unless she plans to lock herself away and become a hermit, and have become widely noted by the faculty and staff, including members of her own lab, two of whom have expressed their concerns to me.  It does us all harm; I'm not sure she gets that."); *id.* at 13 ("[Y]ou should be aware of how isolated she has made herself.  She's let this thing grow to utterly fantastic and, in a way, comical proportions, such that my appearance at a meeting is taken as evidence of stalking, and saying hello as a form of assault.").)  In late 2016, Dr. Chernoff even went so far as to advocate for Dr. O'Reilly's termination from membership in Fox Chase's Cancer Biology Program due to lack of participation.[6] (*See* Doc. No. 48-14.)

Several years passed,[7] and in November 2021, Dr. Chernoff was promoted to Cancer Center Director of Fox Chase. (Doc. No. 48-2 ¶ 13.)  With this promotion, Dr. Chernoff

---

[6] Whether Dr. O'Reilly was ultimately terminated from this program is not entirely clear from the record, though around the same time, Dr. O'Reilly was invited to and did join another program, the Molecular Therapeutics Program. (*See* Doc. No. 46-8, Golemis Dep. at 37:14–17; Doc. No. 48-2 ¶ 37.)

[7] According to Dr. O'Reilly, her colleague and close friend, Dr. Jeffrey Peterson, "stood up" for Dr. O'Reilly against Dr. Chernoff during these intervening years. (Doc. No. 52-1 ¶ 34.)  Dr. Peterson

assumed ultimate supervisory authority over all Fox Chase research employees, including Dr. O'Reilly.  (Doc. No. 52-1 ¶ 16.)  Dr. Chernoff testified that, following his promotion, there was no aspect of his new role that required "personal, direct contact" with Dr. O'Reilly.  (Doc. No. 48-12, Chernoff Dep. at 160:16–21.)  Nevertheless, on January 3, 2022, just two months after his promotion, Dr. Chernoff emailed Ms. Trachtenberg, the same attorney who had overseen the investigation into Dr. O'Reilly's 2014 complaint, seeking to reestablish some communication with Dr. O'Reilly.  (Doc. No. 46-14.)  Dr. Chernoff indicated that for the past seven years, he and Dr. O'Reilly had "practiced a policy of total avoidance, both at work and in our neighborhood (as you may recall, she is my next door neighbor)."  (*Id.* at 3.)  But, considering his "new responsibilities" for Fox Chase's "Core Grant" as Cancer Center Director, it was "becoming awkward to maintain complete isolation."  (*Id.*)  He asked if he could send Dr. O'Reilly an email requesting to "meet remotely" with her to review her plans for the coming year as part of Fox Chase's Core Grant application process.  (*Id.*)  Ms. Trachtenberg replied that "it makes perfect sense to reach out and get the information [Dr. Chernoff] need[s] to do [his] job thoroughly," but, "[f]or a number of reasons, academically and administratively," advised that he include at least one other individual on any correspondence with Dr. O'Reilly."  (*Id.* at 2.)  After confirming that he would "get all [his] ducks in a row before proceeding" (*id.*), Dr. Chernoff ultimately did not send his proposed email to Dr. O'Reilly.

### D.    Dr. O'Reilly's Interactions with Dr. Chernoff in 2023 and Resulting Internal Complaint

Approximately one year later, on January 18, 2023, Dr. Chernoff attended Dr. O'Reilly's annual research presentation.  (Doc. No. 52-1 ¶ 36.)  Two attendees observed Dr. Chernoff

---

passed away in early January 2023.  (*Id.* ¶ 35.)

taking photographs of Dr. O'Reilly and intently reviewing those photographs during her presentation, and they subsequently informed Dr. O'Reilly.[8]  (*Id.*; Doc. No. 48-20; Doc. No. 48-21.)  Although Dr. Chernoff did not otherwise interact with Dr. O'Reilly during her presentation, he did send her an email five days later—without copying anyone else on the email, contrary to Ms. Trachtenberg's earlier advice.  (Doc. No. 48-2 ¶ 33; Doc. No. 46-15.)  In his email, Dr. Chernoff wrote, "It's been eight years, more or less, since we've spoken.  I wonder, after all that time, whether we might begin to work together again."  (*Id.*)  He then went on to praise her work and asked if she would be willing to serve as a reviewer and editor on the education sections of Fox Chase's "Core Grant" resubmission, a grant that is critical to Fox Chase's retention of its NCI Comprehensive Cancer Center designation.  (*Id.*; Doc. No. 48-2 ¶¶ 24–25.)

In light of these events, Dr. O'Reilly arranged a meeting on January 25, 2023 with Dr. David Wiest, Chief Scientific Officer of Fox Chase, and Dr. Erica Golemis, head of Fox Chase's Molecular Therapeutics Program, both of whom Dr. O'Reilly considered her "supervisors."[9]  (Doc. No. 48-2 ¶ 39; Doc. No. 52-1 ¶ 43.)  During that meeting, Dr. O'Reilly reported Dr. Chernoff's conduct at her presentation and his subsequent email outreach and explained "the history" with Dr. Chernoff to them.[10]  (Doc. No. 48-2 ¶ 40; Doc. No. 52-1 ¶ 43.)  Dr. Wiest

---

[8] Unsurprisingly, Dr. Chernoff denies taking any such photographs.  (Doc. No. 46-1, Chernoff Dep. at 164:1–17.)  But we view the evidence in the light most favorable to Dr. O'Reilly at this stage.  And the Court notes that the parties' recent motions in limine about evidence of these photographs certainly suggest that Dr. Chernoff took and then subsequently deleted the photographs.  (*See* Doc. Nos. 65, 72.)

[9] Dr. Beck, who became Dr. O'Reilly's supervisor following Dr. O'Reilly's 2014 sexual harassment complaint about Dr. Chernoff, retired in 2021.  (Doc. No. 52-1 ¶ 12.)

[10] At that time, Dr. Golemis was aware of Dr. O'Reilly's prior sexual harassment complaint against Dr. Chernoff and the resulting imposition of certain restrictions on Dr. Chernoff's contact with Dr. O'Reilly.  (Doc. No. 52-1 ¶ 45.)  But Dr. Wiest had no knowledge of the complaint or resulting restrictions beyond rumors of some sort of past conflict between Drs. O'Reilly and Chernoff.  (*Id.* ¶ 44.)

assured Dr. O'Reilly that he would speak with Dr. Chernoff. (Doc. No. 48-2 ¶ 41; Doc. No. 48-23.) Dr. O'Reilly expressed concern that Dr. Chernoff would react by targeting her funding, and while Dr. Wiest tried to assuage this concern, he also indicated that he could not guarantee Dr. Chernoff's prohibition from participating in financial decisions about Dr. O'Reilly given his new role as Cancer Center Director. (Doc. No. 48-23.)

Because Drs. Wiest and Golemis did not understand Dr. O'Reilly to be making a complaint of sex-based harassment against Dr. Chernoff during the meeting on January 25, they did not subsequently report her concerns to Human Resources.[11] (Doc. No. 52-1 ¶¶ 43, 50–51; Doc. No. 52-2, Wiest Dep. at 56:16–57:6; Doc. No. 52-3, Golemis Dep. at 108:18–111:6.) Nor did Dr. Wiest make any efforts to learn more about "the history" between Drs. Chernoff and O'Reilly—mainly, the documented restrictions on Dr. Chernoff's contact with Dr. O'Reilly that had been imposed back in January 2015. (Doc. No. 52-1 ¶ 55.) But Dr. Wiest did meet with Dr. Chernoff about Dr. O'Reilly's concerns. (Doc. No. 48-2 ¶ 42; Doc. No. 52-1 ¶ 52.) Though Drs. Wiest and Chernoff disagree about the scope of Dr. O'Reilly's concerns discussed during that meeting, they agree that the meeting concluded with their mutual understanding that Dr. O'Reilly would not work with Dr. Chernoff on the Core Grant as he had requested. (Doc. No. 48-2 ¶ 42; Doc. No. 52-1 ¶¶ 52–53.) From that point on, Dr. Chernoff had no direct contact with Dr. O'Reilly.[12]

---

[11] During that meeting, Dr. O'Reilly also expressed her preference not to handle the situation "through legal." (Doc. No. 48-23 at 4.)

[12] In early March 2023, Dr. Chernoff contacted Elizabeth Egan, the widow of his and Dr. O'Reilly's former colleague, Dr. Peterson, about putting together a "tribute video" for Dr. Peterson to be shown in an upcoming faculty reception. (Doc. No. 48-19.) Knowing Dr. O'Reilly was a close friend of Dr. Peterson, Dr. Chernoff asked whether Ms. Egan would like Dr. O'Reilly to participate in the video. (*Id.*) After speaking with Dr. O'Reilly, Dr. Peterson's widow suggested that Dr. Chernoff use the portions of Dr. O'Reilly's January presentation that paid tribute to Dr. Peterson. (*Id.*) After receiving this reply, Dr. Chernoff stopped communicating with Ms. Egan regarding the video. (*Id.*)

### E.    Dr. O'Reilly's ReWARD Grant Application Process in 2023

On March 20, 2023, Dr. O'Reilly responded to an email from Dr. Wiest containing a list of federal funding opportunities and expressed her interest in the "Research With Activities Related to Diversity (ReWARD)" funding opportunity provided by the National Institutes of Health ("NIH") (the "ReWARD grant").  (Doc. No. 48-2 ¶ 44; Doc. No. 52-1 ¶ 59; Doc. No. 46-17.)  There were multiple deadlines to submit applications for the ReWARD grant throughout 2023 and 2024, commensurate with the grant's various funding cycles.  (Doc. No. 48-2 ¶ 67.) Like most grant applications, the ReWARD grant application required an "institutional letter of support," which demonstrates "sufficient institutional resources to allow the investigator to be able to carry out the themes of the grant."[13]  (Doc. No. 48-2 ¶ 9; Doc. No. 52-1 ¶ 59; Doc. No. 46-19 at 3; *see* Doc. No. 48-22, Golemis Dep. at 17:19–24.)

In her email to Dr. Wiest explaining she wanted to apply for the ReWARD grant, Dr. Reilly stated that it "requires significant institutional commitment," and since she has "spent an enormous amount of time writing grants that [she] [doesn't] get because of lack of institutional support," she did not want to "dive in" on the ReWARD grant application "unless getting some support might be feasible."  (Doc. No. 46-17 at 2–3.)  That same day, Dr. Wiest forwarded Dr. O'Reilly's email to Dr. Chernoff, asking if he should follow up with Dr. O'Reilly about the kind

---

[13] The vast majority of institutional letters of support simply require confirmation that the applicant is employed, has access to the institution's facilities, and has time to work on the proposed research.  (Doc. No. 52-1 ¶¶ 72–73.)  Fox Chase routinely grants requests for such letters.  (*Id.* ¶¶ 68, 70–72.)  Some institutional letters of support require that the institution commit additional resources beyond what a faculty member has access to on a daily basis.  (Doc. No. 48-2 ¶ 10.)  Approximately five percent of the requests for institutional letters of support that Fox Chase receives fall into the latter category. (Doc. No. 52-1 ¶ 72.)  Although Dr. O'Reilly's email to Dr. Wiest did not clarify if the letter of support needed for the ReWARD grant was a routine letter or would need Fox Chase to commit additional resources, the record is clear that ultimately it was determined it was a routine letter of support.  (*See* Doc. No. 52-1 ¶ 68.)

of institutional support needed for this grant.  (*Id.* at 2.)  Dr. Chernoff promptly responded that he would "need a day or two to consider."  (*Id.*)

Two days later, on March 22, Dr. Wiest sent a follow-up email to Dr. Chernoff, who responded that they could "discuss in person later this week."  (Doc. No. 46-18.)  According to Dr. Wiest, he and Dr. Chernoff then spoke about Dr. O'Reilly's stated interest in the ReWARD grant, and Dr. Chernoff indicated that Fox Chase could not support that grant due to other competing interests and/or needs.[14]  (Doc. No. 48-2 ¶ 49.)  Following that conversation, Dr. Wiest emailed Dr. O'Reilly on March 23:  "I think it's a great opportunity….but as you know, I don't have resources of my own to invest so I had to see if the institution would be willing to invest and [I] was unable to convince them to provide support as they felt there were other initiatives that were of a higher priority.  Sorry."  (Doc. No. 46-16 at 3.)

Dr. O'Reilly responded to Dr. Wiest's email the following day, explaining that the ReWARD grant aligned with what she understood to be some of Fox Chase's highest priorities, and clarifying that "the institutional requirements for a [letter of support]" "do not require significant resources in addition to what already exists."  (*Id.* at 2.)  She also stated:  "I'm going to go ahead and plan to submit for this opportunity- if things go well, it could provide me with two R01s in time for the core grant review.  I'll notify the grants office of the plan, and hopefully the institution will realize the importance of the program for the core grant in the meantime."  (*Id.*)  On March 25, Dr. Wiest forwarded her response to Dr. Chernoff, suggesting that they "talk briefly on [M]onday."  (*Id.*)  Dr. Chernoff replied later that same day, indicating that "[h]aving

---

[14] Dr. Chernoff recalls no such conversation.  (Doc. No. 48-2 ¶ 51.)  According to Dr. Chernoff, Dr. Wiest "must have misinterpreted" his delayed provision of approval to mean that he was not willing to provide Dr. O'Reilly with her requested letter of support for her ReWARD grant.  (Doc. No. 48-2 ¶ 54.)

reviewed this funding mechanism in detail, . . . . [and] [g]iven that no extra institutional funds or

activities are required," he would provide Dr. O'Reilly with the requested letter of institutional

support for her ReWARD grant application.  (*Id.*)  Dr. Wiest testified that he never saw that

email, and, consequently, Dr. O'Reilly was not informed in March 2023 that Dr. Chernoff had

agreed to provide the requested institutional letter of support for her ReWARD grant application.

(Doc. No. 48-2 ¶ 53; Doc. No. 52-1 ¶¶ 85–86.)  Without the institutional letter of support, Dr.

O'Reilly was unable to submit her ReWARD grant application by the initial deadline of June 5,

2023.[15]  (Doc. No. 52-1 ¶ 89.)

       The second ReWARD grant submission deadline was October 5, 2023.  (Doc. No. 48-29

at 2.)  In preparation, on August 2, 2023, Dr. O'Reilly again contacted Dr. Wiest to request an

institutional letter of support for her application.  (*Id.*)  When she did not receive any response,

Dr. O'Reilly followed up with Dr. Wiest on August 11 with the same request.  (Doc. No. 46-20.)

Dr. Wiest responded less than thirty minutes later:  "I looked through what needs to be in the

letter and I think I'll need help from [Dr.] Camille [Ragin] on specifics here since some of this is

in her wheelhouse..but I'll reach out to her for help."  (*Id.* at 2.)  Dr. Wiest then forwarded Dr.

O'Reilly's email request to Dr. Chernoff, explaining that he would likely need Dr. Ragin's help

writing the letter, so if Dr. Chernoff "ha[s] no objections," Dr. Wiest would contact Dr. Ragin

about the letter.  (Doc. No. 46-21 at 2.)  Minutes later, Dr. Chernoff responded, "Fine with me."

(*Id.*)  Dr. Wiest then contacted Dr. Ragin about Dr. O'Reilly's requested letter of support and

---

[15] Dr. O'Reilly communicated as much to the ReWARD program officials at NIH.  (*See* Doc. No.
46-20 at 5 ("I am very excited about this funding opportunity, but I think we will submit when our
application is stronger.  I'm having difficulty securing the institutional support letter, but I have 5 students
coming this summer to attain preliminary data focused directly on this project.  I think we will have a
stronger application in the Fall-Spring, so we'll work and work until then!"); Doc. No. 48-26, O'Reilly
Dep. at 170:21–172:9.)

asked if she would be willing to help prepare that letter "when the time comes," to which Dr.

Ragin replied, "Happy to help."  (Doc. No. 46-22 at 2.)

There was no further communication with Dr. O'Reilly concerning her request until

September 14, when Dr. Wiest emailed her to clarify that his August 11 email response was

"intended to confirm that we would provide institutional support for [Dr. O'Reilly's] ReWARD

grant" and that he had "spoken with Camille Ragin to get her assistance and [would] send the

letter in a timely manner."  (Doc. No. 46-20 at 2.)  That email came exactly two weeks *after* Dr.

O'Reilly filed a complaint with the PCHR against Defendants for sex discrimination and

retaliation premised, in part, on the denial of her requested institutional letter of support for her

ReWARD grant application.  (Doc. No. 52-1 ¶ 108.)

Dr. O'Reilly received an institutional letter of support in September 2023, and she

submitted her ReWARD grant application by the October 5 deadline for the second funding

cycle.  (Doc. No. 48-2 ¶ 68.)  After that application was not funded, she resubmitted her

application for the ReWARD grant's fourth funding cycle in June 2024.  (*Id.* ¶ 69; *see id.* ¶ 67.)

Unfortunately, that application was not funded either.  (*Id.* ¶ 71.)

### F.    *Dr. O'Reilly's PCHR Complaint and Defendants' Subsequent Actions*

On August 31, 2023, Dr. O'Reilly filed a complaint with the PCHR asserting that the

denial of her requested letter of support for her ReWARD grant application constituted illegal

sex discrimination and retaliation, which Defendants answered on December 7, 2023.  (Doc. No.

52-1 ¶¶ 108, 110; Doc. No. 48-31; Doc. No. 46-23.)  On October 5, 2023, at the request of Holly

Molle, Senior Business Partner in Human Resources at Fox Chase, Dr. O'Reilly, Ms. Molle, and

Dr. Wiest met to review Dr. O'Reilly's reporting structure.  (Doc. No. 48-34; *see* Doc. No. 48-

33.)  During that meeting, Ms. Molle and Dr. Wiest confirmed that Dr. O'Reilly would be

reporting to Dr. Wiest directly, with a "sort of dashed line" to Dr. Golemis, who would continue

to write Dr. O'Reilly's performance reviews.  (*See* Doc. No. 48-35.)  Dr. Wiest also clarified that Dr. Chernoff would still maintain financial decision-making power over Dr. O'Reilly.  (*See id.*)  Both during and after that meeting, Dr. O'Reilly voiced her concern about her ongoing inability to participate in mandatory or otherwise "critically important" program activities due to Fox Chase's unwillingness to prohibit Dr. Chernoff's simultaneous participation in those activities.  (*See id.*; Doc. No. 48-36.)

In February 2024, Plaintiff, along with all other members of her academic program, the Cancer Signaling and Microenvironment Program ("CSM"), was asked to make a brief research presentation during the upcoming CSM retreat in March.  (Doc. No. 46-24.)  After reaching out to Dr. Wiest about "how [to] handle" this event, Dr. O'Reilly met with Dr. Wiest and Ms. Molle, where they presented her with the option of attending and presenting at the retreat via Zoom.  (Doc. No. 48-41; Doc. No. 52-1 ¶¶ 145–46.)  Although Dr. O'Reilly initially expressed concern about being isolated as the only virtual participant and Dr. Chernoff's ability to take photos and record her even if she were on Zoom (Doc. No. 48-41), she ultimately attended the retreat via Zoom and submitted a pre-recorded presentation for the retreat (Doc. No. 52-1 ¶ 150).  This Zoom option was offered to all participants and utilized by other participants in addition to Dr. O'Reilly.  (Doc. No. 42.)

In July 2024, Dr. O'Reilly was asked if she would be interested in presenting at one of the "Wednesday Faculty Seminars" in the spring or summer of 2025.  (Doc. No. 48-47 at 3.)  Dr. O'Reilly again asked Dr. Wiest for guidance.  (*Id.* at 2–3.)  Dr. Wiest responded that she could present either in person or virtually but clarified that Dr. Chernoff would not be prevented from attending the seminar at which she was presenting.  (*Id.* at 2.)  Dr. O'Reilly determined that she would be unable to present as long as Dr. Chernoff was permitted to attend.  (*Id.*)

The following month, Dr. O'Reilly contacted Dr. Wiest to express her interest in participating as fully as possible in Fox Chase's upcoming all-faculty retreat in September and to request "assurances that Dr. Chernoff would not attend the specific breakout sessions" that she was planning to attend or "try to communicate with [her] at all during the retreat." (Doc. No. 48-48.)  In response to this request, Towanda Record, Assistant Vice President of Human Resources Strategy at Fox Chase, met with Dr. O'Reilly in early September to navigate her concerns about attending the retreat. (Doc. No. 48-2 ¶ 82; Doc. No. 52-1 ¶ 163.)  During that meeting, Ms. Record offered to attend the retreat with Dr. O'Reilly to observe and address any issues that might arise with respect to Dr. Chernoff.[16] (Doc. No. 48-2 ¶ 82; *see* Doc. No. 48-50.)  Because Dr. O'Reilly was not comfortable with that option and no alternative virtual attendance option was provided, Dr. O'Reilly did not attend the all-faculty retreat.  (*See id.*)  The recordings of the retreat's general session and breakout session overviews were provided to Dr. O'Reilly after the retreat.  (*See* Doc. No. 52-2, Wiest Dep. at 168:9–18; Doc. No. 48-50.)

## II.    Procedural History

On October 3, 2024, Dr. O'Reilly sued Defendants for sex discrimination, premised on both hostile work environment and quid pro quo sexual harassment, and retaliation in violation of Title VII and the PFPO.  (Doc. No. 1.)  Defendants moved to dismiss all of Dr. O'Reilly's sex discrimination claims as well as her retaliation claim against Dr. Chernoff.  (Doc. No. 11.)  The Court partially granted Defendants' motion and dismissed Dr. O'Reilly's hostile work environment sexual harassment claims.  (Doc. No. 38; Doc. No. 39.)  Defendants now move for summary judgment on Dr. O'Reilly's remaining quid pro quo sexual harassment and retaliation

---

[16] At the time of this meeting, Ms. Record had only been made aware of a past "employee relations" issue between Drs. Chernoff and O'Reilly and that they were not supposed to have contact with each other.  (Doc. No. 52-1 ¶ 165; *see id.* ¶¶ 166–67.)

claims.  (Doc. No. 46; *see* Doc. No. 52.)  Dr. O'Reilly opposes Defendants' motion.  (Doc. No. 48.)  The Court held oral argument on the motion on September 24, 2025.

## III.    Legal Standard

Summary judgment is appropriate when the "materials in the record" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage[,] the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's

case.").  After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 323 (internal quotations omitted); *see also Matsushita Elec. Indus. Co.*., 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23 (internal quotations omitted).  "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings."  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted).  "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV.  Discussion

Defendants move for summary judgment on all of Dr. O'Reilly's remaining claims, i.e., her quid pro quo sexual harassment and retaliation claims brought under both Title VII and the PFPO.  (Doc. No. 46; *see* Doc. No. 52.)  Should any of Plaintiff's claims survive summary judgment, Defendants also move for the dismissal of Temple as a Defendant.  (*Id.*)  The Court

discusses each category of Dr. O'Reilly's remaining claims in turn below.[17]  Because the Court

finds that Defendants are entitled to summary judgment on Dr. O'Reilly's remaining claims, the

Court need not reach the issue of the dismissal of Temple University.

### A.    Quid Pro Quo Sexual Harassment Claims

Dr. O'Reilly brings sex discrimination claims against all Defendants based on quid pro

quo sexual harassment.  (Doc. No. 1, Counts I–VII.)  "Title VII makes it an 'unlawful

employment practice for an employer . . . to discriminate against any individual with respect to

[her] compensation, terms, conditions, or privileges of employment, because of such individual's

. . . sex."  *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 426 (3d Cir. 2020)

(quoting 42 U.S.C. § 2000e–2(a)).  To establish a quid pro quo sexual harassment claim, a

plaintiff must show that she experienced "[u]nwelcome sexual advances, requests for sexual

favors, [or] other verbal or physical conduct of a sexual nature," and "submission to such

conduct is made either explicitly or implicitly a term or condition of [the plaintiff's]

employment" or "submission to or rejection of such conduct by [the plaintiff] is used as the basis

for employment decisions affecting [the plaintiff]."  *Starnes*, 971 F.3d at 427 (quoting

*Bonenberger v. Plymouth Township*, 132 F.3d 20, 27 (3d Cir. 1997)).  In other words, a quid pro

quo plaintiff must demonstrate that "either (1) he/she submitted to sexual advances based on the

quid pro quo offer or threat or (2) a harasser took tangible employment action based on refusal to

submit to his/her sexual advances or demands."  *Purnell v. City of Philadelphia*, No. 20-cv-3718,

---

[17] Because the same legal standards apply to Title VII and the PFPO, the Court analyzes Dr.
O'Reilly's Title VII and PFPO claims together under Title VII's applicable framework.  *See, e.g.*,
*Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 713 (E.D. Pa. 2021) ("Claims brought under
the PHRA and the PFPO are analyzed under the same legal framework as Title VII claims.");
*Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 592 n.8 (E.D. Pa. 2020) ("Courts in the Third
Circuit construe claims under the PHRA and the PFPO consistently with Title VII claims.  Thus, the
analysis of plaintiff's Title VII claims applies with equal force to his PHRA and PFPO claims." (internal
citations omitted)).

2021 WL 3617161, at *2 (E.D. Pa. Aug. 16, 2021).  A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).[18]

---

[18] Dr. O'Reilly raises the possibility that the Third Circuit may broaden the scope of a "tangible employment action" for purposes of quid pro quo sexual harassment claims following the Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).  (Doc. No. 48 at 7 n.3.)  Dr. O'Reilly did not make this argument at the motion to dismiss stage, even though Defendants challenged the sufficiency of Dr. O'Reilly's allegations of a "tangible employment action" in their motion to dismiss her quid pro quo sexual harassment claims.  *Muldrow* involved a Title VII sex discrimination claim brought by a female police officer challenging her job transfer.  *See* 601 U.S. at 350.  The Supreme Court held that "a transferee must show some harm respecting an identifiable term or condition of employment" to establish a Title VII discrimination claim, but that harm need not be "significant," "serious," "substantial," "or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."  *Id.* at 354–55.  The Supreme Court clarified that its decision "changes the legal standard used in any circuit that has previously required 'significant,' 'material,' or 'serious' injury" and "lowers the bar Title VII plaintiffs must meet."  *Id.* at 356 n.2.

The Third Circuit has since applied the standard set forth in *Muldrow* in a Title VII pregnancy discrimination case:  "[T]he Supreme Court held in *Muldrow* . . . that, contrary to our prior precedent, an employee need not demonstrate that the asserted adverse employment action was a 'serious and tangible' employment-related harm. . . .  Rather, the Court explained that an adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic."  *Peifer v. Bd. of Probation & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow*, 601 U.S. at 355) (vacating grant of summary judgment as to Title VII pregnancy discrimination claim and remanding for consideration of the "adverse employment action" element under *Muldrow*).

Neither the parties nor this Court have identified any cases within this Circuit applying the "some harm" standard from *Muldrow* to quid pro quo sexual harassment claims.  However, given the Third Circuit's historical application of the "tangible employment action" standard announced in *Ellerth* in both quid pro quo sexual harassment and other Title VII sex discrimination cases, it appears likely that the Third Circuit may apply the *Muldrow* standard in the context of quid pro quo sexual harassment.  *See, e.g.*, *Minarsky v. Susquehanna County*, 895 F.3d 303, 310 n.5 (3d Cir. 2018) ("To prove a claim for gender discrimination under Title VII or the PHRA and quid pro quo sexual harassment under Title VII, a plaintiff must show that she suffered an adverse employment action, or an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment. . . .  Regardless of whether tangible employment action means precisely the same thing as adverse employment action, we think it clear that neither phrase applies in this case." (cleaned up) (internal quotations and citations omitted)); *Ford v. County of Hudson*, 729 F. App'x 188, 195 (3d Cir. 2018) ("[A] prima facie case of discrimination under the Title VII burden shifting framework requires a showing of an adverse employment action, that is, a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal quotation omitted)).  Therefore, the Court will analyze Dr. O'Reilly's quid pro quo claims, on which Defendants move for summary judgment based, in part, on Dr. O'Reilly's failure to establish a "tangible employment action," using both the higher *Ellerth* and

Dr. O'Reilly bases her quid pro quo sexual harassment claims on Defendants' denial of her request for an institutional letter of support for her ReWARD grant application, which she alleges resulted from her rejection of Dr. Chernoff's efforts to resume working together.  (*See* Doc. No. 48 at 7–8; *see generally* Doc. No. 1.)  In moving for summary judgment on these claims, Defendants argue that Dr. O'Reilly has failed to establish that she experienced a "tangible employment action" or a causal connection between her rejection of Dr. Chernoff's outreach efforts and the purported "tangible employment action."  (Doc. No. 46-2 at 8–18; Doc. No. 52 at 7–9.)  After viewing the facts in the light most favorable to Dr. O'Reilly, the Court finds that Dr. O'Reilly has not established that she suffered a "tangible employment action" when she was denied a letter of support for her ReWARD grant application in March 2023.  Accordingly, the Court need not reach a determination as to the sufficiency of the causal connection element of Dr. O'Reilly's quid pro quo sexual harassment claims.[19]

A tangible employment action requires a "significant change in employment status." *Ellerth*, 524 U.S. at 761.  In other words, "a quid pro quo plaintiff must show a 'quo' that is

---

lower *Muldrow* standards.  *See infra* n.22.

[19] If such a determination was necessary, the Court would find that there is sufficient circumstantial evidence to raise a genuine dispute of material fact about whether a causal connection exists between Dr. O'Reilly's rejection of Dr. Chernoff's invitation to resume working together in January 2023 and Defendants' denial of Dr. O'Reilly's request for a letter of support in March 2023.  Drs. Wiest's and Chernoff's inconsistent reasoning for the initial denial of Dr. O'Reilly's requested letter of support on March 23 alone is enough to establish a reasonable inference of causation.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) ("[A] plaintiff may establish the connection by showing that the employer gave inconsistent reasons for [taking the adverse action against] the employee."); *Sousa v. Amazon.com, Inc.*, No. 22-3043, 2023 WL 7486751, at *4 (3d Cir. Nov. 13, 2023) ("To determine whether a causal connection exists . . . courts consider . . . inconsistencies raised in the explanation for the adverse action.").  Thus, the Court could more than reasonably infer a causal connection based on the combination of that inconsistent reasoning and the nature and timing of Drs. Chernoff's and Wiest's subsequent responses, or lack thereof, to Dr. O'Reilly's March 2023 and August 2023 requests for the letter of support.  *See Farrell*, 206 F.3d at 286 (considering the alleged harasser's behavior, the timing of the alleged tangible employment action, and defendant's inconsistent explanations for the alleged tangible employment action to determine plaintiff established a sufficient causal connection for her quid pro quo sexual harassment claims); *Sousa*, 2023 WL 7486751, at *4.

serious enough to alter [her] compensation, terms, conditions, or privileges of employment." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997), abrogated on other grounds by, *Burlington N. & S.F. Ry. v. White*, 548 U.S. 53 (2006).  "Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the sine qua non.  If an employer's act substantially decreases an employee's earning potential and causes significant disruption in [her] working conditions, a tangible adverse employment action may be found." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999); *Swain v. City of Vineland*, 47 F. App'x 107, 110 (3d Cir. 2012).  A tangible adverse employment action also includes "the loss of significant job benefits or characteristics, such as the resources necessary for an employee to do [her] job." *Durham Life Ins. Co.*, 166 F.3d at 144.

Defendants denied Dr. O'Reilly's request for an institutional letter of support for her ReWARD grant application in March 2023, which, in turn, precluded her from applying for the ReWARD grant during its first funding cycle in June 2023.  (Doc. No. 46-19 at 2; Doc. No. 46-20 at 5.)  Defendants argue that Dr. O'Reilly has put forth evidence of only speculative and subjective harm that resulted from this denial, which does not amount to a tangible employment action.  (Doc. No. 46-2 at 15–18.)  Dr. O'Reilly counters that Defendants' denial of her request for a letter of support constitutes a tangible employment action because it rendered her unable to file her ReWARD grant application "in a situation where she was required to obtain grant funding as a condition of her employment."  (Doc. No. 48 at 7–11.)

Grant funding, particularly external grant funding, is a critical aspect of Dr. O'Reilly's position as a tenured Associate Professor at Fox Chase.  (*See* Doc. No. 46-6 at 27.)  Pursuant to Fox Chase's Academic Appointments and Promotions Policy, Dr. O'Reilly is expected to support half of her "salary and fringe benefits, and the expenses of the laboratory including staff

salaries and fringe benefits." (*Id.*; *see* Doc. No. 48-2 ¶ 4.) That support is ordinarily expected to come from external grant funding, like NIH funding, but may also come from internal funding programs. (Doc. No. 48-2 ¶ 5; Doc. No. 46-6 at 27.) However, at least with respect to NIH funding, most grant applications are not successful. (Doc. No. 48-2 ¶ 8; *see also* Doc. No. 46-10, Wiest Dep. at 98:16–99:2 ("Most people submit literally every cycle. Because the funding pay lines for grants are very low, in the single digits. That means one out of every ten gets funded, if you're lucky. So, I mean, all of us submit virtually every cycle."); Doc No. 48-22, Golemis Dep. at 123:2–17 ("I mean, it's gotten more and more difficult to attract NIH funding. The pay lines have been very low for a long time[.]").) Thus, in the event that a tenured Associate Professor like Dr. O'Reilly is unable to secure the requisite grant funding, Fox Chase will pay 100% of the salary and a "safety net fully covering the investigator's laboratory expenses" for the first 12 months following the cessation of funding. (Doc. No. 46-6 at 27.) And if a tenured Associate Professor is unable to secure additional funding within that twelve-month period, Fox Chase will continue to provide "50% of the investigator's actual salary or 50% of the [NIH] salary cap, whichever is less . . . until new research funding is obtained." (*Id.*) Only when a tenured Associate Professor is without grant funding for 24 months will Fox Chase consider whether that lack of funding warrants termination due to "failure to sustain scientific productivity." (*Id.* at 28.)

      With that context in mind, it is not surprising that the parties do not dispute that Dr. O'Reilly did not need to secure ReWARD grant funding to remain employed at Fox Chase. (*See* Doc. No. 48-2 ¶ 56; Doc. No. 46-5, O'Reilly Dep. at 160:1–6 ("Q. Did you believe that you needed that grant submission, that eventual grant submission, to be funded in order to remain employed at Fox Chase? A. That specific grant to remain employed? Q. Yes. A. No.").)

Nevertheless, Dr. O'Reilly asserts that because she is required to obtain grant funding as a condition of her employment, Defendants' denial of the letter of support for her ReWARD grant application was a tangible employment action that precluded her from the opportunity to seek grant funding. (Doc. No. 48 at 6–11.) Dr. O'Reilly's *sole* support for this argument is this Court's decision denying Defendants' motion to dismiss her quid pro quo claims for failure to allege a tangible employment action. (*Id.*)

To be sure, at the motion to dismiss stage, this Court found that Dr. O'Reilly had plausibly alleged in her Complaint that she experienced a tangible employment action when she lost "the opportunity to seek grant funding," which the Court reasonably inferred equated to "the loss of a significant job benefit or characteristic" based on Dr. O'Reilly's allegations. (Doc. No. 38 at 27–29.) However, as Dr. O'Reilly knows, the Court made that finding (1) using a different, lower standard of review than what must be used at the summary judgment stage and (2) considering only Dr. O'Reilly's allegations in the Complaint, which the Court must assume to be true at the motion to dismiss stage. Now at the summary judgment stage, with the evidentiary record viewed in the light most favorable to Dr. O'Reilly, the Court finds that Dr. O'Reilly was deprived of *an* opportunity to seek grant funding rather than *the* opportunity to seek grant funding—a distinction with a difference for purposes of the Court's tangible employment action analysis.

The Court acknowledges that institutional letters of support are required for all NIH and most other external grant applications, and that most requests for such institutional letters of support are routinely granted.[20] (*See* Doc. No. 48-2 ¶ 9; Doc. No. 48-22, Golemis Dep. at 17:29–

---

[20] It is disputed whether Defendants initially perceived Dr. O'Reilly's request for a letter of support for her ReWARD grant application to be the type of request that is not routinely granted, i.e., because it would require Fox Chase to commit additional resources beyond what it already provides to the grant applicant. (*See* Doc. No. 48-2 ¶ 10; Doc. No. 52-1 ¶ 68; Doc. No. 46-16; Doc. No. 48-17, Wiest

24; Doc. No. 48-17, Wiest Dep. at 20:7–21:7; Doc. No. 48-12, Chernoff Dep. at 18:14–18,

188:2–13.)  And yet, the Court cannot discern from the undisputed evidence before us that a

denial of one letter of support for one cycle of grant funding that Dr. O'Reilly admits she did not

need to remain employed at Fox Chase amounts to a "'quo' that [was] serious enough to alter

[Dr. O'Reilly's] compensation, terms, conditions, or privileges of employment."[21]  *Robinson*,

120 F.3d at 1286.

    For one, Dr. O'Reilly's own testimony and Fox Chase's policy governing the nature of

the relationship between tenured Associate Professors and grant funding confirm that Dr.

O'Reilly did not experience any direct economic harm in terms of her salary or other financial

support when she was denied the opportunity to apply for the ReWARD grant during its first

funding cycle in June 2023.  (*See* Doc. No. 48-2 ¶¶ 4–5, 56; Doc. No. 46-6 at 27–28; Doc.

No. 46-5, O'Reilly Dep. at 160:1–6; *see also* Doc. No. 46-20 at 7 (Dr. O'Reilly explaining that in

March 2023, she was in a "no-cost extension" phase of her "R21" NIH grant, which was set to

expire March 31, 2024).)  Relatedly, the nature of Dr. O'Reilly's tenured position is such that her

inability to apply for the ReWARD grant in June 2023 could not and did not have an imminent

impact on her job security, which aligns with Dr. O'Reilly's testimony that ReWARD grant

funding was not necessary to remain employed in her position.  (*See id.*)  *See Rivers v. Potter*,

---

Dep. at 102:3–30:8.)

    [21] In reaching this conclusion, the Court does not consider the fact that Defendants subsequently
provided Dr. O'Reilly with the requisite letter of institutional support, which enabled her to apply for the
ReWARD grant during two subsequent funding cycles in October 2023 and June 2024.  (*See* Doc.
No. 48-2 ¶¶ 68–69.)  Drawing all reasonable inferences in favor of Dr. O'Reilly, the Court can infer from
the factual record that Defendants may never have provided the institutional letter of support for Dr.
O'Reilly's ReWARD grant application, which would have foreclosed Dr. O'Reilly from applying for the
ReWARD grant during any of its funding cycles, if Dr. O'Reilly had not filed her PCHR complaint based
on Defendants' initial denial of the letter.  (*See* Doc. No. 52-1 ¶¶ 86, 105; Doc. No 48-2 ¶ 65; Doc.
No. 46-20.)  But because it is undisputed that Dr. O'Reilly did not need the ReWARD grant funding to
remain employed at Fox Chase, the Court finds it irrelevant and unnecessary to consider Dr. O'Reilly's
ultimate ReWARD grant applications.

No. 05-cv-4868, 2007 WL 4440880, at *5 (D.N.J. Dec. 18, 2007) (finding the potential adverse employment consequences resulting from employer's reprimand "too attenuated and remote to satisfy the 'serious and tangible' employment effect required for the adverse action element in a Title VII discrimination claim").

For another, the ReWARD grant application was not the only funding opportunity that Dr. O'Reilly sought at that time. She had applied for another "R01" NIH grant at the beginning of March 2023, for which she did receive a letter of support from Dr. Wiest—albeit seemingly a different kind of letter than the institutional letter of support necessary for her ReWARD grant application. (*See* Doc. No. 46-16 at 3; Doc. No. 48-35 at 2; Doc. No. 48-36 at 2.) She received a "Community Pilot grant" in March 2023, which was ultimately renewed for a second year. (Doc. No. 48-27 at 3; Doc. No. 48-46 at 2–3.) And she also receives "an annual donation . . . from the Kicking Cancer Foundation." (*Id.*)

Finally, despite Defendants' denial of Dr. O'Reilly's request for a letter of support for her ReWARD grant application, Dr. O'Reilly received a positive annual performance review in June 2023, including with respect to funding efforts. (*See* Doc. No. 48-27 at 3 (on a scale of 1–3, Dr. O'Reilly received a manager rating of "2 - Achieves Results" with respect to the "Support your laboratory with funding" subsection of "Current Fiscal Year Goals"); *id.* at 5 (manager comments on "Current Fiscal Year Goals" include "[c]onsiderable success in many areas; publications are strong, and the value of the immersion science program is unparalleled. Service to the community through activities at the GSA and the NIH, and in other areas is exceptional. Ongoing efforts should result in improved funding, particularly given the exciting new results.").)

Under these circumstances, Defendants' denial of Dr. O'Reilly's initial request for an institutional letter of support, which precluded her from the opportunity to apply for the

ReWARD grant during its June 2023 funding cycle, did not "substantially decrease[ ] [Dr. O'Reilly's] earning potential," "cause significant disruption in [her] working conditions," or result in Dr. O'Reilly's "loss of significant job benefits or characteristics." *Durham Life Ins. Co.*, 166 F.3d at 144, 155. Thus, the Court finds it does not rise to the level of a "tangible employment action" to support a quid pro quo sexual harassment claim.[22] Therefore, the Court

---

[22] The Court reaches the same conclusion even when assessing Defendants' denial of Dr. O'Reilly's request for a letter of support under the lower "some employment-related harm" standard recently established by the Supreme Court in *Muldrow*. *See supra* n.18. Under that standard, which the Third Circuit has applied to non-sexual harassment sex discrimination claims under Title VII, *see Peifer*, 106 F.4th at 277, an "adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic," *id.* "Although *Muldrow* lowered an employee's burden of proof with respect to adverse employment actions, the employee must still demonstrate an 'injury respecting [her] employment terms or conditions.'" *Gabriel v. DSM Biomedical, Inc.*, No. 24-4546, 2025 WL 2250265, at *7 (E.D. Pa. Aug. 6, 2025). Put differently, an adverse employment action under *Muldrow* still requires some change to the "what, where, or when of [the employee's] work." *Ammar v. McDonough*, No. 22-cv-1608, 2025 WL 692084, at *9 (E.D. Pa. Mar. 4, 2025).

Dr. O'Reilly asserts that Defendants' denial of her request for a letter of support unquestionably meets the *Muldrow* definition of adverse employment action (Doc. No. 48 at 7 n.3), presumably because it impacted her ability to "obtain grant funding as a condition of her employment" (*id.* at 10–11). But any such impact is, at most, purely speculative. (*See* Doc. No. 48-2 ¶¶ 8 ("The vast majority of NIH grant applications are not successful, especially on the first submission.") & 57 ("When asked during her deposition what harm Plaintiff experienced as a result of not receiving a Letter of Support prior to the June 2023 submission date, Plaintiff testified that, had she been able to apply by that date, 'the grant could have potentially been funded' but '[a]ll of this is, obviously, speculation.'"); Doc. No. 46-5, O'Reilly Dep. at 166:2–167:4.) And Defendants are correct that speculation does not suffice to create a genuine issue of material fact. (*See* Doc. No. 46-2 at 15–16.) *See Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a *genuine* issue of fact." (quoting *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)); *Swain*, 457 F. App'x at 111 ("In any event, a speculative increase in potential overtime does not qualify as a change in the terms or conditions of employment.").

The only other harm that Dr. O'Reilly experienced was "complete[ ] devastat[ion]" due to her perception that Defendants' denial of her request for a letter of support "was a decision on the part of the leadership team that they were not going to support [her] science." (Doc. No. 48-26, O'Reilly Dep. at 167:5–168:1; *see* Doc. No. 48-2 ¶ 57; Doc. No. 52-1 ¶ 90; Doc. No. 48-64 ¶ 9.) But, without more, that does not constitute an adverse employment action under *Muldrow*. *See Gabriel*, 2025 WL 2250265, at *7 (holding that plaintiff's "experiencing stress" does not equate to "some harm with respect to the terms and conditions of [plaintiff's] employment); *Ammar*, 2025 WL 692084, at *9 (finding that plaintiff did not suffer "some harm" to a term or condition of employment when she received a letter of counseling that included "job-related constructive criticism," since "nothing in the letter changed the 'what, where, or when' of her work with [d]efendant") (cleaned up) (internal quotations omitted). *But see Holley v. Communication Test Design, Inc.*, No. 23-cv-4670, 2025 WL 1796472, at *8–9 (E.D. Pa. June 30, 2025) (concluding that denial of pro se plaintiff's shift change request constitutes an adverse employment action

grants Defendants' motion for summary judgment on Dr. O'Reilly's quid pro quo sexual harassment claims.

### B.        *Retaliation Claims*

Dr. O'Reilly also brings retaliation claims against all Defendants. (Doc. No. 1, Counts VIII–XIV.) Title VII prohibits "an employer [from] discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Dr. O'Reilly brings both types of actionable Title VII retaliation claims—traditional retaliation and retaliatory harassment (also known as hostile work environment retaliation).

The burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs Dr. O'Reilly's retaliation claims. Under this three-step framework, the plaintiff must first state a prima facie case of retaliation, after which the burden shifts to the defendant to articulate legitimate, non-retaliatory reasons for its actions, after which the burden shifts back to the plaintiff to show that the stated reasons are pretextual. *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). Because the parties' arguments are limited to Dr. O'Reilly's prima facie case of retaliation, so too is the Court's analysis. To establish a prima facie case of retaliation, a plaintiff must establish: "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015).

---

because it resulted in plaintiff's "growing feeling of being 'targeted' for termination").

1.    **Traditional Retaliation**

Like her quid pro quo sexual harassment claims, Dr. O'Reilly bases her traditional

retaliation claims on Defendants' denial of her request for an institutional letter of support for her

ReWARD grant application.  (*See* Doc. No. 48 at 11–16; *see generally* Doc. No. 1.)  She alleges

that this denial resulted from her complaint to Drs. Wiest and Golemis about Dr. Chernoff's

January 2023 conduct that violated the longstanding restrictions on Dr. Chernoff's contact with

Dr. O'Reilly imposed by Defendants since 2015.  (*See id.*)  Defendants argue that Dr. O'Reilly

has failed to establish an adverse employment action and a causal connection between her

complaint about Dr. Chernoff's conduct and the purported adverse employment action.  (Doc.

No. 46-2 at 18–23; Doc. No. 52 at 7–9.)  The Court agrees that Dr. O'Reilly's retaliation claims

fail on the "adverse action" prong and, because that finding is dispositive of the claims, does not

reach the "causal connection" prong.[23]

"'Adverse action' in the retaliation context encompasses a larger class of circumstances

than the narrower 'adverse employment action' concept in substantive discrimination cases."

*Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 482 (E.D. Pa. 2013).  The adverse action

need not relate to the terms or conditions of employment.  *See Burlington N.*, 548 U.S. at 70.

Rather, it covers employer actions that are "materially adverse" to a "reasonable employee,"

such that they "well might have dissuaded a reasonable worker from making or supporting a

charge of discrimination."[24]  *See id.* at 67–68 (internal quotations omitted).

_____

[23] As the Court addresses above with respect to Dr. O'Reilly's quid pro quo sexual harassment claims, *see infra* n.19, the Court could more than reasonably infer a causal connection from Drs. Wiest's and Chernoff's inconsistent reasoning for the initial decision to deny Dr. O'Reilly's request for a letter of support, their responses to Dr. O'Reilly's March 2023 and August 2023 requests for the letter of support, and the timing of Defendants' provision of the letter of support to Dr. O'Reilly.  *See Farrell*, 206 F.3d at 281, 286; *Sousa*, 2023 WL 7486751, at *4.

[24] Defendants seem to argue that the Supreme Court's decision in *Muldrow* clarified that the "materially adverse action" standard for Title VII retaliation claims is higher than the "tangible

This "material adversity" standard is meant "to separate significant from trivial harms." *Id.* at 68. Unlike a tangible employment action for a quid pro quo sexual harassment claim, the significance of an adverse employment action for a retaliation claim is measured by its effect on a reasonable employee's willingness to file a discrimination complaint under the same circumstances faced by the plaintiff. Accordingly, because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," *Burlington N.*, 548 U.S. at 69, the Court "examine[s] the challenged conduct 'from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances,'" *Daniels*, 776 F.3d at 195 (quoting *Burlington N.*, 548 U.S. at 71)).

Defendants argue that the evidence establishes that Dr. O'Reilly experienced only speculative and subjective harm because of Defendants' initial denial of her request for an institutional letter of support, which is insufficient to satisfy the "materially adverse" standard that requires a showing of objective harm. (Doc. No. 46-2 at 21–23.) Dr. O'Reilly, in turn, contends that she spent nearly six months "deprived of the opportunity to seek grant funding and reasonably believing that her employment at Fox Chase and her career were in jeopardy because of Defendants' actions." (Doc. No. 48 at 14–16.) She asserts that a reasonable employee facing the choice between "retaining the ability to seek the external funding required to keep her job and making a sex-harassment complaint might well choose the former." (*Id.*)

---

employment action" standard for Title VII quid pro quo sexual harassment claims. (*See* Doc. No. 46-2 at 19 n.4, 22–23.) Not so. The Supreme Court in *Muldrow* confirmed that its newly established "some harm" standard for Title VII discrimination claims is a lower standard than the "materially adverse standard" for Title VII retaliation claims. *See* 601 U.S. at 357–58. As the Court previously addressed, it is not clear whether the *Muldrow* standard applies to quid pro quo sexual harassment claims, which have historically been analyzed using the "tangible employment action" standard announced in *Ellerth*, i.e., the standard that Defendants argue applies to Dr. O'Reilly's quid pro quo sexual harassment claims.

Dr. O'Reilly analogizes her situation to that addressed by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*. (*Id.*) In *Burlington Northern*, the Court concluded that the plaintiff's 37-day suspension without pay, which occurred while the plaintiff was under investigation for alleged insubordination, was a materially adverse action sufficient to support a Title VII retaliation claim, even though the plaintiff eventually received backpay for that suspension. 548 U.S. at 72–73. Based on evidence that the suspension caused the plaintiff to live for 37 days without income and without knowing whether or when she could return to work and that the plaintiff's resulting emotional distress was serious enough to require medical treatment, the Court found that a reasonable employee "facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former." *Id.* The Court also reasoned that to conclude that employers could avoid liability for a retaliatory suspension by subsequently providing backpay for that suspension would undermine the significance of Title VII's remedies for victims of employment retaliation. *Id.* at 2.

Here, we find that Dr. O'Reilly's situation is distinguishable, as the undisputed evidence shows that Defendants' denial of her requested letter of support had no immediate or even imminent impact on her paycheck or job retention. (*See* Doc. No. 48-2 ¶¶ 4–5, 56; Doc. No. 46-6 at 27–28; Doc. No. 46-5, O'Reilly Dep. at 160:1–6.) This evidence—combined with the additional evidence that Dr. O'Reilly had applied for and received other grant funding around the time of the denial and received a positive annual performance review, including with respect to her funding efforts, shortly after the denial—also belies Dr. O'Reilly's assertion that she reasonably believed that "her employment at Fox Chase and her career were in jeopardy." (*See id.*; Doc. No. 46-16 at 3; Doc. No. 48-35 at 2; Doc. No. 48-36 at 2; Doc. No. 48-27 at 3, 5; Doc. No. 48-46 at 2–3.) *See Goodman v. Norristown Area Sch. Dist.*, No. 20-cv-1682, 2021 WL

29

6063122, at *6 (E.D. Pa. Dec. 22, 2021) (finding that plaintiff failed to establish that being instructed to write her "student learning objectives" reports in a way that lowered her "student learning objectives" scores (a performance measurement) amounted to a retaliatory adverse action because "there is nothing in the record to suggest that any negative employment review or action resulted from those scores"); *St. John v. Potter*, No. 09-cv-4196, 2011 WL 780685, at *10 (E.D. Pa. Mar. 4, 2011) (concluding that plaintiff "has not provided any context from which to discern that [his] subjective feelings" of confusion, embarrassment, humiliation, and impending termination when he was placed on temporary administrative leave "would have dissuaded a reasonable employee from engaging in protected activities"); *see also Anselmo v. City of Philadelphia*, No. 18-5160, 2021 WL 308132, at *13 (E.D. Pa. Jan. 29, 2021) ("While Plaintiff undoubtedly suffered some uncomfortable work situations, she has produced no evidence to establish economic loss, termination of employment, demotion, change in title, material loss in benefits, or significantly diminished material responsibilities.  Indeed, after each of these events, Plaintiff simply continued in the same position.").

The Court does not doubt Dr. O'Reilly's emotional distress when Dr. Wiest informed her that Defendants were unwilling to provide her with a letter of support in March 2023.  But the law does not recognize Dr. O'Reilly's subjective belief that Defendants' denial of her requested letter of support jeopardized her employment and her career as a materially adverse action.[25]

*See, e.g.*, *Heredia-Caines v. Lehigh Valley Hosp., Inc.*, 580 F. Supp. 3d 114, 130 (E.D. Pa. 2022)

---

[25] Nor is the declaration of Jacqueline Simonet, Visiting Research Scientist in Dr. O'Reilly's laboratory at Fox Chase—indicating that Defendants' denial of Dr. O'Reilly's request for a letter of support "seemed like a slap in the face, and a clear indication that Fox Chase was telling Dr. O'Reilly that they did not want her on their staff"—sufficient to establish the *objective* harm necessary for a materially adverse action.  (*See* Doc. No. 48-64.)  *See Raffaele v. Potter*, No. 09-cv-3622, 2012 WL 33035, at *8 (E.D. Pa. Jan. 6, 2012) (rejecting plaintiff's argument that a potentially threatening statement rose to the level of materially adverse action where plaintiff relied on his personal opinion, a coworker's opinion that the statement "could be" a threat, and another coworker's opinion that the statement was "inappropriate").

(rejecting plaintiff's arguments that her interactions with her managers were materially adverse actions because they caused plaintiff to experience severe emotional and physical distress, since "plaintiff's subjective experience of an employer's action does not determine whether that action was materially adverse"); *Raffaele*, 2012 WL 33035, at *8 ("[T]he Court's evaluation of whether an action was adverse does not consider the subjective feelings of the employee alleging retaliation."); *St. John*, 2011 WL 780685, at *9 ("[A] plaintiff's 'subjective' experience of apprehension or intimidation resulting from threats made following protected actions does not, alone, establish materially adverse action."); *Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 390–91 (E.D. Pa. 2007) (finding no adverse employment action to support plaintiff's retaliation claim where plaintiff "has not pointed to any injury or harm she suffered other than her own subjective belief that her career with [defendant] was over"); *see also Swain*, 457 F. App'x at 111 (holding that plaintiff's purported denial of medical treatment for a work injury was not a materially adverse action because he was ultimately approved for and received medical treatment and he presented no evidence that the delay in medical treatment due to the worker's compensation process "caused him any hardship beyond some discomfort or nervousness").

To illustrate the context-specific nature of the materially adverse action inquiry, the Supreme Court in *Burlington Northern* provides several examples of actions that could qualify as materially adverse depending on the circumstances.  548 U.S. at 69.  "The common thread connecting these examples is that the complainant in each suffered some sort of harm or injury to her professional advancement."  *Goodman*, 2021 WL 6063122, at *6; *see Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2006) (holding that plaintiff's corrective performance review was not a materially adverse action because, among other reasons, "the record is devoid of any facts bearing upon the significance of the . . . review on his professional

advancement" and even indicates that the review was not materially adverse to his professional advancement since he was subsequently awarded a new position and pay increase). In that respect, the Court finds that Defendants' denial of Dr. O'Reilly's request for a letter of support for her ReWARD grant application still falls short. For one, Dr. O'Reilly again inaccurately frames that denial as being deprived of *the* opportunity to seek grant funding, when the undisputed evidence establishes that she was deprived of *an* opportunity to seek grant funding. For another, while the ReWARD grant funding certainly would have contributed to Dr. O'Reilly's professional advancement in terms of both research initiatives and financial support (*see* Doc. No. 46-19 at 2–3; Doc. No. 46-20 at 7–10; Doc. No. 46-5, O'Reilly Dep. at 160:7–24), by no means would Defendants' letter of support have guaranteed that Dr. O'Reilly would receive that grant funding (*see* Doc. No. 48-2 ¶¶ 8, 57; Doc. No. 46-5, O'Reilly Dep. at 166:2–167:4).[26] Viewed in the light most favorable to Dr. O'Reilly, the evidence that Dr. O'Reilly could have received ReWARD grant funding had Defendants provided her with the requisite letter of support to apply for the grant during its first funding cycle is only speculative. (*See* Doc. No. 48-2 ¶¶ 8, 57; Doc. No. 46-5, O'Reilly Dep. at 166:2–167:4.) In other words, Dr. O'Reilly at best proffers a speculative "harm or injury" to her professional advancement resulting from Defendants' denial of her request for a letter of support for her ReWARD grant application, which does not create a genuine issue of material fact as to whether she suffered a materially adverse action for purposes of her retaliation claims. *See Lexington Ins. Co.*, 423 F.3d

---

[26] Dr. O'Reilly acknowledges as much when she explains to the NIH's ReWARD program officials that she is not going to submit her application by the June 2023 deadline because she is "having difficulty securing the institutional letter of support." (*See* Doc. No. 46-20 at 5.) She indicates that she "will have a stronger application in the Fall-Spring" both because she will hopefully obtain the letter of support by then and because she "ha[s] 5 students coming this summer to attain preliminary data focused directly on this project." (*See id.*; Doc. No. 48-26, O'Reilly Dep. at 170:21–172:9 ("A. You could never have enough preliminary data or enough additional data to bolster a grant. But the grant would have been ready by the June 5 submission.").)

at 333; *Swain*, 457 F. App'x at 111; *cf. Hare v. Potter*, 220 F. App'x 120, 128–29 (3d Cir. 2007) (concluding that defendant's decision not to select plaintiff for defendant's managerial program, a program that was an undisputedly "important" "stepping stone to advancement," was a materially adverse action).

In sum, the Court concludes that based on the evidentiary record before us, Defendants' denial of Dr. O'Reilly's request for a letter of support for her ReWARD grant application in March 2023 does not amount to a "materially adverse action" for purposes of establishing a retaliation claim. The Court thus grants Defendants' motion for summary judgment on Dr. O'Reilly's retaliation claims premised on Defendants' denial of Dr. O'Reilly's requested letter of support.

### 2.    <u>Retaliatory Harassment</u>

Relying on an entirely different premise than her traditional retaliation and sexual harassment claims, Dr. O'Reilly's retaliatory harassment claims stem from the filing of her PCHR complaint as a prerequisite to the instant action. (Doc. No. 1 ¶¶ 98–109; *see* Doc. No. 48 at 17–18.) Dr. O'Reilly identifies a series of adverse actions by Defendants that followed her PCHR complaint, which primarily fall into three categories: (1) Defendants' investigation, or lack thereof, into the allegations in her PCHR complaint; (2) Defendants' actions taken as part of the PCHR and instant proceedings; and (3) Defendants' failure to facilitate Dr. O'Reilly's participation in mandatory work activities, including faculty meetings and retreats, without Dr. Chernoff present. (Doc. No. 1 ¶¶ 98–109; Doc. No. 48 at 20–23.) Defendants argue that Dr. O'Reilly has not properly exhausted her retaliatory harassment claims and, even if she has, none of the enumerated actions constitute adverse employment actions for purposes of establishing a prima facie retaliatory harassment claim. (Doc. No. 46 at 23–27; Doc. No. 52 at 2–7.) Even

assuming that they have been properly exhausted, the Court finds that Dr. O'Reilly's retaliatory harassment claims nevertheless fail on the "adverse action" prong.

Again, to establish the "adverse action" element of a prima facie retaliatory harassment claim, a plaintiff must show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (quoting *Burlington N.*, 548 U.S. at 68). The Court's analysis "focuses not on isolated incidents, but rather on the 'overall scenario'" presented by the retaliatory acts collectively. *See Hare*, 220 F. App'x at 132; *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003) ("The cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation."). But "where, as here, a plaintiff alleges that discrimination or retaliation is evidenced by discrete categories of conduct, . . . some examination of each category is necessary in order to assess the merits of the case[,] . . . keeping in mind [the Third Circuit's] admonition that 'a play cannot be understood on the basis of some of its scenes but only on its entire performance.'" *Shaner v. Synthes*, 204 F.3d 494, 503 n.9 (3d Cir. 2000) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997)); *see Larkin v. Methacton Sch. Dist.*, 773 F. Supp. 2d 508, 530 (E.D. Pa. 2011).

First, Dr. O'Reilly claims that Defendants retaliated against her by failing to adequately investigate and respond to her PCHR complaint. (Doc. No. 48 at 20–23.) Specifically, Dr. O'Reilly argues that Defendants: (1) failed to provide Dr. O'Reilly with an official "determination" with respect to their investigation of her PCHR complaint, in violation of Defendants' own harassment policy, and instead only provided her an update on their investigatory efforts in their PCHR answer; (2) refused to take any sort of responsive disciplinary

action against Dr. Chernoff; and (3) failed to implement any protective measures to prevent additional discriminatory harassment or retaliation towards Dr. O'Reilly, all of which forced Dr. O'Reilly to revisit upsetting and traumatic past experiences with Dr. Chernoff and resulted in Dr. O'Reilly feeling upset and fearful about being in Dr. Chernoff's presence after she filed her PCHR complaint.  (*Id.*; *see* Doc. No. 52-2 ¶¶ 113–15, 126, 129–33, 135–37.)  However, "courts have held that the failure to investigate a plaintiff's complaint does not constitute an adverse employment action, even in the retaliation context," and the Court so holds here.  *Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 104–05 (E.D. Pa. 2023) (finding that defendant's allegedly purposeful failure to investigate plaintiff's discrimination claims was an insufficient basis for plaintiff's retaliation claims) (internal quotations omitted) (cleaned up); *see, e.g.*, *Fincher v. Depository Tr. & Cleaning Corp.*, 604 F.3d 712 (2d Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."); *Fleet v. CSX Intermodal, Inc.*, No. 17-cv-3562, 2018 WL 3489245, at *17 (E.D. Pa. July 18, 2018) ("A deficient investigation does not constitute an adverse employment action under a Title VII retaliation claim."); *Ashton v. SCI-Fayette*, No. 16-cv-1795, 2018 WL 2966849, at *6 (W.D. Pa. June 13, 2018) (holding that defendant's alleged failure to investigate plaintiff's internal complaint and failure to discipline plaintiff's alleged harasser did not constitute adverse retaliatory employment actions); *see also Scott v. Sunoco Logs. Partners, LP*, 918 F. Supp. 2d 344, 356 (E.D. Pa. 2013) ("Surely, if a total failure to investigate is not an adverse employment action then a failure to provide written notes and conclusions from an investigation is not an adverse employment action."); *cf. Chinery v. Am. Airlines*, 778 F. App'x 142, 146 (3d Cir. 2019) (holding that while defendant's allegedly inadequate investigation into her harassment claims

and related failure to enforce its social media policy "might have some bearing on the question of whether *respondeat superior* liability may be attributed to [defendant]," they "do not in themselves constitute severe or pervasive conduct" for purposes of plaintiff's hostile work environment discrimination claim, since any such failure "merely 'preserved the very circumstances that were the subject of the complaint'" (quoting *Fincher*, 604 F.3d at 724)).  *But see Smith v. RB Distribution, Inc.*, 498 F. Supp. 3d 645, 664 (E.D. Pa. 2020) (finding that defendants' failure to respond to two sexual harassment complaints made by plaintiff, combined with defendants' "unwarranted discipline" of plaintiff, defendants' interference with plaintiff's job performance, and "general antagonism" towards plaintiff satisfied the "material adversity" standard for plaintiff's retaliatory harassment claim).

Second, Dr. O'Reilly claims that Defendants took certain materially adverse actions against her during the PCHR and instant proceedings.  (Doc. No. 48 at 20–23.)  Specifically, Dr. O'Reilly alleges that (1) in their PCHR answer, Defendants misrepresented the terms of their prior corrective action against Dr. Chernoff and whether Dr. Chernoff violated those terms in their PCHR answer, and (2) during his deposition taken for purposes of the instant action, Dr. Wiest testified that he perceived Dr. O'Reilly's behavior during a meeting following the PCHR complaint to be "unprofessional."  (Doc. No. 52-1 ¶¶ 127, 131–32, 135–36.)  It certainly cannot be the case that assertions made in a pleading and deposition during the course of litigation can form the basis for the retaliation claims underlying that litigation, and Dr. O'Reilly has provided no case law or reason that would convince the Court otherwise.  *See Larkin*, 773 F. Supp. 2d at 538–39 (concluding that defendant's statement made about plaintiff in its summary judgment brief "simply does not constitute" retaliatory harassment).

Third, Dr. O'Reilly claims that Defendants retaliated against her by failing to facilitate her participation in three mandatory program meetings and faculty retreats—the CSM retreat in Spring 2024, a "Wednesday Faculty Seminar" in Fall 2024,[27] and the Fox Chase "all faculty retreat" in September 2024—without Dr. Chernoff present, which rendered her unable to fully and effectively participate in these activities and also forced her to revisit upsetting and traumatic past experiences with Dr. Chernoff.  (Doc. No. 48 at 20–23; *see* Doc. No. 52-1 ¶¶ 143–150, 157–161, 162–63, 165, 169, 172, 174.)  All three situations began with a similar sequence of events— Dr. O'Reilly raised concerns to Defendants about participating with Dr. Chernoff present, and Defendants responded by providing at least one alternative option ostensibly aimed at addressing those concerns, though precluding Dr. Chernoff's attendance was never one such option.  (*See* Doc. No. 46-24 at 2; Doc. No. 48-1 at 2–5; Doc. No. 48-2 at 2–3; Doc. No. 48-7 at 2–3; Doc. No. 48-8 at 2–3; Doc. No. 46-5, O'Reilly Dep. at 197:4–24, 204:4–206:12; Doc. No. 48-2, Record Dep. at 114:16–115:18; 158:18–159:15; 160:18–161:24; 165:17–166:12.)  With respect to the CSM retreat, Dr. O'Reilly chose to take the option, which was ultimately offered to all attendees, to attend remotely via Zoom, and she submitted a pre-recorded video of her required presentation to be played during the retreat.  (Doc. No. 52-1 ¶ 150; *see* Doc. No. 48-2 at 4.)  Dr. O'Reilly declined the option to present virtually at a "Wednesday Faculty Seminar" and instead opted not to present at all.  (*See* Doc. No. 48-7 at 2–3.)  And Dr. O'Reilly declined to attend Fox Chase's all-faculty retreat after she was given the option to attend in person with Ms. Record from Human Resources, who would be available to observe and address any issues that might

---

[27] The record clarifies that Dr. O'Reilly was invited to present at one of the "Wednesday Faculty Seminars" in the spring or summer of 2025.  (*See* Doc. No. 48-47 at 3.)

arise relating to Dr. Chernoff's presence.  (*See* Doc. No. 48-2 ¶¶ 82–83; Doc. No. 52-1 ¶ 163; Doc. No. 48-50.)

While the undisputed evidence suggests that all three of these activities were "professional advancement opportunities" for Dr. O'Reilly, it also shows that Defendants did not "exclude" her from those opportunities—rather, Dr. O'Reilly decided to either not participate at all or participate remotely because Defendants would not agree to prevent Dr. Chernoff from participating in those activities.  *See Burlington N.*, 548 U.S. at 69 ("[T]o retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."); *Goodman*, 2021 WL 6063122, at *6 ("In *Burlington Northern*, the Supreme Court provided examples of retaliatory actions that qualified as materially adverse . . . .  The common thread connecting these examples is that the complainant in each suffered some sort of harm or injury to her professional advancement.").  Nor is there any evidence that Defendants required Dr. O'Reilly to participate in those activities with Dr. Chernoff present—in other words, Defendants did not require Dr. O'Reilly to be in Dr. Chernoff's presence.  *Cf. Kostantopoulous v. Westvaco Corp.*, 112 F.3d 710, 718 (3d Cir. 1997) ("readily agree[ing]" that defendant's requirement that plaintiff work in proximity to her alleged harassers "must be considered in determining whether she was subjected to a hostile or abusive working environment"); *Hamilton v. Norristown State Hosp.*, 2024 WL 3623521, at *3, 5 (E.D. Pa. Aug. 1, 2024) (finding that plaintiff established a materially adverse retaliatory action based on a "host of abusive interpersonal interactions, intimidation, and interference with her daily work," including her alleged harasser's continued following and monitoring of plaintiff and routine entrance into plaintiff's office without sufficient intervention from defendant).

In essence, Dr. O'Reilly argues that she was effectively excluded from these professional advancement opportunities because Defendants would not implement her requested remedial action, i.e., prohibiting Dr. Chernoff's simultaneous participation in these activities with Dr. O'Reilly. (*See* Doc. No. 48 at 22–23.) Thus, though framed as actions that harmed her professional advancement, Defendants' repeated failure to facilitate Dr. O'Reilly's participation in these activities without Dr. Chernoff present is just another challenge to Defendants' response, or lack thereof, to Dr. O'Reilly's complaints about Dr. Chernoff that she has made both internally and externally. As the Court has already explained, the failure to adequately investigate a plaintiff's discrimination complaint cannot constitute a materially adverse action to support a retaliation claim. *See, e.g.*, *Fields*, 696 F. Supp. 3d at 104–05; *Fleet*, 2018 WL 3489245, at *17; *Ashton*, 2018 WL 2966849, at *6; *cf. Fincher*, 604 F.3d at 724 ("[F]ederal courts . . . appear to have uniformly rejected the notion that a failure to adequately remediate sexual harassment itself constitutes an act that may contribute to a hostile work environment claim." (cleaned up) (internal quotation omitted)); *Doe ex rel. Nied v. Riverside Sch. Dist.*, No. 23-cv-1118, 2023 WL 8549035, at *6 (M.D. Pa. Dec. 11, 2023) ("Courts in this district have found that a plaintiff may not rely on a defendant's inaction or failure to remedy discrimination as intentional conduct to support a claim of retaliation under Title IX," using "Title VII's familiar retaliation framework" (internal quotations omitted)).

Finally, Dr. O'Reilly identifies two other adverse actions following her PCHR complaint that do not fall into any of the three categories already addressed: (1) Dr. Wiest's "knowingly false" email sent to Dr. O'Reilly in September 2023 clarifying that his August 11, 2023 email to her was meant to confirm that Defendants would provide her with her requested letter of support (Doc. No. 52-1 ¶ 116; Doc. No. 46-20 at 2), and (2) "inappropriate" questioning from

Defendants' Human Resources representative, Ms. Molle, about Dr. O'Reilly PCHR complaint during a meeting with Dr. O'Reilly to review Dr. O'Reilly's reporting structure (Doc. No. 52-1 ¶¶ 119–20).  (Doc. No. 48 at 20–23.)  Even when viewing the facts surrounding these actions in the light most favorable to Dr. O'Reilly, the Court fails to see how either action could be considered materially adverse.  Whether or not it misrepresented what had been previously conveyed to Dr. O'Reilly, Dr. Wiest's September 2023 email to Dr. O'Reilly confirmed that Defendants would provide her requested letter of support for her ReWARD grant application— an unquestionably favorable outcome for Dr. O'Reilly.  And the record is devoid of "any harm or injury" that Dr. O'Reilly suffered due to Ms. Molle's alleged questioning.  *See Morrison*, 193 F. App'x at 154 (concluding that plaintiff cannot establish the "adverse action" element of his retaliation claim based on his corrective performance review where he "[did] not identify, much less establish, any harm or injury produced by" that review).

The Court thus finds that none of the challenged actions taken by Defendants after Dr. O'Reilly filed her PCHR complaint constitute "materially adverse actions" sufficient to support Dr. O'Reilly's retaliatory harassment claims.[28]  Accordingly, the Court grants Defendants' motion for summary judgment on those claims.

---

[28] When considered cumulatively, the challenged actions still do not amount to a materially adverse employment action.  *See Hare*, 220 F. App'x at 132; *Brennan*, 350 F.3d 399 at 422 n.17.  The Court finds it necessary to state this obvious conclusion given Dr. O'Reilly's comparison of her retaliatory harassment claim to that which survived summary judgment in *Hamilton v. Norristown State Hospital*. (*See* Doc. No. 48 at 20; Sept. 24, 2025 Hr'g Tr. at 49:17–54:10.)  In *Hamilton*, the court determined that a reasonable jury could find a materially adverse retaliatory action based on the accumulation of a series of adverse "interpersonal interactions" between plaintiff and her alleged harasser that, individually, might not be significant enough to constitute a materially adverse action.  *See* 2024 WL 3623521, at *3–5.  In contrast, Dr. O'Reilly identifies a series of actions that individually either cannot constitute a materially adverse action as a matter of law or simply are not adverse.

**V.    Conclusion**

The Court ends where it began—with an admonition of the disturbing conduct exhibited by both Dr. Chernoff and the departments and individuals at Fox Chase, Temple Health, and Temple University responsible for responding to Dr. O'Reilly's concerns about Dr. Chernoff since 2014.  Dr. Chernoff unquestionably behaved inappropriately towards Dr. O'Reilly beginning in 2014 and repeatedly violated the longstanding restrictive conditions governing his contact with Dr. O'Reilly.  And Defendants exhibited an inability and/or unwillingness to enforce those restrictions, which *they* had appropriately implemented back in 2015 to ensure that Dr. O'Reilly could move forward without hindering her career at Fox Chase.[29]

But the Court is constrained by the scope of both the actionable claims and the evidentiary record before us in this case.  Subject to those constraints, and for the reasons discussed above, the Court grants Defendants' motion for summary judgment on all of Dr. O'Reilly's claims.  An appropriate Order follows.

---

[29] The Court cautions Defendants should enforce the restrictions that they put in place limiting Dr. Chernoff's communication and influence as to Dr. O'Reilly and her career at Fox Chase.  Otherwise, they may very well face a future lawsuit with an unfavorable outcome.